## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

NIKI ROBINSON and PATRICK TOMLINSON,

               Plaintiffs,

v.                                       Case No. 24-CV-00264

CITY OF MILWAUKEE, LYNDON EVANS,
CHRISTIAN GARRIDO, BRADLEY ORLANDO,
NICOLE PLEVAK, JOHN KOHLER,
JACOB WASECHEK, FIDAH MUSTAFA,
NATHANIEL PETERSEN, SEAN CARLETON,
and PAUL VENTO

               Defendants.

---

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
## UNDER FED. R. CIV. P. 12(B)(6)

---

Defendants, by undersigned counsel, hereby submit their Brief in Support of Defendants' Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(6).

## <u>INTRODUCTION</u>

Plaintiffs bring various claims against the City of Milwaukee and numerous officers under 42 U.S.C. § 1983, stating their purpose in doing so is to "vindicate the violation of Plaintiffs' constitutional rights" and "effect change through punitive damages by punishing the Defendants for their egregious conduct with the hope that the punishment is significant enough to prevent this from happening again in the future." [ECF 13, ¶ 18]. Plaintiffs characterize the routine emergency police response as illegal searches and seizures of their home and persons,[1]

---

[1] *See* [ECF 13, ¶¶ 9, 70, 79, 98-100, 113, 121-124, 132, 135-139, 145-148, 157-160, 164, 169-172, 176, 182-185, 189, 194-197, 201-202, 205-208, 212].

and illegal searches of their curtilage.[2] Additionally, they allege *Monell*[3] claims and claims of officer failure to intervene.[4]

Plaintiffs appear to concede that the police action taken was in direct response to calls that were made for emergency services, and even acknowledge "the police are the unwitting tools" of the "bad actors" who make false claims in requesting emergency services, and that the police "have no choice but to take these fake calls at face value" and that "many of the police officers who have responded to [Plaintiffs'] home have been kind, understanding, and compassionate." [ECF 13, ¶¶ 5, 12]. However, they appear to allege that because their situation involved a number of swatting calls to their home, police should have deviated from standard protocol and treated requests for emergency services to their home differently—that "any rational police force would have recognized at some point that any calls involving the [Plaintiffs'] home were clearly false and should not be taken seriously" and "would have implemented some sort of policy" to avoid further swatting activity. [ECF 13, ¶¶ 6-8]. Plaintiffs claim they "tried to work with the City of Milwaukee to stop this, but the City of Milwaukee failed to adopt a policy or train its officers on how to prevent [Plaintiffs'] stalkers from using the police department as a tool of terror." [ECF 13, ¶ 11].

Plaintiffs raise the following specific claims:

(1) An "unlawful search and seizure" claim and a *Monell* claim against the City of Milwaukee regarding the July 25, 2022 alleged swatting incident;[5]

---

[2] *See* [ECF 13, ¶¶ 120, 129, 198].
[3] *See* [ECF 13, ¶¶ 140-142, 149-151, 161-163, 173-175, 186-189, 198-200, 209-211].
[4] *See* [ECF 13, ¶¶ 100,124, 132, 152-154, 165-166, 177-178, 190-191, 213-214].
[5] *See* [ECF 13, ¶¶ 135-143].

(2) An "unlawful search and seizure" claim, a *Monell* claim against the City of Milwaukee, and a "failure to intervene" claim against Officer Nicole Plevak regarding the August 11, 2022 alleged swatting incident;[6]

(3) An "unlawful search and seizure" claim, a *Monell* claim against the City of Milwaukee and a "failure to intervene" claim against Officer John Kohler, Sgt. Jacob Wasechek, and Officer Fidah Mustafa regarding the October 1, 2022 alleged swatting incident;[7]

(4) An "unlawful search and seizure" claim, a *Monell* claim against the City of Milwaukee, and a "failure to intervene" claim against Sgt. Lyndon Evans, Officer Christian Garrido, and Officer Bradley Orlando regarding the March 20, 2023 alleged swatting incident;[8]

(5) An "unlawful search and seizure" claim, a *Monell* claim against the City of Milwaukee, and a "failure to intervene" claim against Officer Sean Carleton regarding the April 11, 2023 alleged swatting incident;[9]

