UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NIKI ROBINSON AND
PATRICK TOMLINSON,

        *Plaintiff,*

        *v.*

CITY OF MILWAUKEE *et al.*,

        *Defendants.*

Case No. 2:24-cv-264

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

---

Plaintiffs, Niki Robinson and Patrick Tomlinson,[1] offer this brief in opposition to Defendants' Motion to Dismiss First Amended Complaint. For the reasons stated below Plaintiffs request this Court deny the motion.

## I.  INTRODUCTION

Niki Robinson and Patrick Tomlinson have not brought this suit because they were the victims of a single swatting. Members of the Milwaukee Police Department came to their home *over 45 times*. This case is not about the fact that the Milwaukee police responded to these calls or that they showed up on the Plaintiffs' doorsteps to check on them. Thirty-eight of these incidents are not the subject of the claims in this case. Because: the police did nothing wrong during those responses. Officers came, confirmed the call

---

[1] Robinson and Tomlinson are married. Throughout this brief, they are referred to individually or as Plaintiffs. Their home is referred to as either the Robinson-Tomlinson home or the Plaintiffs' home.

was a hoax, and then left. This was good policing and exactly how any reasonable officer would handle this situation.

But on seven of these incidents, things went way further. The police didn't just *respond* to the Robinson-Tomlinson home. Officers *seized* Robinson and Tomlinson and *searched* their home. On these occasions the officers knew that Plaintiffs' home was a "KNOWN SWATTING LOCATION," that there were "previous calls to the residence eliciting multiple squad responses," that there was a "SWATTING RISK AT THIS LOCATION," and that Tomlinson was "disliked by an unknown community and it seems they are determined to continually call false reports on him." (ECF 13, ¶¶76, 85, 109).

The Plaintiffs spoke to the officers and informed them that they were fine, asked them to leave, and informed them the call was bogus. (ECF 13, ¶¶68, 77, 86, 111, 120, 129). But the police refused to listen and instead ignored the Plaintiffs and then *seized* them and *searched* their home.

This is what this lawsuit is about. It is not, as Defendants claim, about "routine emergency police responses" to Plaintiffs' home. (ECF 28 at 5). There is nothing routine about what happened here. This case is about seven occasions where officers ignored the information in front of their noses that had, on 38 other occasions, made it objectively clear that there was no need for a search of Plaintiffs' home and seizure of their persons. And it's about the City of Milwaukee's refusal to respond to Plaintiffs' requests for something to be put in place to protect them from these unreasonable officers.

## II.  THE SEVEN FOURTH AMENDMENT VIOLATIONS

### A.  July 25, 2022, swatting incident.

Robinson and Tomlinson warned the Milwaukee Police Department and FBI that they were the targets of a vicious harassment campaign in April 2022. (ECF 13, ¶¶56–58; ECF 28-1 at 4). They were swatted for the first time on July 25, 2022. (ECF 13, ¶60). "Swatting involves placing a hoax emergency call reporting serious threats to provoke an armed law enforcement response to an individual's residence, usually as an act of harassment or revenge." *Finch v. Rapp*, 38 F.4th 1234, 1237 (10th Cir. 2022).

 On July 25, 2022, someone called pretending to be Tomlinson and told dispatch that Tomlinson had found his wife in bed with another man and killed them both. (ECF 28-1 at 8).

Plaintiffs are not bringing a claim against any individual police officer for the first swatting incident. Instead, the City of Milwaukee is liable for failing to respond to Plaintiffs' warning. (ECF 13, ¶¶135–143).

In April 2022, Tomlinson spoke with a Milwaukee Police Department officer over the phone (ECF 28-1 at 4). Tomlinson told the officer that an online group had been harassing and threatening him for three or four years. *Id.* The stalkers had been making threats while pretending to be Tomlinson. *Id.* They said their goal was to hurt or kill him. *Id.* They had moved from online to offline; the group had been sharing pictures of themselves near Tomlinson. *Id.* In other words, the stalkers' tactics were escalating.

Because the officers were not warned about the swatting threat or trained on how to respond to the swatting calls, officers responded, arms drawn, to the Robinson-

Tomlinson home in response to a call reporting a murder and hostage situation. (ECF 13, ¶¶61–62). Tomlinson was handcuffed and taken outside of his home without clothes on. *Id.*, ¶64. Officers searched the home. *Id.* Eventually, officers realized the call was a hoax. One wrote in a report that "further investigation revealed that the Milwaukee police Department has responded to other similar complaints at the location." *Id.*, ¶65.

### B. August 11, 2022, swatting incident.

After the first swatting incident, individual officers became aware of the swatting risk. On July 27 (two days after the first swatting), an officer listened to the swatting call and determined that Tomlinson had not called 911. *Id.*, ¶66.

On August 11, another emergency call was made about the Robinson-Tomlinson home. *Id.*, ¶67. When Defendant Nicole Pevlak arrived, she was aware that there had been "multiple" swatting calls to the home. *Id.*, ¶68. She nevertheless entered the home and searched it.

### C. October 1, 2022, swatting incident.

During the August 11 swatting incident, a Milwaukee Police Department officer noted on dispatch that the emergency calls would be an "ongoing issue at the residence." Ex. 28-1 at 124. That was prescient. On September 22, 2022, there was another swatting call. *Id.* at 127.

