UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

NIKI ROBINSON and PATRICK TOMLINSON,

        Plaintiffs,

v.                                          Case No. 24-CV-00264

CITY OF MILWAUKEE, LYNDON EVANS,
CHRISTIAN GARRIDO, BRADLEY ORLANDO,
NICOLE PLEVAK, JOHN KOHLER,
JACOB WASECHEK, FIDAH MUSTAFA,
NATHANIEL PETERSEN, SEAN CARLETON,
and PAUL VENTO,

        Defendants.

---

### DEFENDANTS' REPLY BRIEF

---

On August 1, 2024, Defendants filed Defendants' Notice of Motion to Dismiss (*see* ECF 27), Brief in Support of Their Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) (*see* ECF 28), and Exhibit A to their brief (*see* ECF 28-1). On August 21, 2021, Plaintiffs filed Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss. *See* ECF 31. Pursuant to Civil Local Rule 7(c), Defendants reply in support of their Motion:

**1. The 911 Case Precedent Applies Equally to All Requests for Emergency Service in This Case, Regardless of Whether They Originated as A 911 Call.**

Plaintiffs claim that because some of the requests for emergency service at issue in their case involve requests made via means other than a telephone call and to entities other than the official 911 call center—characterizing them as "tips that came from anonymous sources to non-emergency lines"—the 911 case precedent does not apply. *See* ECF 31, pgs. 12-13. They note that one request came from a VPN to a suicide prevention line (*see* ECF 31, pg. 12), another

came from text messages to a crisis text line (*see* ECF 31, pg. 13), and another came from a chat line for a crisis center (*see* ECF 31, pg. 13).

Plaintiffs cite *United States v. Lopez*, 907 F.3d 472 (7th Cir. 2018) seemingly arguing that the tips here, as there, were "unreliable" and insufficient to trigger a search or seizure. *See* ECF 31, pg. 12. Defendants note that the "unreliable and uncorroborated tip" and actions by officers in *Lopez* are clearly distinguishable from the requests for emergency service and actions by police officers involved in Plaintiffs' case: *Lopez* involved police acting "on a tip the officers had obtained the previous night from an informant detained for suspected drug trafficking," and who "stopped cooperating with the officers as soon as he was out of their sight," by stopping and frisking the defendant, who was loading paper bags into his garage, based on a mere "hunch" that the bags contained drug-trafficking contraband. *Lopez*, 907 F.3d at 475. After finding no contraband, the lead officer realized his hunch had been mistaken, at one point telling defendant he was free to go; however, this statement was illusory, because other officers kept possession of defendant's cell phone and keys, "effectively restraining his liberty to leave and stripping the assurance of meaning." *Id*. at 475-476. While detained, officers eventually obtained defendant's permission to search his house based on another hunch that defendant kept drugs there, and found drugs and a gun. *Id*. at 476.

Here, by contrast, the tips came from someone claiming or purporting to be Plaintiff Tomlinson, often making statements against his own penal interests, alleging very serious and violent circumstances that required immediate response and assistance that, if true, would have put human lives at risk if police waited to do more/different fact-finding and investigation before acting on the information *See* ECF 28-1, pgs. 8, 28, 29, 33, 41, 46, 52, 53, 62, 63, 82, 83, 88, 95-98, 113, 115, 118, 120, 123-124, 125, 127, 139, 145, 147, 156, 158, 162, 165, 167-168, 169, 172,

2

176, 178, 186, 188, 192, 194, 197, 202, 204, and 209. And here, the officers' conduct was proportionate and reasonable, and designed to ensure the occupants' safety; they detained the alleged suspect until further information determined the complaint was baseless (*see* ECF 28-1, pg. 8); and/or asked to see the alleged victim to assure themselves she was actually okay, rather than just taking the alleged suspect's assurances at face value (*see* ECF 28-1, pgs. 52, 60); and/or they asked to quickly clear the house to ensure no one else was present that was in need of immediate police intervention or medical assistance (*see* ECF 28-1, pgs. 11, 41, 54, 118. On occasions when the alleged victim(s) came to the door or could be physically observed by officers, did not appear to be injured or under distress, and stated they were fine and that they did not make the request in question, officers were able to satisfy themselves the emergency service requests alleging them as suspects/victims must have been false and left without further incident. *See* ECF 28-1, pgs. 12, 17, 29, 31, 33, 38, 39, 42, 46, 57, 114, 142.

