# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

NIKI ROBINSON and PATRICK
TOMLINSON,

                    Plaintiffs,

v.

CITY OF MILWAUKEE, LYNDON
EVANS, CHRISTIAN GARRIDO,
BRADLEY ORLANDO, NICOLE
PLEVAK, JOHN KOHLER, JACOB
WASECHEK, FIDAH MUSTAFA,
NATHANIEL PETERSEN, SEAN
CARLETON, and PAUL VENTO,

                    Defendants.

Case No. 24-CV-264-JPS

**ORDER**

## 1.     INTRODUCTION

Niki Robinson ("Robinson") and Patrick Tomlinson ("Tomlinson") (together, "Plaintiffs") sue the City of Milwaukee ("the City") and individuals Milwaukee Police Seargant Lyndon Evans ("Evans"), and Officers Bradley Orlando ("Orlando"), Nicole Plevak ("Plevak"), John Kohler ("Kohler"), Jacob Wasecheck ("Wasecheck"), Fidah Mustafa ("Mustafa"), Nathaniel Petersen ("Petersen"), Sean Carleton ("Carleton"), and Paul Vento ("Vento") (together, the "Officer Defendants") (all defendants together, "Defendants"). ECF No. 13 (amended complaint). Plaintiffs assert claims of unlawful search and seizure and failure to intervene via 42 U.S.C. § 1983 against the Officer Defendants as individuals and against the City under *Monell*. *Id.* at 15–26 (Counts I–VII).

Defendants jointly move to dismiss all claims against them. ECF No. 27. The motion is fully briefed. ECF Nos. 27, 28, 31, 32. The parties have also submitted jury instructions detailing the elements of the claims at issue, ECF No. 29, as required by the Court's pretrial procedures order, ECF No. 9 at 5. As explained herein, Defendant's motion to dismiss will be granted as to Count I, granted in part and denied in part as to Counts II and III, and denied as to Counts IV through VII.

Defendants also move to restrict[1] Exhibit A to their motion to dismiss, ECF No. 28-1, to prevent Plaintiffs' anonymous harassers from learning additional information about them. ECF No. 30. Defendants also move to stay discovery pending the Court's ruling on their motion to dismiss. ECF No. 33. For the reasons stated herein, Defendants' motion to restrict will be granted and Defendants' motion to stay discovery will be denied as moot.

## 2. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b) requires dismissal of complaints which fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

"To survive a motion to dismiss, [the] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[1]Defendants technically move the Court to seal Exhibit A, but as explained *infra* Section 5, the motion is more properly construed as a motion to restrict.

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This means the allegations must "plausibly suggest that the plaintiff[s] ha[ve] a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). Plaintiffs "need not include every detail or fact related to the basis" of their allegations to state a plausible claim. *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018). Instead, they only need to include "enough details about the subject-matter of the case to present a story that holds together." *Catinella v. County of Cook*, 881 F.3d 514, 516 (7th Cir. 2018) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)).

In reviewing Plaintiffs' amended complaint, the Court must "accept as true all of the well-pleaded facts" and "draw all reasonable inferences in favor of the plaintiff[s]." *Kubiak*, 810 F.3d at 480–81 (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). A well-pleaded complaint may proceed even if it appears "that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (internal citation omitted).

### 3.    RELEVANT ALLEGATIONS[2]

---

[2]The Court typically may not look beyond pleadings when ruling on a 12(b)(6) motion. *Alioto v. Marshall Field's & Co.*, 77 F.3d 934, 936 (7th Cir. 1996) (citing Fed. R. Civ. P. 12(b) and *Fleischfresser v. Dirs. of Sch. Dist.*, 200, 15 F.3d 680, 684 & n.8 (7th Cir. 1994)). However, documents attached to a motion to dismiss are considered part of the pleadings and may accordingly be considered on a motion to dismiss if they are both referred to in the operative complaint and central to the claim. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (citing *Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 739 n.12 (7th Cir. 1986), *cert denied*, 482 U.S. 915 (1987); *Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1988), *cert denied*, 489 U.S. 1012 (1989); and *Fudge v. Penthouse Int'l, Ltd.*, 840

In April 2022, Plaintiffs informed the Milwaukee Police Department ("MPD") that they were being harassed and stalked by a "group of online bullies" who threatened to "swat" them. ECF No. 13 at 7–8; ECF No. 31 at 3. Swatting occurs when a person places "a hoax emergency call reporting serious threats to provoke an armed law enforcement response to an individual's residence, usually as an act of harassment or revenge." *Finch v. Rapp*, 38 F.4th 1234, 1237 (10th Cir. 2022). These incidents can be fatal. *See,*

---

F.2d 1012, 1015 (1st Cir.), *cert. denied*, 488 U.S. 821 (1988)); *see also* Fed. R. Civ. P. 10(c).

The Court primarily relies on the alleged facts in Plaintiffs' amended complaint. ECF No. 13. However, Plaintiffs' amended complaint explicitly references and quotes from several police and dispatch reports, which Defendants attach as "Exhibit A" to their motion to dismiss. ECF No. 28-1; *see* ECF No. 13 at 8–14. These reports are "central" to Plaintiffs' claims because they shed light on the Officer Defendants' knowledge (or lack thereof) regarding the repeated false calls reporting violent incidents at Plaintiffs' home. *Venture Assocs. Corp.*, 987 F.2d at 431 (citations omitted). Therefore, the Court will occasionally reference these reports. *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (exhibits attached to a motion to dismiss that are referenced in the plaintiff's complaint and that are central to the plaintiff's claim "may be considered by a district court in ruling" on such a motion (citing *Venture Assocs.*, 987 F.2d at 431)).

The Court also considers information in Plaintiffs' brief in response to Defendants' motion to dismiss, ECF No. 31, "to the extent that it is supplemental and consistent with the [amended] complaint" or "clarifies the information in the [amended] complaint." *Anzaldua v. Chi. Transit Auth.*, No. 02 C 2902, 2002 WL 31557622, at *2 (N.D. Ill. Nov. 15, 2002). This is because Plaintiffs may allege supplementary facts in defending against a motion to dismiss "in order to show that there is a state of facts within the scope of the [amended] complaint that if proved (a matter for trial) would entitle [them] to judgment," if these facts "are consistent with the [amended] complaint." *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992) (citing *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909, 915 (7th Cir. 1985)). The Court does not consider additional information that is "inconsistent with the [amended] complaint, expands the [P]laintiff[s'] case, or concerns new claims and new topics." *Anzaldua*, 2002 WL 31557622, at *2 (collecting cases).

*e.g.*, *id.*; ECF No. 13 at 2. Over the next two years, the police came to Plaintiffs' home in response to false emergency calls at least forty-five times. ECF No. 13 at 2. Thirty-eight of these incidents are not the subject of Plaintiffs' claims because, according to Plaintiffs, "the police did nothing wrong during those responses." ECF No. 31 at 1. Plaintiffs' allegations stem from the remaining seven incidents, which occurred on July 25, 2022, August 11, 2022, October 1, 2022, March 20, 2023, April 11, 2023, April 12, 2023, and April 17, 2023. *See* ECF No. 13 at 15–26.

### 3.1    Count One: Incident on July 25, 2022

The first swatting incident at issue occurred at 1:00 A.M. on July 25, 2022. *Id.* at 8. MPD officers responded to a 911 call reporting a murder/hostage situation occurring inside Plaintiffs' home. *Id.* Specifically, the caller claimed that he caught his wife in bed with another man, killed them both, and was going to kill his son next. ECF No. 28-1 at 8. Responding MPD officers arrived at the home and ordered an undressed Tomlinson out of the house at gunpoint. ECF No. 13 at 8. While police searched the home, Tomlinson remained handcuffed on the porch without clothes on. *Id.* The police report noted that MPD had "responded to other similar complaints" at Plaintiffs' home. *Id.*; ECF No. 28-1 at 8. A supplementary police report confirmed that, after listening to the call again, Tomlinson was not the caller. ECF No. 13 at 9; ECF No. 28-1 at 9. Plaintiffs do not allege that the responding officers knew of the swatting situation when they arrived at the home.

### 3.2    Count Two: Incident on August 11, 2022

A little over two weeks later, MPD officers responded to another call regarding Plaintiffs' residence. ECF No. 13 at 9. On August 11, 2022, a caller

claiming to be Patrick Thompson[3] reported that he had just beaten up his girlfriend and was about to shoot himself.[4] ECF No. 28-1 at 125. Robinson was home alone when officers arrived. ECF No. 13 at 9. Robinson told the police, including Plevak, that Plaintiffs had been having "ongoing issues of individuals falsifying 911 calls" as an act of swatting. *Id.*; ECF No. 28-1 at 11. While on scene, three more swatting calls came in. ECF No. 28-1 at 11. The officers ordered Robinson out of the house and searched Plaintiffs' home, confirming that the reported emergency was not occurring. ECF No. 13 at 9. Plevak noted in her report that "there have been previous calls to the residence eliciting multiple squad responses."[5] *Id.* at 9; ECF No. 28-1 at 11.