(6) An "unlawful search and seizure" claim, a *Monell* claim against the City of Milwaukee, and a "failure to intervene" claim against Officer Nathaniel Petersen and Sgt. Lyndon Evans regarding the April 12, 2023 alleged swatting incident;[10] and

(7) An "unlawful search and seizure" claim, a *Monell* claim against the City of Milwaukee, and a "failure to intervene" claim against Officer Paul Vento and Sgt. Lyndon Evans regarding the April 17, 2023 alleged swatting incident.[11]

---

[6] *See* [ECF 13, ¶¶ 144-155].
[7] *See* [ECF 13, ¶¶ 156-167].
[8] *See* [ECF 13, ¶¶ 168-180].
[9] *See* [ECF 13, ¶¶ 181-192].
[10] *See* [ECF 13, ¶¶ 193-203].
[11] *See* [ECF 13, ¶¶ 204-215].

## STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move to dismiss a complaint due to failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in the complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. at 557 (brackets omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Courts are free to consider any facts set forth in the complaint that undermine the plaintiffs' claim. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) can be based on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice. *See Geinosky v. City of Chicago*, 675 F.3d

4

743, 745 n.1 (7th Cir. 2012) (citations omitted); and *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993), *overruled on other grounds* (Holding districts courts may use documents attached to motions to dismiss as long as and insofar as those documents "are referred to in the plaintiff's complaint and central to the [plaintiff's] claims.").[12]

## ARGUMENT

**I.     THE ALLEGED SWATTING INCIDENTS DO NOT CONSTITUTE A CONSTITUTIONAL VIOLATION BECAUSE EXIGENT CIRCUMSTANCES EXISTED JUSTIFYING, IF NOT REQUIRING, DEFENDANTS' ACTIONS.**

Plaintiffs characterize the routine emergency police response as illegal searches and seizures of their home and persons,[13] and illegal searches of their curtilage.[14] Plaintiffs allege that their internet bullies engaged in "swatting," which they define as calling 911 and lying to "provoke a dangerous police response" to their home. [ECF 13, ¶¶ 1-2]. Plaintiffs concede that normally, in these situations, police became the "unwitting tools of these bad actors" and have "no choice but to take these false calls at face value." [ECF 13, ¶ 5]. However, they further allege that "at some point" the police should have recognized that the calls were "clearly false and should not be taken seriously." [ECF 13, ¶¶ 7]. Essentially Plaintiffs allege that, by continuing to take the calls seriously and respond to the requests for emergency service as if they were truly emergencies, the Defendants' actions constituted searches and seizures in violation of the Fourth Amendment—that, at some point, police should have realized the Plaintiffs were the targets of

---

[12] Because Plaintiffs' amended complaint references specific police action that allegedly occurred on specific dates, at times explicitly referencing and/or quoting from police and/or computer aided dispatch ("CAD") reports provided to them by counsel for Defendants (*see* ECF 13, ¶¶ 62, 66, 68-69, 74, 76, 81, 84-85, 90, 91, 95, 98, 105-109, 115-119, and 127-128), Defendants have attached as exhibits all of the relevant police reports and Computer Aided Dispatch ("CAD") reports previously provided to Plaintiffs' counsel, and cite them in this motion to dismiss. *See* Exhibit A.

[13] *See* [ECF 13, ¶¶ 9, 70, 79, 98-100, 113, 121-124, 132, 135-139, 145-148, 157-160, 164, 169-172, 176, 182-185, 189, 194-197, 201-202, 205-208, 212].

[14] *See* [ECF 13, ¶¶ 120, 129, 198].

swatters and should have automatically discounted or disregarded the calls when deciding whether exigent circumstances existed for the alleged searches and seizures.

Assuming, for the sake of this motion to dismiss, that the facts alleged by Plaintiffs are true, Plaintiffs have failed to establish Defendants violated Plaintiffs' constitutional rights against unreasonable search and seizure for the following reasons:

### A. Call center operators and first responders have a duty to treat all emergency calls for service as true emergencies and to route and respond to them accordingly.