Then on October 1, 2022, there was another. *Id.* at 129. The caller, who called anonymously and not through a 911 line, claimed to be Tomlinson and said that he had shot Robinson. *Id.*

This time, dispatch noted, "KNOWN SWATTING LOCATION." *Id.* at 130. Defendant Officers Jacob Wasechek, Fidah Mustafa, and John Kohler responded with firearms and a ballistic shield. (ECF 13, ¶¶73–75).

Robinson, supposedly deceased, answered the door. *Id.*, ¶77. She calmly explained that she was fine and that she and her husband were repeated victims of harassment and swatting. (*Id.*, ¶77; ECF 28-1 at 130). The officers ordered her out of her home at gunpoint and searched her home. (ECF 28-1 at 130; ECF 13, ¶¶78–79).

**D. March 20, 2023, swatting incident (Evans I).**

After the October 1 incident, on October 7, a Milwaukee Police Captain spoke with a reporter who had written about the Robinson-Tomlinson home swattings. (ECF 28-1 at 15–16). The reporter, too, had then received threatening and harassing messages. *Id.* at 15.

Then there were more swatting calls to the Robinson-Tomlinson residence on November 4, November 30, December 4, December 31, February 15, March 16, March 17, and March 19. (ECF 13, ¶¶80; ECF 28-1 at 28, 31, 33, 160). Plaintiffs bring no claims related to those calls. In most of those calls, dispatch noted that the home was a known swatting location. (*See* ECF 13, ¶81). The officers (and once a fireman) who responded to the house knocked on the door, had a polite conversation (sometimes in person, sometimes over the phone), and left. (*Id.*, ¶80; ECF 28-1 at 28, 31, 33, 160). After the February 15 call, an officer noted that Plaintiffs had a note with phone numbers for emergency responders to the swatting calls. (ECF 28-1 at 33.) The officer said he would also make a note and try to have officers call before responding to the swatting calls. *Id.*

March 20, 2023, was a different story. One of the officers who responded was Defendant Lyndon Evans, a sergeant. *Id.* at 41. The responding officers knew that the house was known for swatting calls. (ECF 13, ¶82). Dispatch had warned them, "SWATTING RISK AT THIS LOCATION." *Id.*, ¶ 85. Dispatch also warned that the call (made to a suicide prevention line) had come from a Virtual Private Network (VPN), so there was no phone number for follow-up. (ECF 28-1 at 162). This was an untraceable tip.

Robinson answered the door and told them everyone was fine; it was another swatting attempt. (ECF 28-1 at 41). She put Tomlinson, who was not at home, on the phone, who expressed frustration and told the officers they couldn't go inside. *Id.* Evans nevertheless insisted on clearing the house, despite the fact that he was acting on a completely anonymous tip that had been pre-marked as bogus, and he had made contact with two people who lived at the residence, who were both fine. *Id.* In other words, the fact that the call was bogus was corroborated; the supposed emergency was not.

The way Evans behaved on this call is disputed. But at this stage, Plaintiffs' version must be credited. Evans claims he called another sergeant who said she wasn't aware that officers weren't searching and seizing at the Robinson-Tomlinson house during swatting calls. (ECF 13, ¶95). That sergeant has since said that she told Evans, *during that call when he was there*, not to search the house. *Id.*, ¶97. But he did it anyway. *Id.*, ¶99. Defendants Christian Garrido and Bradley Orlando watched this interaction take place but didn't stop Evans. *Id.*, ¶100.

### E. April 11, 2023, swatting incident on fourth call of the day.

There were more swatting calls to the Robinson-Tomlinson home on March 26, March 28, and two calls on April 3. Plaintiffs are not bringing claims related to those calls.

On April 11, 2023, there were *four separate* swatting calls. (ECF 13, ¶102). Plaintiffs are not bringing claims related to the first three.

The fourth call was from a suicide hotline caller who reported a tip gained through a VPN, this time through a chat line. *Id.*, ¶106. The caller thought the tip was bogus. (ECF 28-1 at 176).

Officer Carleton responded. (ECF 13, ¶107). He noted in his report that he knew there were false calls to the house and that Robinson and Tomlinson were victims of a harassment and stalking campaign. *Id.*, ¶109. The chat claimed that two teenagers had killed their parents and were going to kill themselves. (ECF 28-1 at 176). Carleton nevertheless ordered Robinson (not a teenager) out of her home at gunpoint, handcuffed Tomlinson, and searched the house. (ECF 13, ¶¶111–13).

### F. April 12, 2023, swatting incident (Evans II).

There was another call the next day. *Id.*, ¶114. Sgt. Evans responded again, less than two weeks after he had searched the home. *Id.*, ¶114. By now dispatch was even more clear, marking the call, "BE ADVISED SWATTING RELATED CALL." *Id.*, ¶115. That was in addition to the usual, "SWATTING RISK AT THIS LOCATION." *Id.*, ¶116. Evans arrived with Defendant Officer Nathaniel Peterson. *Id.*, ¶118. His report acknowledged that they were both aware that the home was "a known swatting address." *Id.*, ¶119.