In any event, the case precedent Defendants cited involving 911 calls (*see* ECF 28, pgs. 6-11, 17-18) is applicable to this case involving more modern methods of communication than existed or were common at the time those cases were decided. As Plaintiffs stated, virtual private networks ("VPNs") can[1] be used to disguise a user's identity (*see* ECF 31, pgs. 12-13), but it is worth noting that the same concern was present at the time the 911 cases cited by

---

[1] It is worth noting that in *United States v. Cox*, 54 F.4th 502, 508 (7th Cir. 2022), the case Plaintiffs cited for the proposition that VPNs *can* facilitate discreet browsing by disguising the user's identity (*see* ECF 31, pgs. 12-13 (emphasis added)), the FBI tracked the internet address associated with some of the offending messages to the defendant in that case, searched his computer, and found a VPN on it. *Id*. Despite Defendant Cox's "efforts to cover his tracks through third-party Facebook accounts, VPNs, and burner text message apps," law enforcement was nevertheless able to track him down. *See United States v. Cox*, No. 1:18-CR-83-HAB, 2021 WL 878729, at *4 (N.D. Ind. Mar. 9, 2021). Defendants also note VPNs are commonly used for many legitimate reasons, including but not limited to accessing an employer's network while working remotely (*see Glob. Imaging Acquisitions Grp., LLC v. Rubenstein*, No. 14-C-0635, 2017 WL 11673437, at *8 (E.D. Wis. Aug. 16, 2017) and *United States v. Hanjuan Jin*, 833 F. Supp. 2d 977, 1000 (N.D. Ill. 2012), *aff'd,* 733 F.3d 718 (7th Cir. 2013)); ability to access geographically-restricted content (*see Commodity Futures Trading Comm'n v. Zhao*, No. 1:23-CV-01887, 2023 WL 10448932, at *5 (N.D. Ill. Dec. 14, 2023)), and general concerns about privacy and data security (*see Svoboda v. Amazon.com, Inc.*, No. 21 C 5336, 2024 WL 1363718, at *10 (N.D. Ill. Mar. 30, 2024) (Amazon contended "many individuals use VPNs to mask their IP address for privacy or data security")).

Defendants were decided, which was between 2000 and 2008. *See* ECF 28, pgs. 6-7, 9-10. In 1998, the Federal Communications Commission (FCC) began to require cellular carriers to relay the caller's phone number to 911 dispatchers. *Navarette v. California*, 572 U.S. 393, 401, 134 S. Ct. 1683, 1690, 188 L. Ed. 2d 680 (2014) (citation omitted). Beginning in 2001, carriers have been required to identify the caller's geographic location with increasing specificity. *Id*. Even with these developments, though, there is only so much that can be done to ensure reliability. For example, in *United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018), "[t]he caller borrowed a stranger's phone, limiting the usefulness of the system's tracing ability. Any phone number identified would not lead back to the caller because he had no permanent connection to the phone, and the phone's geographic location at the time of the call would be useful only so long as the caller remained near the phone." *Id*.

The reason emergency 911 calls are "entitled to greater reliability than an anonymous tip concerning general criminality" (*United States v. Drake*, 456 F.3d 771, 775 (7th Cir. 2006)), is not because 911 calls are traceable to a specific phone number and/or location, but rather because of the contemporaneous reporting of an emergency from someone claiming to be an eye witness and expressing an immediate risk of harm. *See Navarette*, 572 U.S. at 399-400 (discussing evidentiary concepts, such as present sense impression and excited utterance, as reasons why a contemporaneous report has long been treated as especially reliable); and *Drake*, 456 F.3d at 775 (noting two sister circuits have afforded eyewitness 911 reports of ongoing emergency situations involving anonymous callers the same treatment as if not anonymous, and citing *Anthony v. City of New York,* 339 F.3d 129, 136-37 (2d Cir.2003) (anonymous 911 call placed from verifiable address justified warrantless entry based on exigent circumstances, where caller "expressed an immediate risk of harm to herself") and *United States v. Holloway,* 290 F.3d 1331, 1338–39

(11th Cir.2002) ("[W]hen an *emergency* is reported by an anonymous caller, the need for immediate action may outweigh the need to verify the reliability of the caller.")).

The three claims Plaintiffs allege do not involve 911 calls are Counts IV, V, and VI. *See* ECF 31, pg. 12. Count IV was from March 20, 2023 and was a "VPN call" made to the Suicide Prevention Life Line which was relayed to local law enforcement. *See* ECF 28-1, pgs. 40-41, 53-56, and 162-163. Count V was from April 11, 2023 and was relayed to local law enforcement by the Suicide Hotline/Trevor Project through a VPN chat service. *See* ECF 28-1, pg. 176. Count VI was from April 12, 2023 and was relayed to local law enforcement by "211 Tampa Bay Cares." *See* ECF 28-1, pgs. 178-179.