### 3.3 Count Three: Incident on October 1, 2022

On October 1, 2022, police received another 911 call, in which the caller claimed to be Tomlinson and stated that he had shot and killed his

---

[3]The Court reasonably infers that the caller was intending to impersonate Tomlinson; either the caller misstated Tomlinson's last name or the dispatcher misheard the caller.

[4]While the transcript of the police call states this, Plevak's report described the call as a "Shots Fired complaint." ECF No. 28-1 at 11.

[5]Plaintiffs cite this statement in the police report in support of their assertion that "the officers were aware that 'there had been previous calls to the residence . . . .'" ECF No. 13 at 9. The police report states "there *have* been previous calls," but Plaintiffs change the tense of the verb in their amended complaint from "have" to "had." *Compare* ECF No. 28-1 at 11 (emphasis added) *with* ECF No. 13 at 9.

Still, when considering this sentence in the report as it originally appeared, it remains ambiguous as to when Plevak became aware of the other swatting calls. At this stage, the Court draws reasonable inferences in favor of Plaintiffs. Therefore, the Court will reasonably infer that the responding officers, including Plevak, were aware of the previous swatting calls when they arrived at Plaintiffs' home on August 11, 2022. *See Kubiak*, 810 F.3d at 480–81.

wife. ECF No. 13 at 9; ECF No. 28-1 at 118–19. According to the amended complaint, Kohler, Wasechek, and Mustafa responded to the scene with knowledge from dispatch that Plaintiffs' home was a "known swatting location." *Id.* at 9–10. Robinson—the alleged murder victim according to the 911 call—answered the door and informed the officers that she was fine. *Id.* at 10. Kohler, Wasechek, and Mustafa nevertheless ordered her out of the home at gunpoint and searched the premises without a warrant. *Id.*

### 3.4 Count Four: Incident on March 20, 2023

Four months later, on March 20, 2023, Evans, Garrido, and Orlando responded to a call to a suicide hotline made from a "virtual private network" ("VPN")[6] in which the caller, claiming to be Tomlinson, stated that he had shot and killed both of his parents. *Id.* at 10–11. The dispatch message noted that there was a "swatting risk" at Plaintiffs' home, ECF No. 28-1 at 53, and the police report noted that "the address is known for swatting calls." ECF No. 13 at 10; ECF No. 28-1 at 41. Robinson answered the door and told the police that everyone was fine, but Evans insisted that the home needed to be searched, notwithstanding that he was "well aware" of their situation. ECF No. 13 at 10–11.

Robinson called Tomlinson, who expressed his frustration over the phone to Garrido and stated that the officers "would need a warrant to

---

[6]A VPN is "a private computer network that functions over a public network." VPN, Merriam-Webster, https://www.merriam-webster.com/dictionary/VPN [https://perma.cc/N3YB-F88P]. It allows a person "communicat[ing] on the internet [to] obscure his or her true IP address and identity because the communication appears to originate from the VPN's IP address, rather than the user's actual IP address." *Columbia Pictures Indus. v. Galindo*, No. 2:20-CV-03129-MEMF (GJSx), 2022 U.S. Dist. LEXIS 210979, *6 n.4 (C.D. Cal. Nov. 18, 2022) (quoting *United States v. Fisher*, No. 2:17-cr-00073-APG-GWF, 2019 U.S. Dist. LEXIS 97833, at *8 (D. Nev. Mar. 28, 2019)).

enter his property." *Id.* at 11. Robinson explained to Evans that Plaintiffs had an arrangement with personnel from MPD District One for dealing with swatting calls. *Id.* at 11–12; ECF No. 28-1 at 54. Robinson told Evans that he should call someone who would know about this, and he called Sergeant Carrie Pocernich ("Pocernich"). ECF No. 13 at 11–12; ECF No. 28-1 at 54. Evans wrote in his police report that Pocernich "was not aware of an agreement," but Plaintiffs allege that Pocernich told Evans *not* to search Plaintiffs' home. *Compare* ECF No. 28-1 at 54 *with* ECF No. 13 at 12; *see also* ECF No. 31 at 6. After calling Pocernich, Evans entered Plaintiffs' house without Robinson's consent and found no one else inside and no injuries. ECF No. 13 at 11–12.

### 3.5    Count Five: Incident on April 11, 2023

Four swatting incidents occurred on April 11, 2023, but Plaintiffs' claim involves only the last one. *Id.* at 12. That evening, six MPD officers, including Carleton, were dispatched to Plaintiffs' home to respond to a suicide hotline call from a purported 17-year-old who had allegedly just killed their parents and was planning on committing suicide. *Id.* at 12–13; ECF No. 28-1 at 52. The dispatch message noted that there was a "[s]watting risk at this location." ECF No. 13 at 12; ECF No. 28-1 at 52, 176.

Tomlinson told the officers to leave. ECF No. 13 at 13. Officers insisted that they needed "to see [Robinson's] current state due to the nature of the call." ECF No. 28–1 at 52. Robinson came downstairs and confirmed that she was fine. *Id.* She was ordered outside at gunpoint, and Tomlinson, who had witnessed the events through Plaintiffs' doorbell

Page 8 of 45

camera application, arrived home and was detained by officers who threatened to put him in handcuffs.[7] ECF No. 31 at 7; ECF No. 13 at 13.

### 3.6 Count Six: Incident on April 12, 2023

The next day on April 12, 2023, Evans (who responded to the swatting incident on March 20) came to Plaintiffs' home again, this time with Petersen, in response to a call to a regional 211-crisis line reporting that Tomlinson had shot Robinson. ECF No. 13 at 13; ECF No. 31 at 7–8. This dispatch included the warning: "Be advised swatting related call." ECF No. 13 at 13; ECF No. 28-1 at 60.

The officers first spoke with at least one person[8] outside of the apartment next door, who stated that they had not heard any gunshots. *Id.* Evans and Petersen then spoke with Tomlinson, apparently remotely,[9] who told them that he and Robinson "were fine and that no one was shot and injured." ECF No. 13 at 14. Evans then stated that if Robinson did not come downstairs to the door he would "force enter [sic] and kick down [the]

---

[7]Plaintiffs allege in the amended complaint that the officers "*threatened* to place [Tomlinson] in handcuffs." ECF No. 13 at 13 (emphasis added). However, in their brief in opposition, Plaintiffs claim that the police *did* handcuff Tomlinson. ECF No. 31 at 7. In an email to police on April 12, Tomlinson stated that the officers did not actually arrest or cuff him; Evans "gave the order to cuff" him, but the officers were unable to position Tomlinson in a way to cuff him. ECF 28-1 at 99. For the purposes of this motion, the Court will disregard the inconsistent allegation in Plaintiffs' brief.

[8]Plaintiffs' amended complaint states that the officers spoke to one person. ECF No. 13 at 13. The police report states that officers spoke with two people. ECF No. 28-1 at 60.

[9]It is not clear how this communication occurred. Plaintiffs state in their brief opposing the motion to dismiss that this conversation was "over the phone." ECF No. 31 at 8. The police report states the officers spoke to Tomlinson "via his doorbell camera." ECF No. 28-1 at 60.

door." *Id.*; ECF No. 28-1 at 60. Evans then ordered Petersen to kick down the door, which Petersen tried and failed to do. ECF No. 13 at 14. Robinson then came downstairs and confirmed she was fine, after which point Evans and Petersen left. *Id.*

### 3.7    Count Seven: Incident on April 17, 2023

Five days later, Evans responded to another call regarding Plaintiffs' residence, this time accompanied by Vento. *Id.* The 911 call reported that Tomlinson had killed Robinson and was going to kill his child next. ECF No. 28-1 at 62. The Glendale Police Department, who received the call, informed MPD that the call "sounded like a recording" and that the house had "a history of . . . similar situations." *Id.* at 62, 186–87. The police report noted that Plaintiffs' home "is the victim of daily swatting calls." *Id.* at 62. On this occasion, Evans refused to leave the home even after Plaintiffs informed him that they were fine. ECF No. 13 at 14. Evans threatened to knock the door down unless Plaintiffs physically showed themselves. *Id.* at 15. Both Tomlinson and Robinson then came to the door, and Evans and Vento left. *Id.*

### 4.    ANALYSIS

For each of the seven counts, Plaintiffs allege that MPD officers conducted a warrantless search of Plaintiffs' home and a warrantless seizure of their persons without an exigency.[10] ECF No. 13 at 15, 17–18, 20, 22–23, 25. Plaintiffs reason that these searches and seizures were unconstitutional because any officer who had knowledge of the history of

---

[10]Plaintiffs bring Count One under *Monell* only and Counts Two through Seven under *Monell* against the City and against certain Officer Defendants in their individual capacities. *Id.* at 17–18, 20, 22–23, 25.