Case precedent is clear that calls for emergency service should be treated as emergencies, and that it is not the place of the call center operators or first-responders to speculate about the veracity of the report: *United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000) held "911 calls reporting an emergency can be enough to support warrantless searches under the exigent circumstances exception, particularly where, as here, the caller identified himself." *Id*. It noted, "The efficient and effective use of the emergency response networks requires that the police (and other rescue agents) be able to respond to such calls quickly and without unnecessary second-guessing. As then-Circuit Judge Burger stated in *Wayne*, "[T]he business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." *Id*. (quoting *Wayne v. United States,* 318 F.2d 205, 212 (D.C. Cir. 1963)). *United States v. Drake,* 456 F.3d 771 (7th Cir. 2006) noted that the reporting of an *ongoing* emergency presents special problems and obligations on the police, and held that, when the police respond to an emergency as a result of a 911 call, the exigencies of the situation do not require further pre-response verification of the caller's identity before action is taken. *Id*. at 774-775. It stated, "Requiring further indicia of reliability [from a 911 caller] would only jeopardize the usefulness

of the 911 system and the ability of officers to prevent further danger to the public." *Id*. at 775. *United States v. Wooden,* 551 F.3d 647 (7th Cir. 2008) stated, "A 911 system designed to provide an emergency response to telephonic tips could not operate if the police had to verify the identity of all callers and test their claim to have seen crimes in progress." *Id*. at 650. "Doubtless greater confidence can be achieved when police know a caller's identity[. . .] yet, as a practical matter a name given by a caller does not make a tip any less anonymous[. . .] it would undermine the goal of the 911 system to require a caller to *prove* his identity." *Id*. at 649-650. In *United States v. Elder*, 466 F.3d 1090, 1091 (7th Cir. 2006), the court rejected defendant's argument that police should have verified the caller's identity and reliability, and stated that doing so would have "require[d] them to act un-reasonable," reasoning that "[m]any 911 calls are brief, and anonymous, precisely because the speaker is at risk and must conceal the call. These persons are more rather than less in need of assistance." *Id. United States v. Hicks*, 531 F.3d 555, 561 (7th Cir. 2008), addressing concerns in another case that sanctioning stops prompted by anonymous tips might 'enable any person seeking to harass another to set in motion an intrusive, embarrassing police search,' noted, "[A]ny body of law requiring 911 operators to carefully make credibility determinations would unacceptably delay the necessary responses to *all* emergency calls, including genuine ones." *Id*.

And, although local governments are generally not liable under *Monell* for failing to provide for the public safety or for failure to protect even if they are aware a danger exists, unless it's a state-created danger (*see DeShaney v. Winnebago County Dept. of Soc. Serv.*, 489 U.S. 189, 201, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)), state law suggests that when a 911 call communicates a known and present danger, emergency call center operators have a duty to promptly relay information to the local law enforcement agency, and the local law enforcement

agency has a duty to promptly dispatch an officer to investigate, and any failure to do so may subject the operator and/or responding officer(s) to civil liability. *See Linville v. City of Janesville*, 174 Wis. 2d 571, 577, 497 N.W.2d 465, 468 (Ct. App. 1993), *aff'd*, 184 Wis. 2d 705, 516 N.W.2d 427 (1994) (reversing dismissal of the suit, finding none of the defendants were entitled to municipal immunity because the paramedics waited twenty minutes before trying to extricate the drowning victims, in violation of their ministerial duties); and *Hoskins v. Dodge Cnty.*, 2002 WI App 40, ¶ 24, 251 Wis. 2d 276, 297, 642 N.W.2d 213, 222-223 (distinguishing facts in that case from the facts in *Linville*, and holding that, unlike in *Linville*, the deputy sheriff was entitled to exercise his discretion to forego immediate search and rescue efforts since the 911 call did not put forth information of a known and compelling danger of such force that his duty to summon personnel and equipment for an immediate waterborne rescue was absolute, certain, and imperative, and to follow up instead by checking the shoreline and boat landings in the area for any signs of the boat in question).

Accordingly, Plaintiffs' claims that Defendants should have treated emergency calls for service to their residence differently than it treated other emergency calls for service should be dismissed for failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6).