The bogus caller had pretended to be Tomlinson and again claimed he had shot his wife. (ECF 28-1 at 178). Dispatch noted that the call had come from an internet address in Florida. *Id.* When officers arrived, a bystander said he hadn't heard any gunshots. *Id.* Sgt. Evans spoke with Tomlinson over the phone, who explained that everything was okay. *Id.* at 60.  Evans nevertheless told Tomlinson that if Robinson did not come downstairs, he would kick down the door. (ECF 13, ¶121). Evans ordered Peterson to kick down the door, which he tried to do, but failed. *Id.*, ¶122. Robinson finally acquiesced, came downstairs, showed herself, and the officers left. *Id.*, ¶123.

### G.  April 17, 2023, swatting incident (Evans III).

There were two additional swatting calls later on April 12 and one call on April 13. (ECF 28-1 at 179–80, 184). Plaintiffs bring no claim related to those calls.

On April 17, 2023, someone called the Glendale Police Department pretending again to be Tomlinson and again saying he had shot his wife and then hung up the phone. *Id.* at 186. The caller from Glendale PD said she thought the voice sounded like a recording. *Id.* at 187. Even Glendale PD was aware that Tomlinson and Robinson "reside at this address and that there are numerous calls at this location, with similar situations." *Id.* at 62. Dispatch again noted that it was likely a swatting call with the usual warnings. *Id.* at 186.

Sgt. Evans again responded, this time with Defendant Officer Paul Vento. (ECF 13, ¶128). Vento wrote in his report that the two were aware that "this address is the victim of daily swatting calls." *Id.*, ¶127. Tomlinson again spoke with Evans and again told him to leave and that no one was hurt. *Id.*, ¶129. Evans nevertheless again threatened to kick

the door down and ordered Robinson to come to the door and show herself. *Id.*, ¶¶130–31.

There have been more swatting calls since. *Id.*, ¶133. Robinson and Tomlinson filed this case on March 4, 2024.

### III.  STANDARD OF REVIEW

A motion to dismiss under to Rule 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted. To survive a 12(b)(6) motion, the complaint must provide enough factual information to state a claim for relief that is plausible on its face and "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014), quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (alteration accepted, quoted source omitted).

At the pleading stage, all of the "factual allegations contained in the complaint" must be "accepted as true." *Twombly*, 550 U.S. at 572. Furthermore, well-pleaded facts are viewed in the light most favorable to the plaintiff. *See United Cent. Bank v. Davenport Estate LLC*, 815 F.3d 315, 318 (7th Cir. 2016). But "legal conclusions and conclusory allegations merely reciting the elements of a claim are not entitled to this presumption of truth." *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011).

9

## IV. ARGUMENT

### A. Although inapplicable here, generally speaking, 911 calls reporting emergencies can justify warrantless searches and seizures.

The parties find a great amount of agreement on general principles. For example, we agree with Defendants that as a *general* matter,"911 calls reporting an emergency" are "enough to support warrantless searches." (ECF 28 at 6) (citations omitted). We agree that, as a *general* idea, requiring 911 operators and first responders "to carefully make credibility determinations would unacceptably delay the necessary responses to *all* emergency calls, including genuine ones." *Id.* at 7 (citations omitted).

Plaintiffs agree that on every occasion the police came to their home, the officers were responding to a call that, in the abstract, involved situations of an exigent nature. *Id.* at 8-10. Without delving into the gritty details, the calls always involved murder or mayhem. (ECF 28-1). That was the whole point. The swatters *wanted* the police to think things were dangerous. The goal was to trigger a high-pressure police encounter between Plaintiffs and the Milwaukee police.

But that's where the agreement ends. Untenable is Defendants' position that these general principles extend *ad infinitum.*

There exists some number of provenly false 911 calls at a citizen's home that would make every reasonable officer take pause before breaching the sanctity of the home.

The Defendants concede no ground here. They argue that regardless of whether the Defendants "had any reason to doubt the veracity of the reports made during the request for emergency service, they were entitled to investigate and take other reasonable measures to ensure the safety and welfare," even if those measures included seizing the

Plaintiffs and searching their home. (ECF 28 at 11). Note the obvious problem. Defendants' argument rests on ignoring "reason." *Id.* In other words, the officers were entitled to act unreasonably.

Taken to its logical endpoint, Defendants' position is that what happened to the Plaintiffs so far *must* continue. The swatting will never, and *should never,* end short of the false callers being arrested or deciding to give up. It matters not if there was a single prior false call to someone's home, if there have been *three prior false calls that same day,* or if police are responding to the 100th false call. Regardless of context or circumstances, the argument goes, if a 911 call describes an emergency, officers responding to that call are entitled to enter the home, seize the occupants, and search it.

### B. This case is about unreasonable searches and seizures, not routine police responses to calls for service.

Thankfully, the Fourth Amendment is not so meek. It's worth pausing here to reiterate what this case is about. The Fourth Amendment does not protect against police *responding* to a scene, even if that response involves officers walking up to a house to try and talk with those inside (what lawyers call a "knock-and-talk"). *United States v. Adeyeye*, 359 F.3d 457, 461 (7th Cir. 2004).

The Fourth Amendment protects against unreasonable *searches* and *seizures.* This case is not about the more than 38 occasions where officers responded to the Robinson-Tomlinson home and after some investigating and conversing with them, left. That was good police work that does not implicate the Constitution.

This case is about the seven occasions on which Plaintiffs' home was **searched,** where they were **seized,** and where officers refused to leave their curtilage. It's those unreasonable searches and seizures that give rise to the claims here.