All of those calls involved a person who stated that they were Plaintiff Tomlinson, provided Plaintiff Tomlinson's address, and was contemporaneously reporting the information as the perpetrator of a violent offense for which the victim(s) would need emergency police or medical assistance. That the information was initially provided either to a suicide prevention hotline or a 211-crisis hotline rather than directly to 911 does not take it out of the realm of the 911 cases cited by the Defendants.

Limitations for verifying the accuracy and reliability of requests for emergency services exist regardless of the technology used, and the 911 case precedent is no less applicable to the facts here as it would be if all of the requests for service had been made via phone calls to 911.

### 2. Knowledge About Prior False Calls for Emergency Service Did Not Render All Subsequent Requests for Emergency Service Unreliable.

Plaintiffs state that they "agree that on every occasion the police came to their home, the officers were responding to a call that, in the abstract, involved situations of an exigent nature." ECF 31, pg. 10. However, they claim that "[t]here exists some number of provenly false 911 calls at a citizen's home that would make every reasonable officer take pause before breaching

the sanctity of the home." *Id*. Plaintiffs contend that their case is the potential future case that was contemplated by *United States v. Richardson*, 208 F.3d 626 (7th Cir. 2000) when it declined to "exclude the possibility of a case in which it would be objectively unreasonable for a police officer to rely on a 911 call, because of additional information available to the officer." *See* ECF 31, pg. 14-17; *Richardson*, 208 F.3d at 631. To that end, they claim that the officers could not have relied upon the information conveyed in the requests for emergency service, because the information they allegedly had about previous swatting attempts constituted "more information" tending to "contradict that tip," made doing so objectively unreasonable. *See* ECF 31, pg. 15. However, Plaintiffs do not state what number of false calls for emergency services is the threshold at which reasonable officers should no longer undertake any investigation involving asking to see the alleged victim or asking to check the residence to ensure that no one inside required emergency assistance. Further, Plaintiffs ask the Defendants to draw no distinction in the time between previous calls and focus solely on the volume of calls. *See* ECF 31, pgs. 17, 20.

Plaintiffs state that it was fine for police to *respond* to the calls, but take issue with police actually *investigating* the subject of the calls while on scene, such as by asking to see the alleged victim, or asking to briefly enter the house to do a welfare check to satisfy themselves that indeed no one needed immediate help and/or medical attention, etc. *See* ECF 31, pgs. 1-2. The *Bruce* and *Hebron* cases Plaintiffs cite suggest otherwise, and in any event are distinguishable from the facts in Plaintiffs' case.

In *Bruce v. Guernsey*, 777 F.3d 872 (7th Cir. 2015), the plaintiff—a minor child—and her father both met with police and assured them plaintiff was fine, and that she was not suicidal, after police received a report from her boyfriend that she had attempted to commit suicide. *Bruce*, 777 F.3d at 874. Plaintiff "showed absolutely no signs of physical, mental, or emotional

distress"; additionally, there were other people at the home that the officer could have asked about plaintiff's mental state, but did not. *Id.* Despite all of this another officer insisted, over plaintiff and her father's objection and their protestations that plaintiff was fine, that plaintiff come with him to the hospital. *Id.*

By contrast, officers here merely asked to see Plaintiff Robinson to assure she was in fact alright, as she claimed (*see* ECF 28-1 pgs. 10-11, 40-41, 53-56, 116-118, 123-124, 129-130, 162-163,) or to clear the home to ensure no one was in need of emergency services; once the officers were able to see Plaintiff Robinson and/or briefly check the home to assure that there was nobody in need of emergency services (*see* ECF 28-1, pgs. 51-52, 60, 176-179,) they left without incident—they did not insist on taking Plaintiffs anywhere for treatment, nor did they question or arrest Plaintiff Tomlinson on the basis of the facts alleged in the emergency calls which painted Plaintiff Tomlinson as the perpetrator of serious violent crimes. Furthermore, the *Bruce* case merely determined that plaintiff's claims concerning the second officer who insisted on taking her to the hospital should not have been dismissed; it did not definitively hold that the second officer's actions were unconstitutional. *Bruce*, 777 F.3d at 879. Further, *Bruce* noted that the first officer had "indisputable probable cause to detain [plaintiff] briefly," upholding the district court's decision dismissing the claims against that officer. *Bruce*, 777 F.3d at 875, 879. So, in that sense, *Bruce* is more helpful to Defendants than Plaintiffs, showing it was reasonable for the officer to detain the plaintiff to investigate the suicide claims made by her boyfriend; likewise, here, it was reasonable for the officers to detain Plaintiffs and/or briefly clear their home before determining there was no merit to the requests for emergency service.