Case 2:24-cv-00264-JPS    Filed 11/01/24    Page 10 of 45    Document 34

the swatting calls and incidents at Plaintiffs' home would know "there was not probable cause to believe a crime was committed," that "someone was in danger," or that there was "an exigency." *Id.* Each of the seven counts include *Monell* claims against the City, alleging that it "failed to implement any policy, practice, or procedure" to address the swatting incidents and that it "failed to adequately train or supervise its officers on swatting," resulting in "illegal search[es] of Plaintiffs' home and seizure[s] of their persons." *Id.* at 16–20, 22, 24–25; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Counts Two through Seven also allege that the Officer Defendants were "personally aware" of the swatting situation and had a duty to intervene to stop the searches and seizures but failed to do so. *See id.* at 17–19, 21–24, 26. Under 42 U.S.C. § 1983, Plaintiffs seek actual or compensatory damages as well as punitive damages against Defendants, costs, and attorneys' fees. *Id.* at 16, 18–19, 21, 23–24, 26.

Defendants move to dismiss Plaintiffs' claims for failure to state a claim for which relief can be granted. ECF No. 27. Specifically, Defendants argue that the exigent nature of the emergency calls justified the MPD officers' searches and seizures, and therefore no constitutional violations occurred. ECF No. 28 at 5. Defendants also argue that because the Officer Defendants did not violate Plaintiffs' constitutional rights, they had no duty to intervene and the City is not liable for not implementing a policy, practice, or procedure to address the swatting situation. *Id.* at 14, 18–20. Finally, Defendants argue that even if they committed constitutional violations, they are shielded by the doctrine of qualified immunity. *Id.* at 15–18. The Court addresses each argument in turn.

Case 2:24-cv-00264-JPS    Filed 11/01/24    Page 11 of 45    Document 34

### 4.1    Warrantless Searches and Seizures

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.[11] At this Amendment's "very core" is the right "to retreat into [one's] own home and there be free from unreasonable governmental intrusion." *Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). As a result, "[i]t is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972)). It is thus a "basic principle of Fourth Amendment law[] that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 749 (collecting cases) (internal quotation marks omitted).

Still, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" the Supreme Court has recognized some permissible exceptions to the warrant requirement. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam) and *Katz v. United States*, 389 U.S. 347, 357 (1967)). One of these is "when 'the exigencies of the situation' make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) and (citing *Payton v. New York*, 445 U.S. 573, 590 (1980)). Various

---

[11]The Fourth Amendment applies to state and local governments via the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*. 367 U.S. 643, 655 (1961).

exigencies may justify a warrantless search, including when officers have probable cause to believe they need to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id. (*quoting *Brigham City*, 547 U.S. at 403 and citing *Michigan v. Fisher*, 558 U.S. 45, 49 (2009)).

To justify a warrantless entry on the basis of exigent circumstances, however, "the police bear a heavy burden . . . ." *Welsh*, 466 U.S. at 749–50. "An officer's *subjective* belief that an injured person might be inside does not justify a warrantless entry . . . ." *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993) (emphasis added) (citing *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir. 1987)). Rather, "the government must establish that the circumstances as they appeared at the moment of entry would lead a *reasonable, experienced* law enforcement officer to believe that someone inside . . . required immediate assistance." *Id.* (emphasis added) (citing *United States v. Salava*, 978 F.2d 320, 324 (7th Cir. 1992) and *United States v. Napue*, 834 F.2d 1311, 1326 (7th Cir. 1987)). The exigent-circumstances exception is "case-specific" and requires courts to look "'to the totality of circumstances' confronting the officer" to determine whether the officer had probable cause justifying the warrantless action. *Lange v. California*, 594 U.S. 295, 302 (2021) (quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013)). This is because "[w]hether a 'now or never situation' actually exists . . . depends upon facts on the ground." *Id.* (quoting *Riley v. California*, 673 U.S. 373, 391 (2014)).

Case 2:24-cv-00264-JPS    Filed 11/01/24    Page 13 of 45    Document 34

### 4.2 Emergency Calls Reporting Exigent Circumstances Usually Provide Probable Cause to Search

In this case, each claim of exigent circumstances for the seven incidents is based solely on emergency calls. The calls for the incidents underlying Counts One, Two, Three and Seven involved 911 calls, Counts Four and Five originated from suicide hotline numbers, and the call involved in Count Six came originally from a regional 211-crisis line. *See* ECF No. 32 at 5 (citing ECF No. 31 at 12 and ECF No. 28-1 at 40–41, 53–56, 162–63, 176, 178–79). While 911 calls have been found sufficient to support warrantless searches under the exigency exception, *see, e.g.*, *Salava*, 978 F.2d 320 and *United States v. Richardson*, 208 F.3d 626 (7th Cir. 2000), such calls are not *per se* reliable. *Navarette v. California*, 572 U.S. 393, 401 (2014).

#### 4.2.1 The Reliability of Calls to 911 and Other Emergency Lines

Whether the caller used the 911 system is one factor in determining whether an emergency call bore "adequate indicia of reliability for the officer to credit the caller's account." *Navarette*, 572 U.S. at 398, 401. Noting "technological and regulatory developments," the Supreme Court concluded in 2014 that "a false tipster would think twice before using [a 911 call] system" because cellular carriers are required to relay the caller's phone number and geographic location to the dispatch. *Id.* at 400–01. However, in situations where the caller does not have a "permanent connection to the phone," such as if the caller has borrowed a stranger's phone, the usefulness of the 911 system's tracing ability is limited. *See, e.g.*, *United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018).

But whether the caller used the 911 system or some other line is only one factor the Court must consider.[12] *Navarette*, 572 U.S. at 401. Additional factors include whether the caller identifies his or herself, *Richardson*, 208 F.3d at 630; uses explicit and detailed descriptions, *Illinois v. Gates*, 462 U.S. 213, 234 (1983); and/or indicates that he or she observed the event firsthand, *id*. However, additional information available to the police may render a call suspicious, even in cases where the caller has identified themselves. *See Hebron v. Touhy*, 18 F.3d 421, 422–23 (7th Cir. 1994) ("Sometimes information from or about a person claiming to be the victim of crime would lead a reasonable officer to be suspicious, making further investigation prudent . . . .").

To be sure, the bar for 911 calls to provide probable cause is low. In fact, even 911 calls that provide *no* information have been found to provide probable cause to enter a home. *See Hanson v. Dane County*, 608 F.3d 335, 337 (7th Cir. 2010) (reasoning that a 911 call that was immediately disconnected gave officers probable cause for a warrantless search because no one answered when the dispatch called back, which could have meant that the caller was unable to answer the phone "because of injury, illness . . . or a threat of violence" (citing *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003) and *Richardson*, 208 F.3d at 629–30))).

---

[12]The parties' briefs both address the issue of the medium use to make the emergency calls, with Plaintiffs arguing that emergency calls made through non-911 systems (such as suicide hotlines or via VPNs) are less reliable as a matter of law, ECF No. 31 at 12–13, while Defendants argue that any emergency call presents a reliable basis for police to believe there is an exigency, ECF No. 28 at 6–12; ECF No. 32 at 1–5. Because the Court does not consider this issue dispositive to the motion at hand, it does not analyze this issue.

The parties appear to agree that each call that triggered the seven incidents in this case—each of which reported either recent or impending shootings, suicides, or murders—reported an exigent circumstance, and thus, based solely on what emergency was being reported by the swatter, provided probable cause to search Plaintiffs' home. ECF. No. 31 at 10; ECF No. 28 at 10–11. In Defendants' view of the law, the inquiry should stop there. ECF No. 28 at 10–11. But Plaintiffs argue that the information that the Officer Defendants learned prior to initiating the searches and seizures impacts the probable cause analysis. ECF. No. 31 at 10–15. The Court agrees with Plaintiffs.