**B.** **The emergency calls for service involved situations of an exigent nature.**

Plaintiffs state that "any reasonable police officer would have known there was not probable cause to believe a crime was committed or someone was in danger" and "any reasonable officer would have known there was not an exigency" and claim the alleged searches and seizures were "without exigency" [ECF 13, ¶¶ 137-138, 146-147, 158-159, 169-171, 182-184, 194-196], presumably because the claims made for calls for service in the past turned out to

8

be false[15]. Although there are a few cases[16] that leave open the possibility there could be some scenario where a 911 call, standing alone, would not be sufficient to establish exigent circumstances for a search/seizure, none stand for Plaintiffs' position that a certain number of prior calls for emergency services that are subsequently determined to have been made on false premises renders all subsequent calls—even if otherwise of a serious nature suggesting exigent circumstances—non-exigent and bars responding officers from investigating the threat.

The U.S. Supreme Court has recognized several exigencies that may justify a warrantless search of a home, including: the "emergency aid" exception, which permits officers to "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury" (*Id*. (quoting *Brigham City*, 547 U.S. at 403)); to prevent the imminent destruction of evidence (*Ker v. California,* 374 U.S. 23, 40 (1963)); to engage in "hot pursuit" of a fleeing suspect (*United States v. Santana,* 427 U.S. 38, 42, 43 (1976)); to prevent a suspect's escape (*Minnesota v. Olson*, 495 U.S. 91,  (1990); and to address the risk of danger to police (*Id*.). Under the exigent circumstances doctrine, "[t]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe a person within is in need of immediate aid." *United States v. Richardson*, 208 F.3d 626, 629 (7th

---

[15] It is worth pointing out that the prior calls for emergency service were determined to be false only after police responded to the scene and investigated. It is also worth noting that emergency services personnel have no way to accurately determine the veracity of a request for emergency services before dispatching officers—at least not any that would not result in delaying an emergency response (and thereby potentially further endangering citizens who truly do need emergency services).

[16] *See United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003) (affirming judgment in favor of officers on warrantless search claim, and distinguishing it from *Kerman v. City of New York*, 261 F.3d 229, 235-236 (2d Cir. 2001), in which a warrantless search based on 911 call was held to be illegal because the caller remained anonymous and police did not corroborate the information); *United States v. Richardson*, 208 F.3d 626 (7th Cir. 2000) (Affirming denial of defendant's motion to suppress in a case involving a search based on exigent circumstances provided during a 911 call, despite that a bogus 911 call stating almost the same thing had been made a week prior, but leaving open the possibility that there could be "a case in which it would be objectively unreasonable for a police officer to rely on a 911 call, because of additional information available to the officer"); and *Sanders v. Marovich*, 102 F.Supp.2d 926, 927-928 (N.D. Ill. 2000) (finding qualified immunity applied to claim involving warrantless search following the plaintiff's twice-disconnected 911 call, but noting, "A 911 call does not always create an effective qualified immunity defense, *see* [*Richardson*, 208 F.3d at 629]").

Cir. 2000) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). "The safety of others is a particular concern when police respond to a report of a crime in progress and, in such a situation, police judgments regarding warrantless entries 'should be afforded an extra degree of deference.'" *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003) (quoting *Reardon v. Wroan*, 811 F.2d 1025, 1029 (7th Cir. 1987)).

Plaintiffs' amended complaint briefly states the nature of two of the calls to the police, noting the July 25, 2022 call stated "there was a murder/hostage situation inside their home,"[17] and the April 12, 2023 call "was for a shooting at the residence."[18] Although Plaintiffs' amended complaint does not state the nature of the calls for emergency services to their residence on August 11, 2022,[19] September 22, 2022,[20] October 1, 2022,[21] November 4, 2022,[22] November 30, 2022,[23] March 20, 2023,[24] April 11, 2023,[25] or April 17, 2023,[26] it can be inferred that they were calls of a very serious nature since, according to Plaintiffs, they were instances of swatting, which entails calls to 911 that are made "to provoke a dangerous police response." [ECF 13, ¶2]. Because these "swatting" calls, as the name suggests, are made with the intention of invoking a SWAT[27]-like response from police, they necessarily involve the swatter making the types of claims that would clearly fall under the exigent circumstances exception to the warrant requirement. And if this Court considers the information contained within the police and CAD reports attached as exhibits (*see* Exhibit A, and specifically the CAD and incident reports therein