### C. Many of the calls were *not* due to emergency reports to 911, so the 911 case law does not apply.

As an initial matter, some of the intrusions into Plaintiffs' home and the seizures of their persons were predicated not by 911 calls but by anonymous and unreliable tips to non-emergency lines. It's true that due to the "particular duty of police officers to speedily respond to emergency situations reported by individuals through the 911 system," officers are normally entitled to "presume the reliability of an eyewitness 911 call…particularly where the caller identifies himself." *United States v. Drake,* 456 F.3d 771, 775 (7th Cir. 2006).

But three of the claims here do not involve 911 calls (Counts IV, V, and VI). Instead, the police were responding to tips that came from anonymous sources to non-emergency lines, putting those situations back firmly into the clear rule that "the bar has not slipped so low as to allow unreliable tips to trigger the humiliating involuntary seizures and sometimes violent encounters that we justify under the bland and familiar phrase *Terry* stops" much less a seizure of a person in their home and a search of the premises. *United States v. Lopez,* 907 F.3d 472, 484 (7th Cir. 2018).

The seizure of Plaintiffs and search of their home on March 20, 2023 (Count IV of the operative complaint) was predicated by a call that officers were aware came from a VPN to a suicide prevention line. (ECF 28-1 at 162). The entire point of a VPN or "Virtual Private Network" is to "facilitate discreet internet browsing by disguising the user's

identity." *United States v. Cox,* 54 F.4th 502, 508 (7th Cir. 2022). Meaning: the call came from a source intentionally using electronic means to hide their identity. These were truly anonymous tips, which by black-letter law cannot justify a warrantless intrusion search or seizure.

The seizures of Plaintiffs and search of their home on April 11, 2023 (Count V) were predicated on "text messages" sent to a "crisis text line" by a "3rd party caller." (ECF 28-1 at 172-3). Whatever this is, it's most certainly not an emergency 911 call made by someone claiming to be an eyewitness. In the light most favorable to the Plaintiffs, this Court should conclude that this was an anonymous tip made to a non-emergency number.

And finally, the seizures of Plaintiffs and search of their home on April 12, 2023, (Count VI) was predicated by a tip provided to a "chat line for crisis center" where the dispatch noted, "there is no way to track subjs info." (ECF 28-1 at 181). Once again, this was an anonymous, untraceable tip to something other than 911.

So, for claims IV, V, and VI the case law related to bona-fide emergency calls to 911 is inapplicable. The searches and seizures in these claims fall into the well-established rule that "something more than just the anonymous call was needed to allow Defendants to enter Plaintiffs' home without a warrant." *Williams v. Maurer,* 9 F.4th 416, 433 (6th Cir. 2021) (collecting cases from the Second, Sixth, and Tenth Circuit); *see Werner v. Wall,* 836 F.3d 751, 762 n.28 (7th Cir. 2016) (explaining how a broad consensus of other Circuits can defeat a claim of qualified immunity even if there is no in-circuit decision dead on point.) At minimum, Defendants' motion to dismiss should be denied for Claims IV–VI.

**D. Each Officer-Defendant was personally aware of the history of bogus swatting calls.**

Even the calls that were made through 911 did not create probable cause of an ongoing crime or exigency. Defendants argue that 911 calls reporting emergencies *always* justify a warrantless search or seizure.

Case law says otherwise. The Supreme Court has made it clear that its decisions should not be read to "suggest that tips in 911 calls are *per se* reliable"; instead, the fact that a "caller's use of the 911 systems" is just "one of the relevant circumstances" officers are entitled to consider when assessing a given situation. *Navarette v. California,* 572 U.S. 393, 400 (2014).

The Seventh Circuit, before *Navarette* similarly avoided a *per se* rule about 911 calls. *United States v. Richardson,* 208 F.3d 626, 631 (7th Cir. 2000). The Court expressly declined to "exclude the possibility of a case in which it would be objectively unreasonable for a police officer to rely on a 911 call, because of additional information available to the officer, . . ." *Id.* This is that case.

In *Richardson*, the Seventh Circuit analyzed a warrantless home entry. *Id.* at 629. "The police officer's claim of exigent circumstances was based entirely on the 911 call, and the 911 operators had received a bogus call with almost exactly the same report only a week earlier." *Id.* The Seventh Circuit observed that an officer's "subjective belief that exigent circumstances exist is insufficient to make a warrantless search" because "the test is objective." In other words, "the government must establish that the circumstances *as they appeared at the moment of entry*, would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required

immediate assistance." *Id.* (emphasis added), citing *United States v. Arch,* 7 F.3d 1300, 1304 (7th Cir. 1993).

Ultimately the *Richards* court found the situation to be a "very close case" but sided with the officers because "they did not personally know about the earlier bogus report" and there was "no evidence indicating that the 911 system is abused so often that it is objectively unreasonable for the police to rely on a call like the one…here." *Id.* at 631.