Similarly, the *Hebron v. Touhy*, 18 F.3d 421 (7th Cir. 1994) case cited by Plaintiffs is more helpful to Defendants than Plaintiffs, as it points out that ordinarily, complaints from

alleged victims establish probable cause; that further investigation is prudent if the report received is of questionable reliability, and that probable cause "depends on information known to the police at the time, not on how things turn out." *Id.* at 422-423. In *Hebron*, that investigation involved, among other things, police going into both the landlord's unit and the tenant's unit to determine whether the water was on, as the tenants claimed that the plaintiff—their landlord—shut their water off. *Id.* at 423. Likewise, here, the police investigation involved asking to see Plaintiff Robinson—the subject of the requests for emergency service—to check on her wellbeing, and/or requesting to clear the house, where the requests for emergency service suggested victim(s) in need of immediate medical attention and/or police intervention would be found. *See* ECF 28-1, pgs. 11, 41, 52, 54, 60, and 118. And, although it ultimately turned out that the requests for emergency service were false, the inquiry of the reasonableness of the police conduct turns upon the information known to police at the time, which was that someone purporting to be Plaintiff Tomlinson made requests for emergency service in which he made statements against his penal interests that involved life-threatening injuries and/or imminent serious bodily injury or death, and, for some of the incidents alleged by the Plaintiff, and that the CAD report noted a potential swatting risk and/or that the police indicated being aware there was a history of swatting. The law does not require that officers turn a blind-eye to an investigation or dismiss reports for service merely because the CAD report contains a notation of a potential swatting risk at that address.

Plaintiffs argue that, "something more than just the anonymous call was needed to allow Defendants to enter Plaintiffs' home without a warrant." ECF 31, pg. 13 (citing *Williams v. Mauerer*, 9 F.4th 416, 433 (6th Cir. 2021)).

8

Case 2:24-cv-00264-JPS     Filed 09/04/24     Page 8 of 15     Document 32

Defendants note that the *Williams* case is not applicable here, as the requests for emergency service were not "anonymous" for purposes of *Williams*, nor did they come from an unknown and unaccountable informant who neither explained how they knew the information nor supplied any basis for believing they had inside information. *Williams* involved an anonymous person who called 911 and claimed she heard someone bust into her neighbor's house, and heard screaming and broken glass, and told them the neighbor's apartment number was 102. *Williams*, 9 F.4th at 423. Officers responded to the scene, but nobody answered the door. *Id*. Two of the officers discovered broken glass, but only on the outer pane of a window, and determined it wasn't a point of entry for an intruder. *Id*. The other two officers called dispatch to confirm the apartment number. *Id*. The officers briefly discussed whether they should "boot the door," but their discussions were interrupted by a call from dispatch informing them that the dispatch officer had called the anonymous caller back and the caller now said she could not be positive about which apartment it came from. *Id*. Despite that, and the fact that the officers did not hear any signs of a disturbance, the officers continued to knock on the door. *Id*. at 423-424. Even after Plaintiff opened the door and police saw no visible injuries or any signs of suspicious activity, and she told them she was fine, and responded affirmatively when officers asked if she had an ID, the officers began to push their way into the apartment. *Id*. at 424. The *Williams* case, and the *Florida v. J.L.*, 529 U.S. 266 (2000) case upon which it heavily relies, are clearly distinguishable from the facts here. Both *Williams* and *J.L.* involved anonymous calls, whereas here the person(s) requesting emergency services claimed to be Plaintiff Tomlinson. The *Williams* case "merely alleged that there had been a disturbance in an unknown area of the building" by someone who heard something but who "did not 'want to get involved'" (*Williams*, 9 F.4th at 423 and 433), whereas here the address to Plaintiffs' residence was provided by

someone alleging to have committed a crime at that address. *J.L.* involved a call that a young black male in a plaid shirt who was standing at a particular bus stop was carrying a gun, and although officers observed someone matching that physical description at the bus stop, they did not have reason apart from the tip to suspect illegal conduct, yet nevertheless stopped and frisked the man. *J.L.*, 529 U.S. at 268. The Supreme Court ruled the frisk violated the Constitution because "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id* at 271. Here, we have reports made by individual(s) purporting to be Plaintiff Tomlinson, about offenses and circumstances for which he, as the alleged perpetrator, had first-hand knowledge.