### 4.3 Additional Information Acquired After the Emergency Call Impacts the Probable Cause Analysis

When police learn information that adds more context or contradicts an initial report, but have not yet begun a search or seizure, it impacts the probable cause analysis. *Richardson*, 208 F.3d at 631; *Bruce v. Guernsey*, 777 F.3d 872, 877 (7th Cir. 2015) (citing *Bailey v. Kennedy*, 349 F.3d 731, 739–41 (4th Cir 2003)); *see also Hebron*, 18 F.3d at 423 (noting that officers' knowledge that tenants who called 911 on their landlords were facing eviction—and thus likely "bore a grudge against their landlords"—would have rendered arresting the landlords solely based on the 911 call "unreasonable—and therefore unconstitutional"). In other words, officers may not "close [their] eyes to facts that would clarify the situation." *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) (collecting cases). For example, in *Bruce*, the Seventh Circuit explained that an officer may have initially had probable cause to seize a minor at her home while responding to a report that she was suicidal, but once the officer arrived and found that the minor

was "perfectly calm and rational" and "surrounded by several friends and her father," the officer's decision to force her into his car to take her to the hospital, over the objections of her father, was unreasonable. *Bruce*, 777 F.3d at 877.

An alleged victim showing themselves and requesting that police leave, however, does not always make any subsequent search or seizure unreasonable. For example, in *Hanson*, the court concluded that the officers did not need to cancel their investigation when the alleged victim asked them to leave, nor did they need to end their inquiry when she informed them that she was unharmed. *Hanson*, 608 F.3d at 338 (citing *United States v. Brooks*, 367 F.3d 1128, 1137 (9th Cir. 2004) and *Fletcher v. Town of Clinton*, 196 F.3d 41, 50 (1st Cir. 1999)). Importantly, the court noted that the alleged victim's statements to the police were "obviously false statements"—she informed them that she was the person who called 911 but that she "could not remember why," and she admitted that she had been arguing with her husband but "could not remember the subject," even though the argument and call were recent. *Id.* This elusiveness, combined with her "nervous demeanor, led the police to think that she had been threatened or feared retaliation should she give honest answers." *Id.*

Similarly, in *Anderson v. City of West Bend Police Department*, police responded to a 911 call, and the alleged victim appeared "distraught" when she first spoke with the officers. 774 F. Supp. 2d 925, 939 (E.D. Wis. 2011). The court concluded that her "distraught appearance" contradicted her statement to the officers that she was "fine," and as a result, police did not need to end their inquiry. *Id*. at 940. In other words, unlike in *Bruce*, all the

information that the officers learned at the scene after the initial call made their continuation of the investigation reasonable.

### 4.4 Previous False Emergency Calls to the Same Home Impact the Reasonableness Inquiry

Seventh Circuit precedent indicates that previous false emergency calls to the same home factor into the probable cause analysis. In *Richardson*, officers claimed that exigent circumstances justified their warrantless search of Richardson's home, based solely on a 911 call reporting a rape and murder. 208 F.3d at 627, 629. Importantly, "the 911 operators had received a bogus call with almost exactly the same report only a week earlier," but the responding officers were unaware of the previous false call. *Id.* at 629, 631. This rendered *Richardson* "a very close case" for the court, which left open the possibility of repeated abuse of the 911 system creating a situation where it would be "objectively unreasonable for the police to rely on" a 911 call . . . ." *Id.* at 629, 631.

### 4.5 Plaintiffs Have Sufficiently Alleged a Constitutional Violation

The first question the Court addresses is whether Plaintiffs have stated a claim that a constitutional violation occurred. To state a claim under Section 1983, Plaintiffs must first sufficiently allege facts that could render plausible the conclusion that "a government official, acting under color of state law, deprived them of a right secured by the Constitution or laws of the United States." *Christensen v. County of Boone*, 483 F.3d 454, 459 (7th Cir. 2007) (citing *Brokaw v. Mercer County*, 235 F.3d 1000, 1009 (7th Cir. 2000) and *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)); *Iqbal*, 556 U.S. at 678; *see also* 42 U.S.C. § 1983.

The Officer Defendants' responses to emergency calls in the seven incidents identified in the amended complaint differ markedly from the majority of MPD's responses to the emergency calls at Plaintiffs' home.[13] In Count One, the unnamed responding officer ordered an undressed Tomlinson out of the house at gunpoint and held him handcuffed on the porch until the warrantless search was complete. ECF No. 13 at 8. In Counts Two through Four, MPD officers ordered Robinson out of Plaintiffs' home to conduct warrantless searches. *Id.* at 9–12. In Count Five, while responding to the fourth false call of the day, the officers ordered Robinson out of the home at gunpoint and threatened to handcuff Tomlinson while they searched Plaintiffs' home. *Id.* at 12–13. In Count Six, the officers tried to kick down the door of Plaintiffs' home, even after Tomlinson confirmed that no emergency was occurring, because Robinson did not come downstairs. *Id.* at 13–14. And in Count Seven, the officers again threatened to kick down the door until both Tomlinson and Robinson came to the door. *Id.* at 14–15.

Critically, in all counts but the first, Plaintiffs allege that the Officer Defendants learned information prior to arriving at Plaintiffs' home that cast doubt on the veracity of the emergency calls. Chiefly, Plaintiffs allege that the responding officers in Counts Two through Seven were aware of the swatting situation.

---

[13]While MPD received more than 35 emergency calls relaying violent crimes occurring at Plaintiffs' residence, only the seven incidents at issue in this action resulted in warrantless searches and seizures. For most of the incidents, MPD arrived at Plaintiffs' home, confirmed that no emergency was occurring by either conducting a perimeter check or by speaking briefly with one of the Plaintiffs, and then left. *See, e.g.*, ECF No. 28-1 at 29, 42, 57, 81, 86, 96–97.

The Court cannot say that, as a matter of law, it must reject Plaintiffs' argument that knowledge of previous false calls to the same residence could reduce the reliability of the emergency calls, potentially counteracting a belief of exigency and therefore removing probable cause for warrantless searches and seizures. *Richardson*, 208 F.3d at 631. To the contrary, the Seventh Circuit contemplated this exact scenario in *Richardson*. *Id.* (discussing defendant-appellant's argument that the probable cause analysis could be affected by people "mak[ing] phony calls . . . in order to allow the police to enter and search their neighbors' property without a warrant"). Furthermore, in *Richardson* there was only *one* prior swatting call, of which the responding officers to the second call were unaware, and the court nevertheless considered the question of whether the officers had probable cause based solely on the second emergency call a week later to be "a very close case." *Id.* at 629. In comparison with the circumstances in *Richardson*, and taking Plaintiffs' well-pleaded allegations as true, this case does not present nearly as 'close' of a case with respect to probable cause; to the contrary, it appears that probable cause may indeed have been lacking.

Accordingly, and as discussed further *infra* Sections 4.5.2 through 4.5.7, the Court concludes that Plaintiffs have sufficiently pled Counts Two through Seven because it is plausible that a reasonable, experienced officer would have determined that they did not have probable cause to conduct the warrantless searches and seizures in those instances. However, as discussed *infra* Section 4.5.1, the Court cannot conclude the same with respect to Count One.

### 4.5.1 Count One: Constitutional Violation Not Sufficiently Pled

In Count One, unnamed MPD officers responded to a call claiming that a man had caught his wife in bed with another man, killed them both, and was going to kill his son next. ECF No. 28-1 at 8. Plaintiffs do not allege that the responding officers knew prior to arriving at the home that Plaintiffs had a history of being targeted with false emergency calls—only that they *should have* known about the situation. ECF No. 13 at 15; *id.* at 8 ("[I]t appears no one informed the officers who responded [on July 25, 2022] of the repeated swatting threats and previous attempts."). Armed only with knowledge of the concerning call, "the officers responded as though[ it] were a true hostage situation." *Id.* at 8.

To allege a violation for an unlawful search and seizure under the Fourth Amendment, Plaintiffs must allege facts that could plausibly lead to the conclusion that a reasonable officer would have believed, based on the information available to the officer at the time, that the officer did not have probable cause to remove Tomlinson from the home and to search the premises. *Arch*, 7 F.3d at 1304. Plaintiffs have failed to do so with respect to Count One. A reasonable officer in this situation—without knowledge of the other false calls—would believe that they had probable cause for a warrantless search, based on the reported exigency. The fact that the police learned afterwards that other officers had responded to similar complaints at the home and that the caller's voice did not match Tomlinson's is immaterial—the probable cause inquiry is based solely on the information known to the officers at the time of the action, not afterwards. *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) ("Knowledge of facts and

circumstances gained after the fact . . . has no place in the trial court's . . . proper post-hoc analysis of the reasonableness of the actor's judgment."). The amended complaint fails to state sufficient facts that would make Plaintiffs' unlawful search and seizure claim facially plausible. *See Iqbal*, 556 U.S. at 678. Accordingly, because no constitutional violation was sufficiently pled, there can be no *Monell* claim, and Defendants' motion to dismiss Count One is granted. *See id.* at 690–91 (citing 42 U.S.C. § 1983); *Johnson v. Prentice*, 29 F.4th 895, 905 (7th Cir. 2022) (noting that plaintiff's *Monell* claim failed because there was "no proof of an underlying constitutional violation . . . .").