---

[17] *See* [ECF 13, ¶ 61].
[18] See [ECF 13, ¶ 115].
[19] *See* [ECF 13, ¶¶ 67-70].
[20] *See* [ECF 13, ¶ 72].
[21] *See* [ECF 13, ¶¶ 73-79].
[22] *See* [ECF 13, ¶ 80].
[23] *See* [ECF 13, ¶ 80].
[24] *See* [ECF 13, ¶¶ 82-101].
[25] *See* [ECF 13, ¶¶ 101-113].
[26] *See* [ECF 13, ¶¶ 125-132].
[27] "SWAT" is generally understood to mean a "special weapons and tactics" unit— "a group of police officers who are specially trained to deal with dangerous situations." *See* https://dictionary.cambridge.org/us/dictionary/english/swat-team

for the above-mentioned incidents) as it is permitted to do so under *Geinosky* and *Venture Assocs. Corp.*, it becomes abundantly clear that the nature of the calls involved life-threatening emergencies, and/or violent crimes that had just been committed and involved a likelihood of imminent destruction of evidence, etc.—both of which have been held to constitute exigent circumstances per *Kentucky v. King*, *Brigham City*, and *Ker*.

### C. Responding officers are entitled to investigate and take reasonable measures to ensure the safety and welfare of the subject(s) of the emergency call for service, and have no obligation to accept a subject's assurances at face value and refrain from further investigation upon request of the subject.

Further, even if the responding officers had any reason to doubt the veracity of the reports made during the requests for emergency service, they were still entitled to investigate and take other reasonable measures to ensure the safety and welfare of the subject(s) of the complaint, and were not constitutionally required to accept Plaintiffs' assurances at face value and abstain from any further investigation once on scene: *See United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995) (holding that where police had legitimate concerns about an apartment occupant's safety, it was unreasonable to think "that the police must stand outside [the] apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams."); *Hanson v. Dane Cty., Wis.*, 608 F.3d 335, 338 (7th Cir. 2010) (holding that even though the wife, who officers learned was the one who called 911 in reference to a domestic battery, asked the officers to leave, "officers who have probable cause need not cancel an investigation on request," and further noted that the wife's statement that she was unharmed did not establish that there was no need for further inquiry, and that because of the nature of domestic violence "the police acted reasonably by continuing their investigation and questioning [the wife] and [the husband] out of each other's presence."); *Anderson v. City of W. Bend Police Dep't*, 774 F. Supp. 2d 925, 941 (E.D. Wis. 2011) (holding an exigency did not dissipate merely because the police officers spoke

with the alleged domestic violence victim who said she was "fine" and did not appear to be physically injured, as "[i]t is not uncommon for victims of domestic violence to deny an assault, especially when an abuser is present," and that when the alleged victim went back into the apartment after leading officers to believe she would return, but did not return even after officers continued trying to make contact by knocking on the door for approximately twenty to twenty-five minutes, officers were justified in breaking down the interior door of the apartment and making entry); *Nail v. Gutierrez*, No. 1:06-CV-292 PS, 2008WL4545332 (N.D. Indiana Oct. 10, 2008), *aff'd*, 339 Fed. Appx. 630 (7th Cir. 2009)) (holding "any reasonably prudent officer would have looked askance at [the plaintiff's claim that his wife mistakenly dialed 911 while trying to dial directory assistance] and sought to investigate further by speaking with the caller to confirm that she had in fact made a mistake and was safe and secure," and that when the plaintiff left the front door and several minutes passed and his wife did not come to the door, this "only heightened the officers' concern," giving the officers probable cause to enter the backyard to try to locate the plaintiff's wife and ensure her safety); and *Martin v. Indiana*, No. 1:12-CV-69-SLC, 2015 WL 4899008, at *17 (N.D. Ind. Aug. 17, 2015) (granting summary judgment in officers' favor, citing/quoting *Neal v. Pauley,* No. 1:12cv343, 2014 WL 2452983, at *4 (N.D. Ind. June 2, 2014) and stating, "[c]ourts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had a substantial reason to believe that one of the parties to the dispute was in danger.")

**D. The officers' alleged actions did not constitute a search of Plaintiffs' curtilage.**

To the extent Plaintiffs allege an illegal search of their curtilage on the basis of officers "walk[ing] onto the porch of [Plaintiffs'] home" and standing at their front door and asking to

physically see them to ensure their safety, despite their verbal assurances that they were okay, [*see* ECF 13, ¶¶ 120-123, 198], it is worth noting that the porch area outside of a front door would not be considered "curtilage."