Contrast that to the case at hand. Here, each individual officer, in the light most favorable to the Plaintiffs' claims, was aware of the history of bogus reports. It was broadcast to them over dispatch, and the officers mentioned it in their police reports. And so, the Defendants should have known that the 911 system, at least when it came to Robinson and Tomlinson, was abused "so often that it is objectively unreasonable for the police to rely on a call." *Id.*

Defendants' argument otherwise is contrary to controlling law. The Seventh Circuit has recognized that when officers are responding to an emergency call, they cannot simply rely on a "potentially unreliable tip" when they have "more information" that tends to contradict that tip. *Bruce v. Guernsey,* 777 F.3d 872, 877 (7th. Cir 2015), citing *Bailey v. Kennedy,* 349 F.3d 731, 739–41 (4th Cir. 2003).

In *Bruce,* an officer seized Falyn Bruce based on a tip from her ex-boyfriend that she was suicidal. *Id.* at 874, 877. The Seventh Circuit allowed the unreasonable seizure claim to proceed past pleading. *Id.* at 879. The Court found that because the officer, after responding to the report, saw Bruce and recognized that she was "perfectly calm and rational" and her father was objecting to taking her away, the claim should go forward.

*Id.* at 877. In doing so, the court emphasized that, because "determining whether probable cause exists" requires a "consideration of the particular circumstances facing the officer," the responding officer could not ignore these facts when assessing if there was really an exigent circumstance justifying a seizure of Bruce. *Id.* at 879.

In a similar vein, in *Hebron v. Touhy,* the Seventh Circuit was unsatisfied with an argument that officers were justified in arresting Susie Hebron solely because they "received reports from two persons…who depicted themselves as victims of crimes." 18 F.3d 421, 422. The Seventh Circuit acknowledged that "such reports ordinarily establish probable cause" but found the situation there was outside the ordinary because the report was of "questionable reliability" and so "the police needed to investigate." *Id.* The court explained,

> Sometimes information from or about a person claiming to be the victim of crime would lead a reasonable officer to be suspicious, making further investigation prudent—and, because the "reasonableness" standard of the fourth amendment links the constitutional obligation to the standard of prudent conduct, the officer must do more.

*Id.* at 422–23, citing *Reardon v. Wroan,* 811 F.2d 1025 (7th Cir. 1987) and *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1344–47 (7th Cir. 1985).

In *Hebron*, the reports came from Hebron's tenants, who the officers knew "were being evicted," so the court concluded that "the significant chance that [the tenants] bore a grudge against their landlords would have made it unreasonable—and therefore unconstitutional—to arrest the landlords on the tenant's mere say-so." *Id.*, citing *Illinois v. Gates,* 462 U.S. 213, 227 (1983).

Here, the officers knew about the situation at the Robinson-Tomlinson home, knew about the previous swatting incidents, and knew that there was a group of people who

seemed "determined to continually call false reports on" them. (ECF 28-1 at 52). Like the officers in *Hebron* and *Bruce,* the officers responding to Plaintiffs' home needed to do more to determine whether the calls were just another in the endless string of hoaxes before seizing the Plaintiffs and searching their home.

At bottom, the law is clear. When determining whether a search or seizure is justified, Seventh Circuit precedent "imposes upon" the police "the duty to act in a reasonable fashion and not to take an ostrich-like approach" when assessing a situation. *Madero v. McGuinness,* 97 F.4th 516, 523 (7th Cir. 2024).

The Officer-Defendants here had information in hand that should have made them wary that on these seven occasions, just like the other thirty-eight times, there was no legitimate emergency at the Plaintiffs' home. And when they spoke to the Plaintiffs who confirmed they were ok, any reasonable officer would have no remaining concern that there was a true emergency that justified a warrantless home entry, search, or seizure of the Plaintiffs. They could not "close [their] eyes to facts that would clarify the situation." *McBridge v. Grice,* 576 F.3d 703, 707 (7th Cir. 2009).

The officers' decisions to ignore the history of swatting calls and Plaintiffs' assurances that they were fine and instead conduct warrantless searches and seizures were unreasonable. The motion to dismiss should be denied.

**E. These were not run-of-the-mill 911 domestic violence calls.**

Defendants place heavy emphasis on a string of cases from the Seventh Circuit and district courts that stand for the proposition that "officers need not cancel an investigation on request," especially in a case involving a potential domestic violence situation because

"it is not uncommon for victims of domestic violence to deny an assault, especially when an abuser is present." (ECF 28 at 11–12), citing *Hanson v. Dane Cty., Wis.*, 608 F.3d 335, 338 (7th Cir 2010),

These cases stand for the obvious idea that, *generally,* police responding to a domestic violence call should not abandon a potential abuse victim simply because they report being fine while their potential abuser looms over them in a home. Again though, Defendants are attempting to stick the very square peg of this case into the round hole of general principles. The callouts here were not *routine.* The officers knew there was a history of false reporting at the home.

Officers were responding to calls that, for the most part, reported that Robinson had been murdered, bound, or otherwise totally incapacitated. (ECF 28-1). When officers arrived, Robinson either appeared at the door or spoke to the officers via her doorbell camera and told them she was totally fine. (ECF 13, ¶¶60, 77, 86, 92). Or Tomlinson told them they were fine and asked the officers to leave. *Id.*, ¶¶111–12, 120.

When dispatched to a home that is a "KNOWN SWATTING LOCATION" to investigate a murder, only to find the person whose murder you're there to investigate answering the door alive and well, any reasonable officer should take a step back and realize this was another bogus call. Any reasonable officer would realize there was no emergency that required a warrantless seizure and entry into the home in those circumstances.