As far as Plaintiffs' claim that there was something "more" these officers, faced with requests for emergency service in which one or more persons were presently in life-threatening situations where every second was absolutely crucial, should have done, short of asking to see and speak with the alleged victim and/or requesting to enter the home for the express purpose of verifying whether anyone in there was in fact in need of immediate assistance, Plaintiffs fail to establish any such requirement existed. *See* ECF 31, pg. 17. Plaintiffs appear to allege that "do[ing] more" was subject to what Plaintiffs—not the trained and experienced members of law enforcement, or society in general— thought was reasonable, and that the police should have just accepted Plaintiffs' assurances—including the assurances of Plaintiff Tomlinson, the alleged suspect—at face value and left. ECF 31, pg. 17. The case precedent does not support this view. *See* ECF 28, pgs. 11-12. And although Plaintiffs claim they don't take issue with the fact that police responded, but rather with the fact that the investigation undertaken by police involved what Plaintiffs characterize as "searches" and "seizures," the police incident reports suggest

10

otherwise. *See* ECF 28-1, pgs. 5 (Plaintiff Tomlinson telling police he was irritated with their constant response, even though police merely came to check whether Plaintiffs were okay, and did not ask to enter Plaintiffs' home or request that Plaintiff Tomlinson, who spoke to them through a security camera, make himself physically available), 39 (Plaintiff Tomlinson requesting that the District come up with some sort of code word that will identify him as the caller, presumably so police would not respond to any requests for service that did not mention the code word), 69 (Plaintiff Tomlinson emailing detectives stating police should not respond to his residence unless a call is made to 911 on either his cell phone or Plaintiff Robinson's cell phone—that any calls from other numbers or calls routed through third parties should receive no response), and 113 (Plaintiff Tomlinson informed officers he was upset and stated that officers should not be responding to his residence anymore, and Officer Bogust informed Plaintiff Tomlinson that police "have to" respond to that type of call).

    **3.    The Front Porch of the Home is Traditionally Considered Curtilage, but Defendants Did Not Violate the Fourth Amendment by Conducting a Knock and Talk.**

Defendants wish to correct and clarify section D of their brief in support of the motion to dismiss. *See* ECF 28. As Plaintiffs correctly pointed out in their responsive brief, the front porch is traditionally considered the curtilage of the home and entitled to Fourth Amendment protections.

Defendants instead intended to point out and now wish to clarify, as argued and understood in both briefs, that Defendant officers who approached the home, knocked, and waited to be received do not violate the Fourth Amendment in performing that action. Officers, without a warrant, are permitted to do knock and talks because that is no more than any private citizen might do. *Kentucky v. King* 563 U.S. 452, 469 (2011).

### 4. Defendants Are Entitled to Qualified Immunity.

Plaintiffs argue that the qualified immunity analysis is not complicated. *See* ECF 31, pg. 22. Plaintiffs seek to identify the right as the right to be free from warrantless search and seizure in the home, absent exigent circumstances. *See* ECF 31, pg. 21. Plaintiffs try to frame the qualified immunity issue as whether or not it is sufficiently clear that "officers know they can't go into homes without warrants, and exigent circumstances or emergency aid require probable cause to believe there's an emergency." *See* ECF 31, pg. 22.

However, the Supreme Court has emphasized that the constitutional right in question should not be defined at too high a level of generality. *See Kisela v. Hughes*, 584 U.S. 100 (2018); *White v. Pauly*, 580 U.S. 73 (2017). The clearly established law must be particularized to the facts of the case. *Pauly* at 552.

Plaintiffs agree with the Defendants that "on every occasion the police came to their home, the officers were responding to a call that, in the abstract, involved situations of an exigent nature." *See* ECF 31, pg. 10. In the operative complaint, Plaintiffs state that "Any rational police force would have recognized at some point that any calls involving the Robinson-Tomlinson home were clearly false and should not be taken seriously." *See* ECF 13, ¶ 7. Further, Plaintiffs state that the Milwaukee Police have become "tools in their stalkers' harassment campaign." *See* ECF 13, ¶ 59.

Therefore, the constitutional right in question should not be defined as simply as whether or not a warrant or exigent circumstances are required before entering a home. Instead, the Court should define the constitutional right to match the unique circumstances that the Defendants face when responding to emergency calls and reports that, in the abstract, describe exigent circumstances.