The Court is skeptical that Plaintiffs will be able to successfully cure this deficiency through amendment, especially given the hundreds of pages of additional information constructively included in the pleadings. Nevertheless, the Seventh Circuit has adopted a liberal approach to amending pleadings, so the Court will dismiss Count One without prejudice. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. and N.W. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("[P]laintiff[s] whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to amend [their] complaint . . . .").

### 4.5.2 Count Two: Constitutional Violation Sufficiently Pled

In the second incident, MPD officers—including Plevak—responded to an emergency call in which the caller, claiming to be Tomlinson, said he had just beaten up his girlfriend and was about to shoot himself. ECF No. 28-1 at 125. Robinson answered the door, informed the officers that everyone was fine, and explained the swatting situation. ECF No. 13 at 9.

Plaintiffs allege, therefore, that "the officers were aware that there had been previous calls to the residence." *Id.* The amended complaint does not allege that this awareness derived from any other source other than Robinson.[14]

The question becomes, then, whether police were justified to disregard Robinson's assurances that everyone was okay. As noted *supra* Section 4.3, officers need not necessarily end their inquiry when an alleged victim assures them that they are okay. *See Hanson*, 608 F.3d at 338; *Anderson,* 774 F. Supp. 2d at 939. In *Hanson* and *Anderson*, however, the officers were met with some facts that suggested that the alleged victim was being untruthful such that there could, in fact, be an exigency. *See Hanson*, 608 F.3d at 338 (noting Hanson's nervous demeanor when speaking with police and that her statements were "obviously false"); *Anderson*, 774 F. Supp. 2d at 939 (finding that Anderson's "distraught appearance" contradicted her statement that she was "fine"). The same is not true here. As alleged in the amended complaint, there was no indication that Robinson was being untruthful when she assured officers that she and Tomlinson were both fine. Plevak did not report having suspected otherwise. ECF No. 28-1 at 11. Thus, the Court cannot say that, as a matter of law, officers acted reasonably when they conducted a warrantless search and seizure in this instance. Accordingly, Defendants' motion to dismiss

---

[14]Plaintiffs do point to Plevak's police report, but unlike other counts where a warning of the swatting situation came from the dispatch or from a conversation with another officer, the amended complaint does not allege facts that would suggest that Plevak's knowledge of the swatting situation that she wrote about in her report came from anything else other than her conversation with Robinson prior to conducting the search of the home. *See* ECF No. 13 at 9; ECF No. 28-1 at 11.

Count Two as to the Officer Defendants is denied. The Court takes up the remaining *Monell* claim in Count Two *infra* Section 4.7

### 4.5.3  Count Three: Constitutional Violation Sufficiently Pled

On October 1, 2022, MPD officers—including Kohler, Wasechek, and Mustafa—responded to a call in which someone claiming to be Tomlinson stated that he had shot and killed his wife. ECF No. 13 at 9; ECF No. 28-1 at 118–19. The dispatch included the warning that the home was a "known swatting location." ECF No. 13 at 9–10. Robinson—who, according to the call, was supposed to be dead—answered the door and confirmed that she was fine. *Id.* at 10. The Officer Defendants had, in other words, received a warning from the dispatch that the call was potentially false, heard directly from Robinson that the call was false, and visibly confirmed that she was neither shot nor dead. *Id.* at 9–10.

It is a "basic principle of Fourth Amendment law[] that searches and seizures inside a home without a warrant are presumptively unreasonable." *Welsh*, 466 U.S. at 749 (collecting cases) (internal quotation marks omitted). And while exigent circumstances may, in some circumstances, provide an exception whereby officers may conduct warrantless searches and seizures, *King*, 563 U.S. at 460, officers may not "close [their] eyes to facts that would clarify the situation." *McBride*, 576 F.3d at 707 (collecting cases).

Here, there were multiple fact that could have clarified the situation for Kohler, Wasechek, and Mustafa; the Court cannot, as a matter of law, rule that their actions fell within the exigent-circumstances exception, because it is plausible to infer that the circumstances would have led a

reasonable, experienced officer to determine that there was no exigency on October 1, 2022 at Plaintiffs' home. Accordingly, Plaintiffs have sufficiently an unlawful Fourth Amendment search and seizure and Defendants' motion to dismiss Count Three as to the Officer Defendants is denied.

### 4.5.4 Count Four: Constitutional Violation Sufficiently Pled

In the fourth incident, MPD officers—including Evans, Garrido, and Orlando—responded to another call in which someone claimed to be Tomlinson, this time stating that he had killed his parents. ECF No. 13 at 10. In addition, the dispatch informed the officers that (1) the call was made from a VPN and (2) Plaintiffs' home was a "swatting risk" location. *Id.* at 10–11; ECF No. 28-1 at 53. Robinson answered the door and explained that everyone in the home was fine, then she called Tomlinson, who spoke with one of the Officer Defendants over the phone. ECF No. 13 at 10–11. *Both* Plaintiffs thus assured the officers no shooting had occurred. *Id.* Robinson also encouraged Evans to call another Sergeant to learn more about the swatting situation. *Id.* at 11–12. Evans did so, and Plaintiffs allege that the other Sergeant told him *not* to search Plaintiffs' home.[15] *Id.*

In considering the knowledge available to Evans, Garrido, and Orlando at the time of their decision to search Plaintiffs' home—including another MPD Sergeant allegedly instructing them *not* to search the home and the fact that the call came from a VPN, *see Watson*, 900 F.3d at 895—the Court concludes that Plaintiffs have sufficiently pled facts from which one

---

[15]Defendants dispute this fact, but in ruling on the motion, the court views the facts in the light most favorable to the Plaintiffs. *See Kubiak*, 810 F.3d at 480–81 (citation omitted).

could plausibly conclude that a reasonable, experienced officer would have determined that there was no exigency. Defendants' motion to dismiss Count Four as to the Officer Defendants is accordingly denied.

### 4.5.5 Count Five: Constitutional Violation Sufficiently Pled

In Count Five, Carleton and additional MPD officers responded to a suicide hotline call in which a purported 17-year-old caller claimed that he killed his parents and was about to kill himself. ECF No. 13 at 12–13; ECF No. 28-1 at 52. The dispatch noted that Plaintiffs' home presented a swatting risk. ECF No. 13 at 13; ECF No. 28-1 at 52, 176. Tomlinson, who was not home, spoke to the responding officers through his doorbell camera, telling them to leave. ECF No. 13 at 13; ECF No. 28-1 at 52. Despite the call being about a seventeen-year-old who had apparently killed his parents, the officers insisted they needed to physically see Robinson—an adult woman. *Id.* Robinson came to the door and told the officers that she was fine, and the facts, as alleged, do not suggest that she gave any indication of dishonesty. *Id.* Still, Carleton and other MPD officers ordered her outside at gunpoint and searched her home. ECF No. 31 at 7. At some point, Tomlinson arrived, and MPD officers threatened to place him in handcuffs while they searched the home. ECF No. 13 at 13.

Considering the totality of the circumstances surrounding the Officer Defendant's actions, the Court concludes that a reasonable, experienced officer could plausibly have determined there was no exigency at Plaintiffs' home in this instance. Several facts—including knowledge of the home being a swatting risk and the inaccuracies in the emergency caller's claims about the residents of Plaintiffs' home—could impact

Case 2:24-cv-00264-JPS    Filed 11/01/24    Page 26 of 45    Document 34

whether the relevant Officer Defendants acted reasonably on this occasion and the Court cannot, as a matter of law, conclude that they did. Accordingly, Plaintiffs have sufficiently pled a plausible unconstitutional search and seizure and Defendants' motion to dismiss Count Five as to the Officer Defendants is denied.

### 4.5.6   Count Six: Constitutional Violation Sufficiently Pled

Underlying Count Six, Evans and Petersen responded to a call on April 12, 2023, reporting that Tomlinson had shot Robinson; the dispatch included an advisory that this was a "swatting related call." ECF No. 13 at 13; ECF No. 28-1 at 60. Evans had previously responded to the home on March 20, 2023 (the incident underlying Count Four) and thus had experience responding to a false emergency call at Plaintiffs' home. *Id.* On scene, the officers spoke with neighbors who claimed they had not heard any gunshots. ECF No. 13 at 13; ECF No. 28-1 at 60. Once on the porch, Evans and Petersen spoke with Tomlinson who confirmed that no shooting had occurred and that both he and Robinson were fine. ECF No. 13 at 14. The officers threatened to knock down the door until Robinson came to the door. *Id.* Petersen then tried and failed to kick in the door. *Id.* Robinson thereafter came downstairs and confirmed that she was fine. *Id.*

The parties briefly addressed the issue of whether the Officer Defendants' actions in this Count could constitute a search or seizure. The parties agree that no violation occurred by simply knocking and talking with Plaintiffs but disagree about whether the Officer Defendants' continued presence thereafter constitutes a search or seizure. *Compare* ECF No. 28 at 12–13 and ECF No. 32 at 11 *with* ECF No. 31 at 20–21. Neither party analyzed this question in sufficient depth for the Court to appropriately

review,[16] but because the burden lies with the moving party, the Court will—for the purposes of this motion—presume that the Officer Defendants' actions in threatening and attempting to break down Plaintiffs' door constituted a search or seizure. *See White v. Richert*, No. 15 C 8185, 2019 WL 4062539, at *9 (N.D. Ill. Aug. 28, 2019) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point." (quoting *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990))).