Courts have recognized, "The knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Fla. v. Jardines*, 569 U.S. 1, 8 (2013) (quoting *Breard v. Alexandria,* 341 U.S. 622, 626 (1951)). Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." *Kentucky v. King,* 563 U.S. 452, 469-470 (2011). Police officers are generally permitted to approach the back door of a residence in an attempt to interview someone if the front door proves fruitless. *See United States v. James*, 40 F.3d 850, 861-862 (7th Cir. 1994). A plaintiff claiming an illegal search of their curtilage must establish the area constituted "curtilage," with relevant factors including the size of the area, how plaintiff typically used the area, whether a fence completely enclosed the area, and whether plaintiff had taken any other measures to protect the area from observation. *Nail v. Gutierrez*, 339 Fed.Appx. 630, 632 (7th Cir. 2009) (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987).

Plaintiffs have failed to establish that the porch area outside of their front door constitutes "curtilage," and thus have not put forth any claims upon which relief can be granted concerning the alleged search of their curtilage. Accordingly, the claim should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### E.    Conclusion

Accordingly, because Plaintiffs have impliedly acknowledged the existence of exigent circumstances by way of stating that the police conduct at issue was the result of swatting,

because the police reports and CAD reports establish the life-threatening nature of the calls for emergency service (*see* Exhibit A), and because there is no legal authority that states that a certain number of prior calls for emergency services that are subsequently determined to have been made on false premises renders all subsequent calls—even if otherwise of a serious nature suggesting exigent circumstances—non-exigent and bars responding officers from investigating the threat, Plaintiffs have failed to state any Fourth Amendment claims upon which relief may be granted, and this Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## II. THERE WERE NO CONSTITUTIONAL VIOLATIONS REQUIRING OFFICER INTERVENTION.

In their amended complaint, Plaintiffs make claims against various officers for failure to intervene to stop an illegal search and/or seizure. *See* [ECF 13, ¶¶ 100,124, 132, 152-154, 165-166, 177-178, 190-191, 213-214].

A police officer, whether supervisory or nonsupervisory, who is present and fails to intervene to prevent other officers from infringing constitutional rights of citizens is liable under § 1983 if that officer had reasonable opportunity to intervene to prevent harm from occurring and if the officer had reason to know that excessive force was being used, that citizen has been unjustifiably arrested, or that any constitutional violation has been committed by law enforcement official. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (citations omitted).

As analyzed and discussed in the previous section of this brief, the defendant officers did not violate Plaintiffs' constitutional rights. The Defendants' actions were constitutionally permissible and, as such, there was no need for any officers to intervene on the Plaintiffs' behalf to protect their rights that they had no reason to believe were being violated and, in fact, were not violated.

14

Accordingly, this claim should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## III. REGARDLESS OF WHETHER ANY CONSTITUTIONAL VIOLATIONS ACTUALLY OCCURRED, DEFENDANTS ARE SHIELDED BY THE DOCTRINE OF QUALIFIED IMMUNITY, BECAUSE THERE WAS NO PRECEDENT CLEARLY ESTABLISHING THAT MULTIPLE FALSE CALLS FOR EMERGENCY SERVICES RENDERS ALL SUBSEQUENT CALLS FOR SERVICE NON-EXIGENT.

An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "clearly established" at the time of the challenged conduct. *Ashcroft v. al–Kidd,* 563 U.S. 731 (2011). Qualified immunity exists to protect public servants from liability for reasonable mistakes made while performing public duties. *See Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). In *Hunter v. Bryant*, 502 U.S. 224 (1991), the United States Supreme Court stressed the importance of resolving immunity questions at the earliest possible stage of litigation, and is an issue that should be decided by the court long before trial. *Id*.

Defeating qualified immunity requires: (1) conduct violating the plaintiff's constitutional or statutory rights that is: (2) clearly established at the time of the violation such that a "reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court's decision in *Pearson v. Callahan*, 555 U.S. 223, 242-243 (2009), encouraged courts to begin with the substantive constitutional violation, but they are also free to consider first whether the right is clearly established if doing so will conserve judicial resources. Whether the law was clearly established at a specific time is a question of law that must be answered by the Court, as opposed to a jury. *See Pearson,* 555 U.S. at 232.