Contrast that situation to one analyzed by this Court in *Anderson v. City of West Bend Police Dept.* where this Court concluded that a report from a potential victim of domestic

violence that they were "fine" did not eliminate the officers' belief that she may have been in need of "immediate assistance and that the danger of domestic violence had not passed." 774 F.Supp.2d 928, 940 (E.D. Wis. 2011). But look at what the officers on scene did in *Anderson*: they continued to investigate, and they found evidence that made them realize there could still be danger.

In *Anderson*, officers "went to speak with witnesses" and discovered the "911 caller" was a neighbor who "heard a female voice say help me, help me" and heard things "like furniture moving and things banging around." *Id.* at 941–42. And so, "though the officers may not have observed evidence of violence or other type of emergency…the other facts known to them and gathered during this lull in time provided the officers with objectively reasonable belief that Anderson's safety was threatened and the situation was sufficiently exigent as to justify entry without a warrant." *Id.* at 942.

Here, officers who spoke to the Plaintiffs at their home not only had *nothing* corroborating the initial 911 calls but *actively knew* that the Plaintiffs were the victims of a never-ending campaign of false emergency reports at their home. This makes the situation present at the Plaintiffs' home easily distinguishable from a standard call-out for a domestic violence situation. The calls were not corroborated. The fact that the calls were false was corroborated.

"The key question in a warrantless entry case is whether the circumstances as they appeared *at the moment of entry* would lead a reasonable, experienced law enforcement officer to believe that someone inside the house…required immediate assistance." *Bautista v. Village of Lomira,* 2013 WL 2405443 at * 8 (E.D. Wis. May 31, 2013). And while a

"911 call can help support a warrantless entry under the exigent circumstances exception," the officers here were armed with information that should have led them to be skeptical in the first place that there was any danger at all, and any remaining concern should have been dissipated when Ms. Robinson and Mr. Tomlinson told them they were fine. *Id.* distinguishing from *Anderson*, 774 F.Supp.2d 928.

On 38 other occasions, officers responding to similar calls at the Robinson-Tomlinson home realized that there was no emergency. Thirty-eight times, officers realized there was no exigency. There's no reason why on the seven occasions here, the officers should not have realized the same thing.

It was unreasonable on these seven occasions, "based on actual knowledge the officers had at the time," for the Defendants to believe there was any exigency. *Fitzgerald v. Santoro,* 708 F. 3d 725, 730–31 (7th Cir. 2013), citing *United States v. Jenkins,* 329 F.3d 579, 581 (7th Cir. 2003). These officers should have recognized it was yet another hoax and left after speaking to the Plaintiffs. To instead seize them and search their home was unreasonable. The motion to dismiss should be denied.

**F.  The front porch is curtilage.**

Defendants argue that "it is worth noting that the porch area outside of a front door would not be considered curtilage" and therefore argue that the officers entering into, remaining upon the porch after being told to leave, and demanding the Plaintiffs present themselves for inspection would not require a warrant. (ECF 28 at 12-13).

This position is directly contrary to controlling law: "as the Supreme Court has held in no uncertain terms that a front porch—part of a home's so-called curtilage—receives

the same protection as the home itself." *United States v. Banks,* 60 F.4th 386, 387 (7th Cir. 2023). Indeed, in *Jardines,* a case cited by Defendants, "Justice Scalia's majority opinion reasoned that the front porch is the 'classic exemplar' of the curtilage, meaning that it is part of the home for Fourth Amendment purposes." *United States v. Lewis,* 38 F.4th 527, 534 (7th Cir. 2022), discussing *Florida v. Jardines,* 569 U.S. 1, 6 (2013).

Defendant Evans showed up to the Plaintiffs' porch without probable cause of an ongoing crime or exigency. He was allowed to approach and ask for a consensual encounter without implicating the Fourth Amendment. But once he was told to leave—that's it. "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8.

To the extent that any claim here rests and falls on the definition of curtilage, the Plaintiff's front porch is a "classic exemplar" of it and so the Defendant's motion to dismiss should be denied on those grounds. *Id.* at 7.

### G. The right to be free from a warrantless search and seizure in the home, absent exigent circumstances, is clearly established.

Defendants assert qualified immunity. To overcome qualified immunity, a plaintiff must show that his constitutional rights were violated and that the violated right was clearly established. *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017). The second prong can be proved in one of two ways: Plaintiffs "must either (1) present case law that has articulated both the right at issue and applied it to a factual circumstance similar to the one at hand or (2) demonstrate that the 'contours of the right are so established as to make

the unconstitutionality obvious.'" *Ault v. Speicher*, 634 F.3d 942, 946 (7th Cir. 2011), quoting *Boyd v. Owen*, 481 F.3d 520, 526–27 (7th Cir. 2007).

The Court should reject qualified immunity because the contours of the right are clear. As a starting point, we are talking about a home here.

First, the "physical entry of the home is the chief evil against which the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585–86 (1980). An officer cannot enter a home without a warrant or an exception to the warrant requirement. *Lange v. California*, 594 U.S. 295, 301 (2021).

Second, the front porch receives the same protection as the home. *Banks*, 60 F.4th 386, 387. "By 1984 the Supreme Court made plain that the Fourth Amendment provides equal protection to a home's curtilage, the area immediately surrounding the home itself." *Id.* at 389, citing *Oliver v. United States*, 466 U.S. 170, 180 (1984).