To defeat a defense of qualified immunity, the plaintiff would have to show either "either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017), quoting *Chan v. Wodnicki*, 123 F.3d 1005, 1008 (7th Cir. 1997).

Plaintiffs cite *Denius v. Dunlap*, 209 F.3d 944 (7th Cir. 2000) in support of the concept that some factual situations are so obvious that the defendants' actions were unconstitutional that an analogous case is required. However, the court in *Denius* noted that these situations would be rare. *Denius* at 951. Plaintiffs also cite *Hope v. Pelzer*, 536 U.S. 730 (2002) in support of the concept that officials can still be on notice that their conduct violates established law in novel factual circumstances.

While this premise is true, the actions of the Defendants here fall far short of the egregious actions required to overcome the qualified immunity defense. In *Hope*, the Court found no qualified immunity when the prisoner plaintiff was handcuffed to a hitching post and, "…had already been subdued, handcuffed, placed in leg irons, and transported back to the prison. He was separated from his work squad and not given the opportunity to return to work. Despite the clear lack of an emergency situation, the respondents knowingly subjected him to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and the restricted position of confinement for a 7–hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation." *Id.* at 738.

Several Seventh Circuit cases discuss the framework used in *Denius v. Dunlap*, finding that officers' actions were not entitled to qualified immunity. In one Seventh Circuit case, the

13

court held that defendants were not entitled to qualified immunity when it ruled that law enforcement officers failed to disclose exculpatory evidence to the plaintiff through the trial, appeal, and post-conviction proceeding, including, but not limited to the fact that one of the state's witnesses had named other people as the perpetrators of the original crime. *See Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007). In another Seventh Circuit case, the court held that a defendant was not entitled to qualified immunity when the defendant seized and held the plaintiffs by pointing his firearm at the plaintiffs when there was not a hint of danger. *See Baird v. Renbarger,* 576 F.3d 340, 347 (7th Cir. 2009).

Lastly, the court in *Taylor v. Ways*, 999 F.3d 478 (7th Cir. 2021) analyzed a 42 U.S.C. § 1983 equal protection race discrimination claim where the Plaintiff police officer was fired from his job. The Plaintiff had alleged that a lead investigator for the Cook County Sheriff's Office of Professional Responsibility engineered his firing based on racial animus. The evidence showed that the lead investigator, while investigating a crime allegedly committed by the plaintiff, used multiple racial slurs, saying that the Plaintiff "lived like a n****r and referring to the Plaintiff as a "porch monkey." *Id.* at 483. The evidence showed that the investigator used the word "n****r" two to five times while at the scene, and then back at headquarters stated, "We're [going] to get this n****r." *Id.* The court explicitly noted that even if cited cases on race discrimination weren't enough, this case would qualify as the rare, obvious one. *Id*. at 492.

When comparing the cases above with the facts alleged in the Plaintiff's First Amended Complaint, Defendant's actions do not rise to the level of the rare, obvious case, where plaintiffs should not be required to show an analogous case. As outlined in Plaintiffs' first amended complaint, officers responded with varying degrees of reactions to different emergency calls. The mere fact that officers only knocked on some occasions, does not show that the law has been

clearly established as to what the constitutional law enforcement response should be to a swatting incident. Simply put, the law has not been clearly established as to officer's responses to incidents that on their own, establish exigent circumstances, where there is a known swatting risk.

## CONCLUSION

In conclusion, given the facts as put forth in Plaintiffs' First Amended Complaint (*see* ECF 13) and in the police incident reports and CAD reports attached to Defendants' brief in support of their motion to dismiss and which are permissible for consideration by the Court (*see* ECF 28, pgs. 4-5), Plaintiffs have failed to state a claim upon which relief may be granted. Accordingly, Defendants respectfully request that the Court grant their Motion to Dismiss.

Dated and signed at Milwaukee, Wisconsin this 4th day of September, 2024.

EVAN C. GOYKE
City Attorney

s/Maria Mesoloras
MARIA MESOLORAS
Assistant City Attorney
State Bar No. 1098921
WILLIAM HOTCHKISS
Assistant City Attorney
State Bar No. 1112878
*Attorney for Defendants*

**P.O. ADDRESS:**
200 East Wells Street
City Hall 800
Milwaukee, WI 53202
414-286-2601 – Telephone
414-286-8550 – Facsimile
Email: mmesol@milwaukee.gov
whotch@milwaukee.gov

1032-2024-394/292984