Plaintiffs have sufficiently stated a claim for an unconstitutional search for this occurrence because, by the time Evans and Petersen stepped onto Plaintiffs' porch, they were faced with enough information—including knowledge of a swatting risk and confirmation from both witnesses and Plaintiffs that controverted the emergency call—to plausibly render reliance on the emergency call unreasonable. Accordingly, Defendants' motion to dismiss Count Six as to the Officer Defendants is denied.

### 4.5.7 Count VII: Constitutional Violation Sufficiently Pled

For Count VII, Evans and Vento responded to a 911 call reporting that Tomlinson had killed his wife and was going to kill his child next. ECF No. 13 at 14; ECF No. 28-1 at 62. The department that relayed the information about the call included the warning that it "sounded like a recording" and that Plaintiffs' home had "a history of . . . similar situations." ECF No. 28-1 at 62, 186–87. As with Count VI, Evans had direct knowledge

---

[16]In particular, no party specifically addresses whether the Defendant Officers' threats and attempts to break down Plaintiffs' door constitute a search or seizure. *See* ECF No. 28 at 12–13; ECF No. 31 at 20–21; ECF No. 32 at 11.

of false emergency calls regarding Plaintiffs' home as this was his third visit to the home in response to a false call within two months. *See supra* Sections 4.5.4 and 4.5.6; ECF No. 13 at 14. Plaintiffs told Evans and Vento that they were fine, but Evans threatened to knock down the door again unless Robinson showed herself.[17] ECF No. 13 at 14–15. Both Plaintiffs came to the door, and Evans and Vento left. *Id.* at 15.

Once again, the Court cannot conclude, as a matter of law, that Plaintiffs have failed to state a claim here because Plaintiffs have alleged sufficient facts from which one could plausibly conclude that a constitutional violation occurred. This is because the relevant Officer Defendants' knowledge at the time of the alleged search and seizure included several facts that undermined the reliability of the emergency call, including information from dispatch that the caller may have been just a recording, that the dispatch residence had a history of 'similar situations,' and Evans' personal knowledge of and involvement with *two* false calls at Plaintiffs' home. Accordingly, Defendants' motion to dismiss Count Seven as to the Officer Defendants is denied.

### 4.6 Plaintiffs Have Sufficiently Pled Failure to Intervene Claims Against the Officer Defendants

Having determined that Plaintiffs have sufficiently pled constitutional violations in Counts Two through Seven, the Court now turns to the failure to intervene claims against Plevak (Count Two); Kohler, Wasechek, and Mustafa (Count Three); Evans, Garrido, and Orlando

---

[17]Whether or not Evans's threat to knock down Plaintiffs' door without further action constitutes a search or seizure was not properly addressed by the parties. *See supra* note 16 and accompanying text. For purposes of this motion, the Court will presume that it does. *Id.*

(Count Four); Carleton (Count Five); Evans and Petersen (Count Six); and Evans and Vento (Count Seven). ECF No. 13 at 15–26.

Under *Yang v. Hardin*, "an officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know . . . that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." 37 F.3d 282, 285 (7th Cir. 1994) (citing *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994) and *Byrd v. Clark*, 783 F.2d 1002, 1006–07 (11th Cir. 1986)). Both "prongs of this analysis almost always implicate questions of fact for the jury."[18] *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005).

Defendants' only argument in their motion to dismiss the failure to intervene claims is that the "[Officer Defendants'] actions were constitutionally permissible and, as such, there was no need to intervene on the Plaintiffs' behalf . . . ." ECF No. 28 at 14. Because the Court finds that Plaintiffs have sufficiently pled facts plausible constitutional violations for each count corresponding to Failure to Intervene claims, this argument is unsuccessful. Accordingly, the Court denies Defendants' motion to dismiss the failure to intervene claims.

---

[18] This is because "[w]hether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury *could not possibly conclude otherwise*." *Lanigan v. Village of E. Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997) (emphasis added) (citing *Anderson*, 17 F.3d at 557).

### 4.7 Plaintiffs Have Sufficiently Pled *Monell* Claims Against the City for Certain Counts

The Court next turns to Plaintiffs' claims against the City under *Monell*. In *Monell*, the Supreme Court determined that "Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." 436 U.S. at 690. However, "[m]unicipal liability under *Monell* carries an important limitation: the statute does not incorporate the common-law doctrine of respondeat superior, so a municipality cannot be held liable for the constitutional torts of its employees and agents." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (citing *Monell*, 436 U.S. at 690–91).

As a result, "to prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself." *Id.* (citing *Bd. of Cnty. Cmm'rs v. Brown*, 520 U.S. 397, 403–04 (1997)); *see also White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (federal courts may not apply a "heightened pleading standard" to *Monell* claims (citing *Leatherman v. Tarrant Cnty. Narcotics Intel. and Coordination Unit*, 507 U.S. 163, 164 (1993))). More specifically, Plaintiffs must allege that a constitutional violation was caused by a governmental "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694; *see also McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (to state a *Monell* claim a plaintiff must "'plead[] factual content that allows the court to draw the reasonable inference' that the City maintained a[n

unconstitutional] policy, custom, or practice . . . .") (quoting *Iqbal*, 129 S.Ct. at 1949).

To state a *Monell* claim, then, Plaintiffs must plead facts sufficient to plausibly show three elements. *Sisson v. Dougherty*, Case No. 18-3094, 2019 U.S. Dist. LEXIS 240957, *5 (C.D. Ill. Jan. 24, 2019) (citing *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) and *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 799 (7th Cir. 2016)). First, Plaintiffs must plausibly allege that they suffered a deprivation of a constitutional right. *See Monell*, 436 U.S. at 690–91 (citing 42 U.S.C. § 1983); *Prentice*, 29 F.4th at 905 (7th Cir. 2022).

Second, they must allege any of "three bases for municipal liability: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (quoting *Est. of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007)). Under the second basis (widespread practice), the custom need not, in itself, be unconstitutional, but "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish . . . the requisite fault on the part of the municipality . . . ." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).

Third, Plaintiffs must allege that the policy, practice, or procedure "caused the constitutional deprivation." *Glisson*, 849 F.3d at 379. In other words, the "governmental body's policies must be the *moving* force behind the constitutional violation before [the Court] can impose liability under *Monell*." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 306 (7th Cir. 2010)

(citing *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004)).

### 4.7.1    Failure to Implement a Policy, Practice, or Procedure *Monell* Claims

The Seventh Circuit has clearly stated that "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Glisson*, 849 F.3d at 381 (quoting *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990)). Similarly, a government entity's failure to make a policy when a practice is potentially dangerous is actionable. *Thomas*, 604 F.3d at 303 (citing *Mulcahy*, 902 F.2d at 543); *see also King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (noting that a municipality "may not adopt a policy of inaction" when it has "actual or constructive knowledge that its agents will probably violate constitutional rights" (quoting *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004))). The function of this theory of *Monell* liability is to still hold a municipality liable for unconstitutional practices that have "not been formally approved by an appropriate decisionmaker" but which are "so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997) (citing *Monell*, 436 U.S. at 690–91).

To state a claim under the failure-to-implement-policy theory, Plaintiffs must allege that "the same problem has arisen many times and the municipality has acquiesced in the outcome . . . ." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). In other words, Plaintiffs must allege facts that "show[] a series of bad acts" that allow the Court to plausibly infer that "the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least

condoned, thus in either event adopting, the misconduct of the subordinate officers." *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995) (citing *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 509–11 (7th Cir. 1993)).

This is no small feat—showing that the government "could, or even should, have been aware of the unlawful activity because it occurred more than once" is not enough. *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Ent., Inc.*, 834 F.3d 760 (7th Cir. 2016). "The plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.*; *see also Glisson*, 849 F.3d at 381 ("[T]he key is whether there is a conscious decision not to take action."). In other words, the Plaintiffs must "weave the[] separate incidents together into a cognizable policy." *Phelan*, 463 F.3d at 790.