15

A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Plumhoff v. Rickard*, 572 U.S. 765, 778-779 (2014) (citing *Ashcroft*, 563 U.S. at 741). In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." *Id*. In determining whether a right was clearly established, the Supreme Court has "'repeatedly told courts … not to define clearly established law at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 572 U.S. at 780 (quoting *Ashcroft*, 563 U.S. at 742). The clearly established law must be "particularized" to the facts of the case, otherwise "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson,* 483 U.S. at 639-640. The Seventh Circuit Court of Appeals has stated that in almost any case of first impression, defendants are entitled to qualified immunity. *Greenberg v. Kmetko,* 922 F.2d 382, 385 (7th. Cir. 1991) (Cudahy, concurring).

As stated in a previous section of this brief, there was no constitutional violation, because exigent circumstances existed justifying the alleged warrantless searches and seizures. Regardless, even if Plaintiffs could establish a constitutional violation occurred, Defendants are shielded by the doctrine of qualified immunity:

Although Plaintiffs state "any reasonable police officer would have known there was not probable cause to believe a crime was committed or someone was in danger" and "any reasonable officer would have known there was not an exigency" and claim the alleged searches and seizures were "without exigency" [ECF 13, ¶¶ 137-138, 146-147, 158-159, 169-171, 182-

184, 194-196], presumably because previous calls for emergency services were later determined to be premised on false information, Plaintiffs fail to establish these facts violated a clearly established constitutional right.

There is no clearly established law that states that repeated calls for emergency service to a residence that are subsequently determined to be false, even if those calls are of a serious nature and suggest the existence of exigent circumstances, should be disregarded or treated as non-exigent, and that failure to do so constitutes a Fourth Amendment violation. *United States v. Richardson*, 208 F.3d 626 (7th Cir. 2000), which affirmed the denial of defendant's motion to suppress in a case involving a search based on exigent circumstances provided during a 911 call, despite that a bogus 911 call stating almost the same thing had been made a week prior, left open the possibility that there could be "a case in which it would be objectively unreasonable for a police officer to rely on a 911 call, because of additional information available to the officer," but said, "this is not that case." *Id*. at 631. Perhaps Plaintiffs believe their case is that case. Even if this Court were to find it objectively unreasonable for the officers to continue to take the emergency calls seriously and investigate accordingly in light of the prior history of false calls for service, Defendants are entitled to qualified immunity since the law was not clearly established at the time, and as this would be a case of first impression. *See Plumhoff*, 572 U.S. at 778-779 (internal citations omitted); and *Greenberg,* 922 F.2d at 385.

Further, Plaintiff's contention that officers acted unreasonably is in conflict with existing case law. In denying a motion to suppress stemming from a warrantless entry following a 911 call, the Court in *Elder* stated, "His argument that police cannot take steps to protect a caller's safety unless they know the caller's identity and "reliability" would require them to act *un*-reasonably. Many 911 calls are brief, and anonymous, precisely because the speaker is at risk

17

and must conceal the call. These persons are more rather than less in need of assistance. *United States v. Elder*, 466 F.3d 1090, 1091 (7th Cir. 2006). This inherent conflict and ambiguity in the law requires that the doctrine of qualified immunity apply to the present situation.

Because Defendants did not violate any "clearly established right" of Plaintiffs when responding to emergency calls for service at Plaintiffs' residence, they are protected from suit by the doctrine of qualified immunity. Accordingly, this Court should find that the Defendants are entitled to qualified immunity, and should dismiss the Plaintiffs' Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief may be granted.

## IV.    PLAINTIFFS' *MONELL* LIABILITY CLAIMS ARE PREMISED UPON FAULTY AND UNFOUNDED BELIEFS AND EXPECTATIONS.

Plaintiffs allege *Monell* claims regarding the various incidents in which police officers responded to their residence after being dispatched due to calls for emergency services. *See* [ECF 13, ¶¶ 140-142, 149-151, 161-163, 173-175, 186-189, 198-200, 209-211].