And third, the exigent circumstances and emergency aid exception to the warrant rule require probable cause of an exigency or emergency. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 559–60, 564 (7th Cir. 2014).

The analysis is not complicated. Officers know they can't go into homes without warrants, and exigent circumstances or emergency aid require probable cause to believe there's an emergency.

Consider a thought experiment. If these officers had sought warrants, would they have been granted? As a threshold point, inferences must be drawn in Plaintiffs favor at this stage. *Twombly*, 550 U.S. at 572. Plaintiffs have not taken depositions of the officers yet. We don't know how many of the swatting attempts the officers were aware of when

they arrived at the Robinson-Tomlinson home. We don't know if there were emails about it. We don't know if there were memos about it. We *do* know that the harassers, pretending to be Tomlinson, called in a bomb threat to Miller Park during the Brewer's home opener in 2023. (ECF 28-1 at 73; JR Radcliffe, *Replay: Brewers 10, New York Mets 0; it's a blowout in home-opening victory*, Milwaukee Journal Sentinel (April 3, 2023)[2]). So it's reasonable to infer that *every* officer in Milwaukee was aware of Tomlinson's issues with his harassers.

With that, let's look at what the officers knew.

In Count II (August 11, 2022), Defendant Plevak knew "there had been previous calls to the residence eliciting multiple squad responses." (ECF 13, ¶68). The calls said that there was a gunshot, that Tomlinson had beat Robinson up, and that Tomlinson had a pistol. (ECF 28-1 at 123–26). Robinson answered the door and explained that they were having issues with false police calls. (ECF 13, ¶69). Plevak ordered Robinson outside and then searched the home. Would a warrant have issued for her to do so?

In Count III (October 1, 2022), Defendants Kohler, Wasechek, and Mustafa knew when they arrived that the Robinson-Tomlinson home was a "known swatting location." *Id.*, ¶76. The caller again pretended to be Tomlinson and said he had shot Robinson. (ECF 28-1 at 129). When the officers arrived, Robinson answered the door and said she was okay.

---

[2] Available at:
https://www.jsonline.com/story/sports/mlb/brewers/2023/04/03/new-york-mets-vs-milwaukee-brewers-2023-home-opener-game-score-updates-american-family-field/70070220007/

(ECF 13, ¶77). The officers pointed their firearms at *her*, ordered her out of the home, and searched it. *Id.*, ¶¶78–79. Would a warrant have issued for that search?

In Count IV (March 20, 2023), Defendants Evans, Garrido, and Orlando responded to the 18th swatting call. *Id.*, ¶¶82–83. When they arrived, they knew the "address is known for swatting calls." *Id.*, ¶84. Dispatch told them there was a swatting risk. *Id.*, ¶85. The call had come from an untraceable VPN. (ECF 28-1 at 162). Tomlinson and Robinson told the officers they were fine, and it was just another swatting call. (ECF 13, ¶¶86, 88.). Evans told Robinson that he was "well aware" of the situation. *Id.*, ¶87. Evans called another Sergeant who told him that she had told Tomlinson she wouldn't search their home. *Id.*, ¶97. Evans then entered and searched the home over Robinson and Tomlinson's objections. (ECF 28-1 at 53–54). Would a warrant have issued for him to do so?

In Count V (April 11, 2023), Defendant Carleton responded to the fourth swatting attempt of the day. (ECF 13, ¶¶102, 107). This swat came in through a VPN chat service. *Id.*, ¶106. Carleton knew that the Robinson-Tomlinson home had been prey to "numerous false reports." *Id.*, ¶108. He knew that people were "determined to continually" swat the home. *Id.*, ¶109. Despite all that, Carleton ordered Robinson out of the home at gunpoint, handcuffed Tomlinson, and searched the house. *Id.*, ¶¶111–13. Would a warrant have issued for him to do so?

In Count VI (April 12, 2023), Defendant Evans again came to the Robinson-Tomlinson home, this time with Defendant Petersen. (ECF 13, ¶¶114, 118). Obviously, Evans knew what was happening; he had been there two weeks earlier. But as to Petersen, by now dispatch had stopped just saying there was a swatting risk; dispatch said, "be advised

swatting related call." *Id.*, ¶115. The officers were told ahead of time it was a false call. And when they arrived, a passerby said they did not hear any gunshots, which was inconsistent with the bogus call. *Id.*, ¶117. Despite that, the officers ignored Tomlinson's request to leave his curtilage and instead tried to kick the door down and ordered Robinson downstairs. *Id.*, ¶¶120–123. Would a warrant have issued for this?

In Count VII (April 17, 2023), Defendant Evans came again to the home, this time with Defendant Vento. *Id.*, ¶¶125–26. They were both aware that the "address is the victim of daily swatting calls." *Id.*, ¶127. But still, Evans refused to leave the porch when asked to do so and instead ordered Robinson to show herself. *Id.*, ¶129. Would a warrant have authorized the officers to stay on the porch and force Robinson to show herself?

These are clear violations of established law. As the *Bautista* court explained, "that warrantless searches are presumptively unreasonable is undoubtedly clearly established law" and "[t]hat a police officer needs an exception to the warrant requirement is equally well established." *Bautista,* 2013 WL 2405443 at *9, citing *Payton,* 445 U.S. at 586 and *Katz v. United States,* 389 U.S. 347 (1967). The same is true of warrantless seizures in the home. *United States v. Tepiew,* 859 F.3d 452, 456 (7th Cir. 2017) ("A warrantless search or seizure conducted inside a home is, therefore, presumptively unreasonable.").