### 4.7.2 Failure to Adequately Train or Supervise *Monell* Claims

Training programs, or the lack thereof, may also give rise to municipal liability. *See Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019) (recognizing that failure-to-supervise claims "tenous[ly]" fall within the scope of *Monell* liability (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011))). Claims under this theory are "appropriate only when inadequate training 'amounts to deliberate indifference to the rights of persons with whom [municipal employees] come into contact.'" *Flores v. City of South Bend*, 997 F.3d 725, 731 (7th Cir. 2021) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Like failure-to-implement-policy claims, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference . . . ." *Connick,*

Case 2:24-cv-00264-JPS    Filed 11/01/24    Page 34 of 45    Document 34

563 U.S. at 62 (quoting *Brown*, 520 U.S. at 409). However, there may be "circumstances in which 'the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights' that a factfinder could find deliberate indifference to the need for training." *J.K.J. v. Polk County*, 960 F.3d 367, 380 (7th Cir. 2020) (quoting *City of Canton*, 489 U.S. at 390).

### 4.7.3 Count One Fails to Sufficiently Plead a *Monell* Claim

Analyzing the elements of a cognizable *Monell* claim, it becomes clear that Count One must be dismissed as to the City. *See Monell*, 436 U.S. 690–94. To state a *Monell* claim, the Plaintiff must plausibly allege that a "constitutional deprivation" occurred. *Id*. at 690–91 (citing 42 U.S.C. § 1983); *Prentice*, 29 F.4th at 905 (7th Cir. 2022). Because the Court concluded that no constitutional violation was sufficiently pled in Count One, *see supra* Section 4.5.1, the *Monell* claim cannot proceed. Accordingly, Defendants' motion to dismiss Count One against the City is granted without prejudice. *See Runnion*, 786 F.3d at 519.

### 4.7.4 Counts Two and Three Fail to Sufficiently Plead *Monell* Claims

For Counts Two and Three, prong one of the *Monell* analysis is met, because the Court found plausible underlying constitutional violations. *See supra* Sections 4.5.2 and 4.5.3. However, Counts Two and Three, as pled, fail to make it past prong two—the showing of an unconstitutional policy or procedure. While it is true that "the failure to make policy . . . may be actionable," *Glisson*, 849 F.3d at 381 (quoting *Mulcahy*, 902 F.2d at 543), Plaintiffs still must plausibly allege that the municipality was "aware of the risk created by the custom or practice [or lack thereof] and . . . failed to take

appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303 (citing *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). While the Seventh Circuit has not adopted bright-line rules to determine how many incidents create a policy, or lack thereof, sufficiently widespread under *Monell*, "it is clear that a single incident or even three incidents do not suffice." *Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014) (citing *Thomas*, 604 F.3d at 303).

Plaintiffs fail to plead facts from which the Court could plausibly infer that the City was "aware of the risk created by the" lack of policy to address the risk of warrantless searches or seizures in response to swatting calls for Counts One and Two. *Thomas*, 604 F.3d at 303 (citing *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). This is because, prior to Count One, and by Plaintiffs' own admission, there had been no constitutional violations in response to the swatting calls. *See* ECF No. 31 at 11 ("This case is not about the more than 38 occasions where officers responded to [Plaintiffs'] home and after some investigating and conversing with them, left. That was good police work and does not implicate the Constitution."). The Court's analysis finds no constitutional violation pled in Count One, *see supra* Section 4.5.1, which means that the first plausible constitutional violations occurred in Count Two. Accordingly, at the time of the alleged violations underlying Count One, there could have been no pattern established and no awareness of any risk by the City.[19]

_____

[19]Defendants fail to explicitly argue that the City could not have been aware of the incidents such that a plausible pattern exists with respect to Counts Two and Three, merely citing cases in the context of the standard for *Monell* liability generally. *See* ECF No. 28 at 19–20 (citing *Phelan*, 463 F.3d 773 and *Wilson*, 742 F.3d 775). Nevertheless, the Court *sua sponte* considers the fatal lack of pattern pled in Counts Two and Three and accordingly dismisses the corresponding *Monell* claims.

Plaintiffs allege that they made certain City employees aware of the fact that online bullies were swatting them, but they do not allege that any of those employees had policymaking authority. ECF No. 13 at 8; ECF No. 31 at 3. Nor do Plaintiffs allege that the City knew that there was a risk of MPD committing constitutional violations due to the swatting.

The lack of facts alleging knowledge of the constitutional risk posed by Plaintiffs' swatting situation is also fatal to Counts Two and Three under a failure to supervise theory, which ordinarily requires "[a] pattern of similar constitutional violations . . . to demonstrate deliberate indifference." *Connick*, 563 U.S. at 62 (citing *Brown*, 520 U.S. at 409). A pattern requires more than one violation, so this prong cannot have been met until, at the very least, two constitutional violations occurred. And while a failure to supervise theory may allow for *Monell* liability even absent a pattern, the allegations must present "circumstances in which 'the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights' that a factfinder could find deliberate indifference to the need for training." *J.K.J. v. Polk County*, 960 F.3d 367, 380 (7th Cir. 2020) (quoting *City of Canton*, 489 U.S. at 390). Plaintiffs fail to allege that constitutional violations due to swatting was such an 'obvious' risk that deliberate indifference could be plausibly inferred without a pattern of constitutional violations. Accordingly, Defendants' motion to dismiss Counts Two and Three as to the City is granted without prejudice. *See Runnion*, 786 F.3d at 519.

### 4.7.5 Counts Four Through Seven Sufficiently Plead *Monell* Claims

In contrast to Counts Two and Three, Counts Four through Seven establish facts that could support *Monell* claims. By the third warrantless search of Plaintiffs' home, it is plausible that the City had become aware and thus deliberately indifferent to the risk of unconstitutional warrantless searches or seizures caused by its lack of policy addressing swatting—or, alternatively, its failure to train or supervise its officers regarding swatting. The facts as pled plausibly suggest that the various underlying alleged Fourth Amendment violations created a pattern and "weave[d] together into a cognizable policy" (or in this case, a lack thereof) to constitute municipal acquiescence. *Phelan*, 463 F.3d at 790.

One year after Plaintiffs first informed MPD of their swatting situation, ECF No. 13 at 7; No. 31 at 3, officers with personal knowledge of the swatting situation were still committing alleged Fourth Amendment violations, and the actions of the officers continued to differ drastically from response to response. *See* ECF No. 13 at 14–15. This contrasts with the facts of *Estate of Moreland v. Dieter* and *Palmer v. Marion County*, where the Seventh Circuit concluded that two or three separate and *unrelated* incidents were insufficient to constitute a "widespread practice." *See Dieter*, 395 F.3d 747, 760 (7th Cir. 2005) (finding three separate and *unrelated* occasions in which guards sprayed inmate with pepper spray insufficient to constitute "'a widespread practice' that is "permanent and well settled"); *Palmer*, 327 F.3d 588, 595 (7th Cir. 2003) (finding two situations in which the prison placed Black inmates in cells that poses threats to their safety insufficient to constitute "a widespread practice"). In *Dieter* and *Palmer*—both decided at

Case 2:24-cv-00264-JPS    Filed 11/01/24    Page 38 of 45    Document 34

the summary judgment stage—the plaintiffs attempted to use unrelated instances of similar conduct to suggest that the municipality had an unconstitutional widespread practice. Here, the Court considers the issue at the pleading stage and, importantly, MPD officers allegedly knew about the swatting risk and false emergency calls prior to responding. It is notable, too, that Plaintiffs allege that multiple officers—responding in separate incidents—committed Fourth Amendment violations, as opposed to one single officer, who may have been acting on his or her own accord. *See Thomas*, 604 F.3d at 303–04 (noting that "an isolated act of an individual employee . . . would be insufficient to establish" *Monell* liability (citing *Monell*, 436 U.S. at 691–94)).

The drastic differences in how police responded to the home—during the incidents underlying the six counts found herein to plausibly allege Fourth Amendment violations and all of the other police responses—allow for the reasonable inference that "the same problem has arisen many times and the municipality has acquiesced in the outcome . . . ." *Calhoun*, 408 F.3d at 380. For similar reasons, the failure-to-train theory of liability also survives for Counts Four through Seven; Plaintiffs have pled sufficient facts to render plausible a finding of a "pattern of similar constitutional violations" by seemingly untrained employees constituting "deliberate indifference." *Connick*, 563 U.S. at 62 (citing *Brown*, 520 U.S. at 409).