Plaintiffs acknowledge the police action taken was in direct response to calls that were made for emergency services, and even concede that, in swatting cases, "the police are the unwitting tools" of the "bad actors" who make false claims in requesting emergency services, and that the police "have no choice but to take these fake calls at face value." [ECF 13, ¶ 5]. However, they allege that because their situation involved numerous alleged swatting calls to their home, police should have deviated from standard protocol and treated requests for emergency services to their home differently—that "any rational police force would have recognized at some point that any calls involving the [Plaintiffs'] home were clearly false and should not be taken seriously" and "would have implemented some sort of policy" to avoid further swatting activity. [ECF 13, ¶¶ 7-8]. Plaintiffs further allege, "The City of Milwaukee

18

failed to adequately train or supervise its officers on swatting and on the swatting campaign against [Plaintiffs]," and "The City of Milwaukee's failure to adequately train or supervise its officers and its failure to implement any policy or procedure to prevent Plaintiffs from being swatted by the police was a direct cause or moving force behind the violation of Plaintiffs' Fourth Amendment rights." [ECF 13, ¶¶ 141-142, 150-151, 162-163, 174-175, 187-188, 199-200, 210-211]; *see also* "Eighth Requested Jury Instruction [Liability Of Municipality For Failure to Train, Supervise, or Discipline]" in "Parties' Joint Proposed Jury Instructions," which has been contemporaneously filed with this brief pursuant to ECF 9, pg. 5. Plaintiffs claim they "tried to work with the City of Milwaukee to stop this, but the City of Milwaukee failed to adopt a policy or train its officers on how to prevent [Plaintiffs'] stalkers from using the police department as a tool of terror." [ECF 13, ¶ 11].

A municipality is liable in a § 1983 claim under *Monell* [*v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978)] if the constitutional violation was caused by: "(1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with 'final policymaking authority.'" *Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011). "To establish a municipal policy or custom, [the] plaintiff must allege a specific pattern or series of incidents that support the general allegation of a custom or policy." *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1237 (7th Cir. 1986). Further, to demonstrate that a municipality "is liable for a harmful custom or practice, the plaintiff must show that [municipal] policymakers were deliberately indifferent as to the known or obvious consequences." *Thomas C. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.* Under this stringent standard, "it

is not enough to demonstrate that policymakers could, or even should, have been aware of unlawful activity because it occurred more than once." *Phelan v. Cook Cnty.*, 463 F. 3d 773, 790 (7th Cir. 2006). "Although [the Seventh Circuit] has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident or even three incidents do not suffice." *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014) (citing *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) (internal citations omitted).

As discussed in a previous section, none of the facts as stated in the amended complaint suggest any Fourth Amendment constitutional violation occurred, given the request for emergency services of an extremely serious and exigent nature as is inherent in swatting calls. Because no constitutional violations occurred, the claims that any constitutional violations were caused by the City of Milwaukee's alleged failure to implement any policy, practice, or procedure to stop the alleged constitutional violation likewise should be dismissed for failure to state a claim upon which relief may be granted.

Further, regardless of whether any constitutional violations occurred, Plaintiffs' claims that the Defendants should have implemented a policy to take subsequent calls for emergency service less seriously and should have refrained from treating exigent circumstances as such if previous calls for emergency service turned out to be false find no legal support. Existing case precedent contradicts Plaintiffs' assertions, and suggests calls for emergency service should be treated as emergencies, and that it is not the place of the call system operator or first-responders to speculate about the veracity of the report. *See Richardson*, 208 F.3d at 630; *Wayne*, 318 F.2d at 212; *Drake*, 456 F.3d at 774-775; *Elder*, 466 F.3d 1090 at 1091; and *Wooden*, 551 F.3d at 649-650.

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court grant this

Motion to Dismiss and dismiss all claims against all defendants with prejudice.

Dated and signed at Milwaukee, Wisconsin this 1st day of August, 2024.

EVAN C. GOYKE
City Attorney

/s/ Maria Mesoloras
MARIA MESOLORAS
Assistant City Attorney
State Bar No. 1098921
WILLIAM HOTCHKISS
Assistant City Attorney
State Bar No. 1112878
*Attorneys for the Defendants*

ADDRESS:
800 City Hall
200 East Wells Street
Milwaukee, WI 53202
Telephone: (414) 286-2601
Fax: (414) 286-8014
Email: mmesol@milwaukee.gov
        whotch@milwaukee.gov

1032-2024-394/291464

21