Strange situations in Section 1983 cases do not always lead to dismissal on qualified immunity grounds. Qualified immunity does not apply just because there are unique facts; "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Sometimes, the situation is one that has not generated analogous case law because it is so obvious

that the defendants' actions were unconstitutional that *no other state actor has even attempted to justify a similar situation*. When "widespread compliance" with "clearly apparent law" has "prevented the issue from previously being litigated" a plaintiff is not required to present a court with a set of perfectly "analogous cases." *Denius v. Dunlap*, 209 F.3d 944, 951 (7th Cir. 2000). This Court should find that the searches and seizures at issue here were obviously unconstitutional, and so, Defendants are not entitled to qualified immunity.

### H. The failure to intervene and *Monell* claims should go forward.

The Defendants accurately explain the law surrounding the failure to intervene claims here. Plaintiff agrees that the analysis for those claims rises and falls on the question of whether "the Defendants' actions were constitutionally permissible." (ECF 28 at 14). For the reasons stated above, because there were constitutional violations and the officers "had reasonable opportunity to intervene to prevent harm" these claims should go forward, and the motion to dismiss them should be denied. *Id.*, citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Similarly, on the *Monell* claims, Plaintiffs rely on their above arguments on the question of whether a constitutional violation occurred, which we agree is a prerequisite to establishing *Monell* liability in this case. *Id.* at 20.

Turning to the issues unique to a *Monell* claim, the operative complaint alleges facts sufficient to allow the claim of municipal liability to go forward. To state a claim for municipal liability, a plaintiff must allege three things: 1) an action pursuant to a municipal policy, 2) knowledge of the municipality that the policy would lead to constitutional violations and 3) that the policy was the "moving force" behind the

constitutional violation. *Hall v. City of Chicago,* 953 F.3d 945, 950–51 (7th Cir. 2020). Failing to train or condoning repeated behavior qualifies as a policy. *Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir. 2010) (holding that a "series of bad acts creat[es] an inference that municipal officers were of and condoned the misconduct of their employees.").

We have plausibly alleged all three here. We have a pattern of constitutional violations, given that the Plaintiffs' home was breached on seven different occasions on bogus calls. That gives rise to a plausible conclusion that the City of Milwaukee condoned these illegal searches, "which in turn could give rise to a pattern or practice that has the force of law." *Ashford v. City of Milwaukee,* 304 F.R.D. 547, 549-550 (E.D. Wis. 2015).

We have knowledge, both because the Plaintiffs actively contacted the City of Milwaukee to warn them that they were the victims of a swatting campaign and because Milwaukee officials responded to their home *on at least 45 occasions.* (ECF 13, ¶¶6, 56–57).

And causation: as the Defendants put it in their own motion to dismiss, the City's belief that there was no reason to train or educate their officers on why they should "deviate[]" from the "standard protocol" of treating every call to the Plaintiffs' home as exigent circumstances led to the warrantless searches and seizures here. (ECF 28 at 2). This Court should allow the *Monell* claim to proceed.

### V. CONCLUSION

The reasonable response to the callouts to Plaintiffs' home on 38 occasions are *not* the subject of this lawsuit. The seven unreasonable responses are. The officers should have come out, checked with the Plaintiffs, and then left once they confirmed they were fine and the call was another hoax.

But not every officer acted reasonably, and that's what gives rise to the claims here. Take, for example, Sergeant Lyndon Evans. No reasonable officer could believe that even though he had responded to this exact house on multiple previous occasions to calls he determined were bogus, he was justified in conducting a warrantless seizure of the Plaintiffs and threatening to kick down their door when responding to a nearly identical call. (ECF 13, ¶¶85–131). Even with both Ms. Robinson and Mr. Tomlinson asking him to leave, telling him that this was yet another bogus call. *Id.* ¶¶ 125-131.

The Court should conclude that, at least at this stage, it should have been obvious to officers who were aware that the Plaintiffs were the targets of an endless stream of bogus tips and reports that they should not enter into their home, seize them, and search the premises despite the Plaintiffs telling them they were fine.

And this Court should conclude that it is at least plausible that the City of Milwaukee had a responsibility, after being contacted by the Plaintiffs and made aware of the situation, to curb the excesses of officers like Sergeant Evans who refused to take into account that information before deciding to effectuate the "chief evil" that the Fourth Amendment seeks to protect: unjustified "government entry into the home." *United States v. Sabo,* 724 F.3d 891, 893 (7th Cir. 2013) (citing *Payton,* 445 U.S. at 585).

The Defendants motion to dismiss should be denied, and the case allowed to proceed forward.

Respectfully submitted,

Dated: August 21, 2024

STRANG BRADLEY, LLC,

/s/ James Odell
John Bradley
  Wisconsin Bar No. 1053124
James Odell
  Wisconsin Bar No. 1131587
William E. Grau
  Wisconsin Bar No. 1117724
613 Williamson St., Suite 204
Madison, Wisconsin 53703
(608) 535-1550
John@StrangBradley.com
James@StrangBradley.com
William@StrangBradley.com