Finally, for the third element, Plaintiffs allege that the underlying Fourth Amendment violations were *directly caused* by (1) the City's failure to implement any policy or procedure to prevent Plaintiffs from being swatted and (2) by the City's failure to adequately train or supervise its officers. As discussed, these allegations are supported by specific facts that

render plausible the reasonable inference that the City is liable under either theory. *See Sisson*, 2019 U.S. Dist. LEXIS 240957, at *6–8 (finding plaintiff's allegations "that as a direct and proximate result of the failure to promulgate . . . procedures, [he] was injured" sufficient to plead this third element, and ultimately denying a motion to dismiss a *Monell* claim). Plaintiffs have plausibly alleged that had the City trained its officers or instituted a policy for how to respond to swatting calls, police's responses would have been more uniform and would not have resulted in the constitutional violations that occurred in this case. Thus, the facts as alleged render plausible that the City's failure to institute a policy or training caused the alleged deprivation of Plaintiffs' Fourth Amendment rights. Accordingly, Defendants' motion to dismiss the *Monell* claims in Counts Four through Seven is denied.

### 4.8 Qualified Immunity Defenses Are Not Suitable for Dismissal at the Rule 12(b)(6) Stage

The Court next addresses Defendants' argument that they are shielded by qualified immunity. ECF No. 28 at 15. A motion to dismiss is rarely, if ever, "the most suitable procedural setting to determine whether an official is qualifiedly immune, because immunity may depend on particular facts that a plaintiff need not plead to state a claim." *Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020) (citing *Alvarado v. Litscher*, 267 F.3d 648, 651–52 (7th Cir. 2001)). In fact, "[a]sserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Reed*, 906 F.3d at 549 (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014)). At the 12(b)(6) stage, "it is the defendant's conduct *as alleged in the*

*complaint* that is scrutinized for 'objective legal reasonableness.'" *Id.* (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)). For the reasons discussed herein, Defendants have failed to demonstrate that their actions are shielded by qualified immunity as a matter of law.

An official sued under Section 1983 is entitled to qualified immunity unless the Plaintiffs show that the official violated a statutory or constitutional right "clearly established" at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Plaintiffs can show that this right was clearly established either by "present[ing] case law that has articulated both the right at issue and applied it to a factual circumstance similar to the one at hand" or by "demonstrat[ing] that the 'contours of the right are so established as to make the unconstitutionality obvious.'" *Ault v. Speicher*, 634 F.3d 942, 946 (7th Cir. 2011) (quoting *Boyd v. Owen*, 481 F.3d 520, 526–27 (7th Cir. 2007)).

The constitutional right at issue here is the right to be free from warrantless searches and seizures—specifically in situations where additional facts available to the police render their reliance on the exigent circumstances exception to warrantless searches and seizures unreasonable. Relying solely on the facts before the Court at this stage, it is plausible that the "contours of the right are so established as to make the unconstitutionality obvious" and therefore "clearly established." *Id.* (citation omitted); *see Bautista v. Village of Lomira*, No. 12-CV-126, 2013 LEXIS 76828 (E.D. Wis. May 31, 2013) (noting that it is "undoubtedly clearly established law" that "warrantless searches are presumptively unreasonable" (citing *Payton*, 445 U.S. at 586)); *id.* (noting that it is "equally

well established" that "police officers need[] an exception to the warrant requirement" to render warrantless searches constitutional (citing *Katz*, 389 U.S. 347)). Furthermore, it is equally established that officers may not "close [their] eyes to facts that would clarify the situation." *McBride*, 576 F.3d at 707 (collecting cases).

The fact that this is a unique factual situation in which the unreasonableness of relying on the initial emergency calls to establish an exigency was due to knowledge of false calls in the past as to the same home need not foreclose the conclusion that the right is not clearly established. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). At this juncture, then, the Court cannot say as a matter of law that Defendants are entitled to qualified immunity. Accordingly, the Court will not dismiss this action on grounds of qualified immunity at this juncture.

**5.     MOTION TO RESTRICT**

The Court next addresses Defendants' "motion to seal." ECF No. 30. In this District, a "sealed document" is only viewable by the judge. No attorney, not even the filing attorney, will be able to view the document unless given permission by the Court. In contrast, a document restricted to case participants allows all attorneys of record, but not the general public, to view the document. *See Filing Restricted and Sealed Documents*, United States District Court Eastern District of Wisconsin, *available at* https://perma.cc/9ZEG-KAUL. A review of Defendants' motion reveals that it is seeking protection from public disclosure, rather than

requesting that the documents only be viewed by the Court. Therefore, the Court will construe the motion as a motion to restrict.

Documents should only be restricted for good cause. Gen. L.R. 79(d)(3) ("Any motion to restrict access . . . must be supported by sufficient facts demonstrating good cause for withholding the document or material from the public record."). Defendants move to restrict documents that could possibly serve to further the interests of Plaintiffs' alleged harassers. ECF No. 30. Plaintiffs have not opposed the motion, and the Court finds that there is good cause for Exhibit A to Defendants' motion to dismiss, ECF No. 28-1, to be restricted. Defendants' motion to restrict, ECF No. 30, is accordingly granted. Exhibit A shall remain under restriction unless and until the Court orders otherwise.

6.    **MOTION TO STAY**

Lastly, the Court addresses Defendant's motion to stay, filed on September 30, 2024. ECF No. 33. Defendants moved to stay discovery pending the Court's ruling on their motion to dismiss. *Id.* This Order moots the motion to stay. Nevertheless, the Court will extend the deadlines set forth in the Court's scheduling order, ECF No. 12, as follows: interim settlement report due by February 7, 2025 and dispositive motions due March 7, 2025.

7.    **CONCLUSION**

As stated above, Defendants' motion to dismiss, ECF No. 28, will be granted in part, denied in part. Defendants' motion as to Count One of the amended complaint will be granted and Count One will be dismissed without prejudice for failure to state a claim against which relief may be granted, because Plaintiffs have failed to allege facts to plausibly support

an unlawful search and seizure under *Monell.* Defendant's motion will further be granted as to the *Monell* claims against the City in Counts Two and Three, because Plaintiffs have failed to plead sufficient facts to support *Monell* liability for the alleged underlying constitutional violations. Defendants' motion will be denied as to the *Monell* claims in Counts Four through Seven because Plaintiffs have adequately pled facts to plausibly support *Monell* liability as to the City. And Defendants' motion will be denied as to the Officer Defendants for Counts Two through Seven, because Plaintiffs have adequately pled facts to plausibly support individual liability for alleged unconstitutional searches and seizures for those counts.

Accordingly,

**IT IS ORDERED** that Defendants City of Milwaukee, Lyndon Evans, Christian Garrido, Bradley Orlando, Nicole Plevak, John Kohler, Jacob Wasechek, Fidah Mustafa, Nathaniel Petersen, Sean Carleton, and Paul Vento's motion to dismiss the amended complaint, ECF No. 27, be and the same is hereby **GRANTED in part** and **DENIED in part as set forth herein**;

**IT IS FURTHER ORDERED** that Count One of Plaintiffs Niki Robinson and Patrick Tomlinson's amended complaint, ECF No. 13, be and the same is hereby **DISMISSED without prejudice**;

**IT IS FURTHER ORDERED** that Counts Two and Three of Plaintiffs Niki Robinson and Patrick Tomlinson's amended complaint, ECF No. 13, be and the same are hereby **DISMISSED without prejudice as to the City of Milwaukee**;

**IT IS FURTHER ORDERED** that Defendants City of Milwaukee, Lyndon Evans, Christian Garrido, Bradley Orlando, Nicole Plevak, John

Kohler, Jacob Wasechek, Fidah Mustafa, Nathaniel Petersen, Sean Carleton, and Paul Vento's motion to seal, ECF No. 30, construed as a motion to restrict, be and the same is hereby **GRANTED;** the document filed at ECF No. 28-1 be and the same shall hereby remain under restriction unless and until the Court orders otherwise;

IT IS FURTHER ORDERED that Defendants City of Milwaukee, Lyndon Evans, Christian Garrido, Bradley Orlando, Nicole Plevak, John Kohler, Jacob Wasechek, Fidah Mustafa, Nathaniel Petersen, Sean Carleton, and Paul Vento's motion to stay discovery, ECF No. 33, be and the same is hereby **DENIED** as moot;

IT IS FURTHER ORDERED that the current deadlines for Interim Settlement Report and Dispositive Motions, ECF No. 12, be and the same are hereby **EXTENDED**; and

IT IS FURTHER ORDERED that the deadline for the parties' interim settlement report be and the same is hereby **RESCHEDULED** for February 7, 2025; and the deadline for Dispositive Motions be and the same is hereby **RESCHEDULED** for March 7, 2025.

Dated at Milwaukee, Wisconsin, this 1st day of November, 2024.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge