UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

NIKI ROBINSON AND
PATRICK TOMLINSON,

     *Plaintiffs,*

     *v.*

CITY OF MILWAUKEE, LYNDON EVANS,
JOSEPH SCHEURING, CHRISTIAN GARRIDO,
BRADLEY ORLANDO, NICOLE PLEVAK,
LORENZO HERNANDEZ, DEXTER LEE,
ANDREW DUDLEY, KELTON MCCOWAN,
MATTHEW HELWER, JASON WARWICK,
GREGORY RUPNIK, PAUL TERRIQUEZ,
KEVIN BECKER, DEVON WILLIAMS,
SHAWN SWITZER, FIDAH MUSTAFA,
NATHANIEL PETERSEN, SEAN CARLETON,     Case No: 2:24-cv-264
AND PATRICK TIVNAN,

     *Defendants.*

---

## SECOND AMENDED COMPLAINT

---

Plaintiffs Niki Robinson and Patrick Tomlinson, by their attorneys, Strang

Bradley, LLC, for their complaint against Defendants, state:

## INTRODUCTION

1.     Niki Robinson and Patrick Tomlinson, a married couple, are the targets of a

vicious campaign of domestic terrorism carried out at the hands of a group of bullies who

hide behind the anonymity of the internet.

2. The bullies' main weapon of choice is something called "swatting," which is when someone who wants to endanger the life and safety of another calls 911 and lies to provoke a dangerous police response to the victim's home.

3. The goal is to either harm or terrorize an innocent person at the hands of the police, who the caller is hoping will barge into their victim's home and, in the chaos, injure or kill them.

4. "Swatting" has become a widespread and well-known method of harassment, with several states and the federal government adopting harsh criminal penalties to deter would-be swatters.

5. Normally the police are unwitting tools of these bad actors who have no choice but to take these false calls at face value.

6. But Niki and Patrick's situation is different because the Milwaukee Police Department has responded to swatting calls to their home *at least 45 times* in the past two years.

7. Any rational police force would have recognized at some point that any calls involving the Robinson-Tomlinson home were clearly false and should not be taken seriously.

8. Any rational police force would have implemented some sort of policy to avoid becoming a tool of terror against the very citizens they are sworn to protect.

9. But time and time again, the Milwaukee police have ignored reality, resulting in multiple illegal searches of Niki and Patrick's home and illegal seizures of their persons.

10.     This insanity has drawn local, national, and international media attention.

11.     Niki and Patrick have tried to work with the City of Milwaukee to stop this, but the City of Milwaukee failed to adopt a policy or train its officers on how to prevent Niki and Patrick's stalkers from using the police department as a tool of terror.

12.     And while many of the police officers who have responded to Patrick and Niki's home have been kind, understanding, and compassionate, others have not.

13.     The worst offender is Sergeant Lyndon Evans.

14.     On three occasions, Sergeant Evans responded to a swatting call with abuse and violence.

15.     Sergeant Evans told Niki and Patrick that he was "well aware" of the situation but still demanded to be let inside their home, going so far as to threaten to break down the front door if he was not allowed inside.

16.     Niki and Patrick live in a constant state of fear, worried that the next encounter they have with the police will be their last.

17.     Every knock on the door or police car that drives by leaves them terrified that they are about to be staring down an officer's gun or that they will be paraded outside in handcuffs to their further humiliation.

18.     This lawsuit seeks to end the madness and vindicate the violation of Plaintiffs' constitutional rights. It seeks to effect change through punitive damages by punishing the Defendants for their egregious conduct with the hope that the punishment is significant enough to prevent this from happening again in the future.

3

## JURISDICTION AND VENUE

19.     This action is brought under 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

20.     This Court has jurisdiction over federal claims under 28 U.S.C. § 1331 and the state law claim for indemnification under 28 U.S.C. § 1367.

21.     Venue is proper under 28 U.S.C. § 1391(b). Defendant City of Milwaukee is a political subdivision of the state of Wisconsin located within this judicial district. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

22.     Plaintiff Niki Robinson is a resident of the State of Wisconsin and the County of Milwaukee.

23.     Plaintiff Patrick Tomlinson is a resident of the State of Wisconsin and the County of Milwaukee.

24.     Defendant City of Milwaukee is a political subdivision of the state of Wisconsin.

25.     Defendant City of Milwaukee is or was the employer of the individual defendants and is required to pay any tort judgment for damages for which its employees are liable for acts within the scope of their employment.

26.     Defendant Lyndon Evans was, at the time of this occurrence, employed as a sergeant in the City of Milwaukee's Police Department.

27. Defendant Evans engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

28. Defendant Evans engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

29. Defendant Joseph Scheuring was, at the time of this occurrence, employed as a sergeant in the City of Milwaukee's Police Department.

30. Defendant Scheuring engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

31. Defendant Scheuring engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

32. Defendant Patrick Tivnan was, at the time of this occurrence, employed as an officer in the City of Milwaukee's Police Department.

33. Defendant Tivnan engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

34. Defendant Tivnan engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

35. Defendant Dexter Lee was, at the time of this occurrence, employed as an officer in the City of Milwaukee's Police Department.

36. Defendant Lee engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

37.     Defendant Lee engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

38.     Defendant Andrew Dudley was, at the time of this occurrence, employed as an officer in the City of Milwaukee's Police Department.

39.     Defendant Dudley engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

40.     Defendant Dudley engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

41.     Defendant Kelton McCowan was, at the time of this occurrence, employed as an officer in the City of Milwaukee's Police Department.

42.     Defendant McCowan engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

43.     Defendant McCowan engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

44.     Defendant Kevin Becker was, at the time of this occurrence, employed as an officer in the City of Milwaukee's Police Department.

45.     Defendant Becker engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

46.     Defendant Becker engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

47.     Defendant Devon Williams was, at the time of this occurrence, employed as an officer in the City of Milwaukee's Police Department.

48.     Defendant Williams engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

49.     Defendant Williams engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

50.     Defendant Shawn Switzer was, at the time of this occurrence, employed as an officer in the City of Milwaukee's Police Department.

51.     Defendant Switzer engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

52.     Defendant Switzer engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

53.     Defendant Christian Garrido was, at the time of this occurrence, employed as a police officer in the City of Milwaukee's Police Department.

54.     Defendant Garrido engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

55.     Defendant Garrido engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

56.     Defendant Bradley Orlando was, at the time of this occurrence, employed as a police officer in the City of Milwaukee's Police Department.

57.     Defendant Orlando engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

58.     Defendant Orlando engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

59.     Defendant Matthew Helwer was, at the time of this occurrence, employed as a police officer in the City of Milwaukee's Police Department.

60.     Defendant Helwer engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

61.     Defendant Helwer engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

62.     Defendant Paul Terriquez was, at the time of this occurrence, employed as an officer in the City of Milwaukee's Police Department.

63.     Defendant Terriquez engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

64.     Defendant Terriquez engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

65.     Defendant Fidah Mustafa was, at the time of this occurrence, employed as a police officer in the City of Milwaukee's Police Department.

66.     Defendant Mustafa engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

67.     Defendant Mustafa engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

68.     Defendant Sean Carleton was, at the time of this occurrence, employed as a police officer in the City of Milwaukee's Police Department.

69.     Defendant Carleton engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

70.     Defendant Carleton engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

71.     Defendant Nathaniel Petersen was, at the time of this occurrence, employed as a police officer in the City of Milwaukee's Police Department.

72.     Defendant Petersen engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

73.     Defendant Petersen engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

74.     Defendant Gregory Rupnik was, at the time of this occurrence, employed as a police officer in the City of Milwaukee's Police Department.

75.     Defendant Rupnik engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

76.     Defendant Rupnik engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

77.     Defendant Nicole Plevak was, at the time of this occurrence, employed as a police officer in the City of Milwaukee's Police Department.

78.     Defendant Plevak engaged in the conduct complained of while she was on duty, acting under color of state law, ordinance, and or regulation.

79. Defendant Plevak engaged in the conduct complained of in the course and scope of her employment with the City of Milwaukee. She is sued in her individual capacity.

80. Defendant Lorenzo Hernandez was, at the time of this occurrence, employed as an officer in the City of Milwaukee's Police Department.

81. Defendant Hernandez engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

82. Defendant Hernandez engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

83. Defendant Jason Warwick was, at the time of this occurrence, employed as an officer in the City of Milwaukee's Police Department.

84. Defendant Warwick engaged in the conduct complained of while he was on duty, acting under color of state law, ordinance, and or regulation.

85. Defendant Warwick engaged in the conduct complained of in the course and scope of his employment with the City of Milwaukee. He is sued in his individual capacity.

**FACTS**

86. Niki and Patrick informed their local police, Milwaukee Police Department District 1, that they were the victims of a targeted harassment and stalking campaign in 2019.

87. The City of Milwaukee Police Department divides the cities into districts.

88. Niki and Patrick's home is in District One.

89.     Patrick spoke to officers at his local district, a dispatcher, and a desk Sergeant, to inform them that the group of online bullies who were stalking him and his wife Niki were threatening to swat them through harassing text messages.

90.     Niki called the FBI as well, telling them the same thing.

91.     They believed that the police officers were going to do the right thing and put something in place that would keep the officers from becoming tools in their stalkers' harassment campaign.

92.     But Niki and Patrick realized this wasn't the case on July 25, 2022, when police officers appeared on their front porch holding guns at one in the morning.

93.     Members of the Milwaukee police were there on a call by one of Niki and Patrick's stalkers that there was a murder/hostage situation inside their home.

94.     From the police reports of that incident, it appears no one informed the officers who responded of the repeated swatting threats and previous attempts.

95.     Because they were not informed of the repeated swatting attempts, the officers responded as though this were a true hostage situation.

96.     Patrick was home alone and, without even time to get dressed, was ordered out of the home at gunpoint and left in a state of undress in handcuffs outside while the officers entered his home to search it.

97.     It was only after the seizure of Patrick and the search of his home that, according to the officer's reports, "further investigation revealed that the Milwaukee Police Department has responded to other similar complaints at the location."

98. Sergeant Carrie Pocernich, a District One officer, wrote a memorandum to Captain James Campbell explaining the situation at Patrick and Niki's home.

99. A follow-up police report from July 27, 2022, confirms that after police listened to the "original 911 call," it was determined that Patrick was "NOT the 911 caller."

100. Lieutenant Thiel, who would later become acting Captain and then Captain of District One, wrote an e-mail on August 3, 2022, requesting that a memo be generated to have Patrick and Niki's home flagged as a swatting risk in the dispatch system because "the victim of this swatting has the FBI involved and I don't want to overly aggressively respond to this residence in the future."

101. But the address was not flagged because, according to an e-mail authored by Thiel, City of Milwaukee officials decided they did not want to create "complacency" in any officers who were responding to Patrick and Niki's home.

102. By early August of 2022, the issue of the repeated bogus calls and swatting attempts at the Robinson-Tomlinson house was known to all District One officers.

103. Police officers in Milwaukee start their shifts with a "roll call" meeting, in which their supervising sergeants update them on important issues, happenings in the district, and new policies.

104. District One officers were told repeatedly at their daily roll call meetings that Patrick and Niki were the victims of a harassment and swatting campaign.

105. But officers were not given instructions on how to change their response to calls for service at Patrick and Niki's home.

106.     The Milwaukee Police Department, the 25th largest police department in the United States, has no formal policy or guidelines on the issue of swatting or responding to false emergency calls.

107.     And members of the Milwaukee Police Department have received no training on swatting.

108.     The only familiarity officers had with the concept came from this case and what they heard on television or read in the news.

109.     And so, unprotected by any formal action or policy by the City of Milwaukee, Patrick and Niki were swatted again on August 11, 2022.

110.     According to the police report, this time authored by District One Officer Nicole Plevak, the officers who responded were aware that "there had been previous calls to the residence eliciting multiple squad responses."

111.     Nevertheless, Defendants Plevak, Hernandez, Switzer, McCowan, Tivnan, and Dudley, all District One officers, responded to the home pursuant to another bogus call.

112.     According to the August 11, 2022, police report, Niki told the police everyone in the house was fine and told the officers *again* that they "have been having ongoing issues of individuals falsifying 911 calls."

113.     Switzer told Niki that he knew about the history of swatting ("we're aware"), but he wasn't sure whether Niki would've been aware of the swatting history.

114.     Despite this, officers ordered Niki out of the home.

115. The body camera footage shows that the officers clearly didn't think they were dealing with an emergency.

116. The officers had a casual conversation with Niki on her porch, asking her about who might have made the bogus call and taking notes.

117. The officers had their weapons holstered and clearly did not believe there was an emergency at the home.

118. Niki told the officers that Patrick had been handcuffed during a previous swatting.

119. Plevak aware of the incident, told Niki, "Officers weren't aware at that time because I know it happened on late shift."

120. Niki asked the officers if, when they responded to a call, they could lead with the fact that they know about the swatting history so she didn't have to worry about being hurt.

121. Switzer told her that was something they would take into consideration.

122. Despite the officers knowing it was a bogus call and speaking to Niki about it for over five minutes, one of the officers present approached Niki and told her that they "have to" walk through her home.

123. Plevak, Tivnan, Switzer, McCowan, and Kohler were all in earshot of this conversation.

124. Yet none of them made an effort to stop the illegal search that happened after Niki acquiesced to this assertion of authority.

125. Defendants Switzer and Plevak entered and searched Niki's home.

126. While Plevak, Tivnan, Switzer, McCowan, and Kohler were in the front of the house, Defendants Dudley and Hernandez were in the backyard, having their own conversation.

127. Their body cameras captured them discussing how dangerous fake calls like this can be for themselves and the residents of the home.

128. After Dudley discussed that he knew the call was fake and that the fake calls were dangerous, he illegally searched the Robinson-Tomlinson residence by opening their cellar door and peering inside.

129. Hernandez watched the Dudley open and look in the cellar door and didn't stop him.

130. For a moment, Niki and Patrick thought the madness would end, as after this illegal search and seizure, they received an e-mail from an FBI agent telling them that their home had finally been flagged in the system as a swatting risk.

131. On September 22, 2022, officers arrived at their home but politely told them they knew the report was false and left right away after telling the couple they didn't need to come inside.

132. But on October 1, 2022, Niki was ordered out of the house by heavily armed officers stacked up behind a ballistic shield responding to another false call.

133. These officers were not members of District One but were instead assigned to the Milwaukee Tactical Enforcement Unit ("TEU"), which is what Milwaukee calls its SWAT team.

134. And while members of District One had been briefed on the swatting situation at Niki and Patrick's home, no one at the City of Milwaukee thought it would be prudent to pass this information on to the Milwaukee Police Department's SWAT team prior to October 1, 2022.

135. However the information was provided over the radio to the TEU officers who responded to the call.

136. Helwer, Terriquez, Warwick, and Rupnik all heard a fellow officer come over the radio and tell them they should "be aware there are multiple calls, a history of calls for shooting at that residence" and that the Robinson-Tomlinson household was a "known swatting address"

137. Also on scene was Defendant Mustafa, who had been briefed on the situation and heard the same announcement over the radio.

138. Defendant Helwer can be heard commenting on the drive to the home that the call sounded "fake" directly after hearing the warning over the radio to be aware of the house's history.

139. Niki, the person whose murder the officers were allegedly there to discover, came to the door and told the assembled SWAT team that she was fine.

140. Despite this, officers pointed guns in her face, ordered her out of the home, and then searched her house.

141. The officers aimed rifles at her and then proceeded to search the Robinson-Tomlinson home without a warrant.

142.     Two days later, a sergeant from District One forwarded to a TEU officer an email from District One Captain Campbell explaining that the Robinson-Tomlinson home is the victim of multiple swattings and calls to the house are likely hoaxes. The TEU officer forwarded the email to his sergeants.

143.     On November 4 and 30, 2022, police officers responded to the Robinson-Tomlinson home based on false reports but simply knocked on the door and had a polite conversation with them about their situation.

144.     On each of these occasions, the dispatcher made it clear the officers were responding to a "KNOWN SWATTING LOCATION."

145.     However, there was still no formal policy, practice, or training to give guidance to how District One officers were supposed to respond to calls at the home.

146.     And so, on March 20, 2023, Niki and Patrick had their constitutional rights violated once again.

147.     Sergeant Lyndon Evans was one of the officers who was called to what was the 18th false 911 call (so far) made by Niki and Patrick's stalkers.

148.     By this time, Sergeant Evans had been copied on multiple e-mails informing him of the situation at the Robinson-Tomlinson home.

149.     Sergeant Evans had been charged with bringing up this issue with the officers under his command at their daily roll-call meetings.

150.     One of those e-mails, authored by Evans's direct supervisor, then-Lieutenant Thiel, instructed him and his fellow supervisors to "not breach the building unless we know for sure there is some legitimacy to the call."

151.    Sergeant Evans, along with District One Officers Christian Garrido and Bradley Orlando, were called out to the home on a false call that a male had murdered his parents.

152.    According to the police report, the officers who responded knew that "the address is known for swatting calls."

153.    The dispatch made it clear to the officers that there was a "SWATTING RISK AT THIS LOCATION."

154.    Niki appeared at the front door and told the officers everyone was fine.

155.    Sergeant Evans told her that he was "well aware" of their situation but was still demanding to enter the home.

156.    Niki got Patrick on the phone who spoke to Officer Garrido and told him, according to the police report, that "these swatting calls are frustrating and…that he is upset that the Milwaukee Police Department does not have a solution for these swatting calls" and told Garrido that the officers "would need a warrant to enter his property."

157.    According to Sergeant Evans's police report, he was told by dispatch that the call was made from a "virtual private network" and that there was a "swatting risk at this location."

158.    Sergeant Evans's police report says that he was "aware of the location's history with swatting" and when he approached the front door he could see a set of "handwritten instructions for first responders…to call a phone number."

159.     Despite this, Sergeant Evans "insisted that [he needed to] check the interior of the location" even though Niki told him she did not consent for him to come inside because she was busy working at home.

160.     Niki told Sergeant Evans that he should call another police Sergeant, Carrie Pocernich, which Sergeant Evans did.

161.     According to his police report, Sergeant Evans spoke to Sergeant Pocernich, who told him that "she was not aware of an agreement between [Niki and Patrick] and personnel from the District One Station."

162.     Sergeant Pocernich testified in her deposition that she explicitly told Evans that he should *not* enter the home because of the history of fake calls at that location.

163.     Specifically, Pocernich testified,

> And I told him it was swatting address, and I advised him not to go in, and to call. And he told me he didn't feel comfortable with that because of the circumstances.

164.     Despite all this, Sergeant Evans forced his way into the house.

165.     Officer Garrido and Officer Orlando did not intervene to stop this illegal search and seizure.

166.     On April 11, 2023, there were *four* separate swatting attempts.

167.     Three of them ended peacefully with a simple conversation.

168.     But on the last one, late at night, six members of District One came to the Robinson-Tomlinson home and again detained Niki and Patrick.

169.     Again, the dispatch made it clear that there was a "SWATTING RISK AT THIS LOCATION."

170. This time the call wasn't made over 911, but through a "VPN CHAT SERVICE."

171. One of the officers, Sean Carleton, wrote the police report.

172. Officer Carleton wrote that it was important to "be noted" that Niki and Patrick's home "is listed as a swatting risk, meaning that there have been numerous false reports made at this home but not by the occupants of the home."

173. Officer Carleton continued, writing that he was aware that Niki and Patrick are "disliked by an unknown community and it seems that are determined to continually call false reports on him."

174. Patrick, who saw the whole thing on their doorbell camera application, tried to speak to the officers over the camera.

175. He told the officers to leave, but they refused.

176. Officers ordered Niki to come to the front door and open it so they could visually inspect her.

177. Officers are seen on body camera standing on Patrick and Niki's lawn holding assault rifles.

178. And yet when Patrick asks them to lower their weapons, Officer Carleton can be heard on his body-worn camera telling Patrick that there are no guns on scene.

179. After the officers informed Niki that they would not leave unless she presented herself to them, Niki came down with her hands raised above her head.

180. Officer Carleton can be heard complaining on his body camera by sarcastically commenting, "Are you kidding me?" at the idea that Niki would feel the need

to show her hands as she walked outside to talk to the officers equipped with automatic weaponry who were refusing to leave her house without seeing her.

181.    Patrick, who returned home to demand the officers leave his property, was then detained by the officers, who threatened to place him in handcuffs for trying to go inside his own home.

182.    Defendant Officers Lee, Garrido, Carleton, Becker, and Williams and Defendant Sergeant Joseph Scheuring were all on scene.

183.    All of them had been briefed on the situation at the home and were well aware of the history of false calls.

184.    Although Defendant Lee was not usually assigned to District One, that day, he was working with Defendant Garrido, who explained the swatting history to him.

185.    It stands to reason that at least some of them had heard about the three previous swatting attempts that very day.

186.    In particular, as a District One supervisor, Sergeant Scheuring had been a named recipient on multiple e-mails discussing the situation.

187.    Scheuring was tasked, by an e-mail sent by his supervisor, Lieutenant Zieger, on March 25, 2023, to "please discuss this location and proper response at roll calls with our shift officers so they are either initially informed or memory refreshed so they are aware if they get dispatched."

188.    And yet neither Scheuring nor anyone else stopped the seizures of Niki and Patrick, instead choosing to berate them for what they labeled as uncooperative behavior.

189.    The *very next day*, April 12, 2023, Sergeant Evans again responded to yet another swatting attempt at Niki and Patrick's home.

190.    The call was for a shooting at the residence, and the dispatcher advised officers they were to "BE ADVISED SWATTING RELATED CALL."

191.    As usual, the dispatch informed the officers that there was a "SWATTING RISK AT THIS LOCATION."

192.    Upon arrival, officers spoke with someone standing around who told them they "had not heard any gunshots."

193.    This time Officer Nathaniel Petersen wrote the report.

194.    Peterson had been dispatched to the house the previous day for a swatting call. He made contact with Patrick through a Ring camera on the porch, left a card in their mailbox, and left without issue.

195.    But on April 12, even though Petersen had been briefed repeatedly in roll calls, had just been there the day before, and would write in his report that the Robinson-Tomlinson house was "a known swatting address," he nevertheless activated the emergency lights on his squad car and sped through downtown Milwaukee, driving through red lights and stop signs, overtaking a school bus (it was about 8:30 A.M.), for over five minutes to arrive at the Robinson-Tomlinson house.

196.    Petersen arrived on the porch and began writing on another card to leave at the house like he had the day before.

197.     Patrick then started talking to Petersen through the camera on his porch. Petersen told Patrick he was sorry to bother him, but there was another call. Patrick replied that he and Niki were fine and no one was hurt.

198.     As Petersen was talking to Patrick, Evans arrived and joined Petersen on the porch.

199.     Evans told Petersen to tell Patrick that Niki had to come downstairs and show themselves.

200.     Petersen asked Patrick, "Is she able to come down?"

201.     And Evans interrupted, saying, "Not able. She needs to come down."

202.     Niki responded over the phone that she was fine.

203.     Patrick and Niki declined to come down.

204.     Evans told them that they would kick in the door if Niki didn't come down.

205.     Patrick told the officers that Niki would not be coming down.

206.     Evans again threatened to kick in the door.

207.     Petersen then, too, threatened to kick in the door.

208.     Patrick told Evans to "go away."

209.     Evans responded, "No."

210.     Sergeant Evans then ordered Officer Petersen to kick down their front door, and Petersen kicked at the door but failed to knock it down.

211.     Evans told Patrick, "You don't need to talk to me. But I do need to come in."

212.     Rather than have their door kicked down by Sergeant Evans, Niki walked down toward the door so the officers could see her.

213.    But the officers still refused to leave.

214.    After arguing with Patrick and Niki more, Petersen and Evans finally left.

215.    Then, *again*, five days later, on April 17, 2023, Sergeant Evans responded to *another* false 911 call at Niki and Patrick's home.

216.    This time he was accompanied by Officer Paul Vento, who wrote the police report.

217.    According to that report, Officer Vento and Sergeant Evans were aware that "this address is the victim of daily swatting calls."

218.    Once again, the dispatch informed Officer Vento and Sergeant Evans that there was a "SWATTING RISK AT THIS LOCATION."

219.    As Vento and Evans approached the house, Vento commented, while laughing, that it was his first time there. He added, "I've heard it like 50 times."

220.    On the porch, Vento started to call the number on the door and asked who Niki Robinson was. Evans explained that Niki is Patrick's wife.

221.    As Vento was dialing, Sgt. Pocernich, who had previously told Evans not to go into the house, called Vento.

222.    Pocernich told Vento that it was "the same thing, same m.o., same thing they always say." Vento told Pocernich he would call the number on the door and thanked Pocernich.

223.    Vento left Niki a voicemail.

224.    Evans then began pounding on the front door.

225.    Patrick then came to the door but didn't open it.

226. Evans told Patrick that he had to see Niki.

227. Patrick told Evans to go away.

228. Evans said he didn't care and he needed to see Niki.

229. Evans threatened to kick the door down.

230. Niki came down and showed herself.

231. The officers finally left. As they were walking away, Vento said, "This will be a C9 as usual. And everyone's okay." C9 means the call was unfounded.

232. Since then, although the Milwaukee police have received at least fifteen additional swatting calls, they have thankfully not invaded Niki and Patrick's home again.

233. As a direct and proximate result of the acts of Defendants, as detailed above, Plaintiffs have suffered, *inter alia*, physical pain, mental distress, humiliation, loss of liberty, and incurred expenses.

## COUNT A:
### August 11, 2022, Swatting: Unlawful Search and Seizure/Failure to Intervene
(*Monell* Claim against City of Milwaukee)
(Individual Claims against Nicole Plevak, Lorenzo Hernandez, Andrew Switzer, Kelton McCowan, Patrick Tivnan, and Andrew Dudley)

234. Plaintiffs reallege the above paragraphs.

235. On August 11, 2022, members of the Milwaukee Police Department conducted a warrantless search of Niki and Patrick's home and warrantless seizure of their persons.

236. Any reasonable officer would have known there was not probable cause to believe a crime was committed or someone was in danger.

237. Any reasonable officer would have known there was not an exigency.

238.   Any reasonable officer would have known they were being used as an implement of harassment by Niki and Patrick's stalkers.

239.   Despite being aware that Niki and Patrick were the victims of a vicious and dangerous swatting campaign, the City of Milwaukee failed to implement any policy, practice, or procedure to stop officers from conducting the illegal search of Plaintiffs' home and seizure of their persons.

240.   The City of Milwaukee failed to adequately train or supervise its officers on swatting and on the swatting campaign against Niki and Patrick.

241.   The City of Milwaukee's failure to adequately train or supervise its officers and its failure to implement any policy or procedure to protect Plaintiffs from being swatted by the police was a direct cause or moving force behind the violation of Plaintiffs' Fourth Amendment rights.

242.   Defendants Plevak, Hernandez, Switzer, McCowan, Tivnan, and Dudley were personally aware that Patrick and Niki were the victims of a swatting campaign, and so had no reason to believe she had probable cause or exigent circumstances justifying a seizure or search of the home.

243.   Defendants Plevak, Hernandez, Switzer, McCowan, Tivnan, and Dudley had a duty to intervene to stop an illegal search or seizure.

244.   Defendants Plevak, Hernandez, Switzer, McCowan, Tivnan, and Dudley did not intervene but instead participated in the illegal search and seizure.

245. The aforementioned actions of Defendants were the direct and proximate cause of the constitutional violations set forth above and of Plaintiffs' injuries and damages set forth above.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiffs demand actual or compensatory damages against Defendants; and because they acted maliciously, wantonly, or oppressively, punitive damages; the costs of this action, attorneys' fees; and such other and further relief that the Court deems just and equitable.

**COUNT B:**
**October 1, 2022, Swatting: Unlawful Search and Seizure/Failure to Intervene**
**(*Monell* Claim against City of Milwaukee)**
**(Individual Claim against Matthew Helwer, Paul Terriquez, Jason Warwick, Gregory Rupnik, and Fidah Mustafa)**

246. Plaintiffs reallege the above paragraphs.

247. On October 1, 2022, members of the Milwaukee Police Department, including Defendants Helwer, Terriquez, Warwick, Rupnik, and Mustafa, conducted a warrantless search of Niki and Patrick's home and warrantless seizure of their persons.

248. Any reasonable officer would have known there was not probable cause to believe a crime was committed or someone was in danger.

249. Any reasonable officer would have known there was not an exigency.

250. Any reasonable officer would have known they were being used as an implement of harassment by Niki and Patrick's stalkers.

251. Despite being aware that Niki and Patrick were the victims of a vicious and dangerous swatting campaign, the City of Milwaukee failed to implement any policy, practice, or procedure to stop officers from conducting the illegal search of Plaintiffs' home and seizure of their persons.

252. The City of Milwaukee failed to adequately train or supervise its officers on swatting and on the swatting campaign against Niki and Patrick.

253. The City of Milwaukee's failure to adequately train or supervise its officers and its failure to implement any policy or procedure to protect Plaintiffs from being swatted by the police was a direct cause or moving force behind the violation of Plaintiffs' Fourth Amendment rights.

254. Defendants Helwer, Terriquez, Warwick, Rupnik, and Mustafa were personally aware that Patrick and Niki were the victims of a swatting campaign, so they had no reason to believe they had probable cause or exigent circumstances justifying a seizure or search of the home.

255. Defendants Helwer, Terriquez, Warwick, Rupnik, and Mustafa had a duty to intervene to stop an illegal search or seizure.

256. Defendants Helwer, Terriquez, Warwick, Rupnik, and Mustafa did not intervene to stop the illegal search or seizure.

257. The aforementioned actions of Defendants were the direct and proximate cause of the constitutional violations set forth above and of Plaintiffs' injuries and damages set forth above.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiffs demand actual or compensatory damages against Defendants; and because they acted maliciously, wantonly, or oppressively, punitive damages; the costs of this action, attorneys' fees; and such other and further relief that the Court deems just and equitable.

## COUNT C:
**March 20, 2023, Swatting: Unlawful Search and Seizure/Failure to Intervene**
**(*Monell* Claim against City of Milwaukee)**
**(Individual Claim against Lyndon Evans, Christian Garrido, and Bradley Orlando)**

258.    Plaintiffs reallege the above paragraphs.

259.    On March 20, 2023, members of the Milwaukee Police Department, including Defendants Evans, Garrido, and Orlando, conducted a warrantless search of Niki and Patrick's home and warrantless seizure of their persons without exigency.

260.    Any reasonable officer would have known there was not probable cause to believe a crime was committed or someone was in danger.

261.    Any reasonable officer would have known there was not an exigency.

262.    Any reasonable officer would have known they were being used as an implement of harassment by Niki and Patrick's stalkers.

263.    Despite being aware that Niki and Patrick were the victims of a vicious and dangerous swatting campaign, the City of Milwaukee failed to implement any policy, practice, or procedure to stop officers from conducting the illegal search of Plaintiffs' home and seizure of their persons.

264.    The City of Milwaukee failed to adequately train or supervise its officers on swatting and on the swatting campaign against Niki and Patrick.

265. The City of Milwaukee's failure to adequately train or supervise its officers and its failure to implement any policy or procedure to protect Plaintiffs from being swatted by the police was a direct cause or moving force behind the violation of Plaintiffs' Fourth Amendment Rights.

266. Defendants Evans, Garrido, and Orlando were personally aware that Patrick and Niki were the victims of a swatting campaign, so they had no reason to believe they had probable cause or exigent circumstances justifying a seizure or search of the home.

267. Defendants Evans, Garrido, and Orlando had a duty to intervene to stop an illegal search or seizure.

268. Defendants Evans, Garrido, and Orlando did not intervene but instead participated in the illegal search and seizure.

269. The aforementioned actions of Defendants were the direct and proximate cause of the constitutional violations set forth above and of Plaintiffs' injuries and damages set forth above.

270. The aforementioned actions of Defendants were the direct and proximate cause of the constitutional violations set forth above and of Plaintiffs' injuries and damages set forth above.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiffs demand actual or compensatory damages against Defendants; and because they acted maliciously, wantonly, or oppressively, punitive damages; the costs of this action, attorneys' fees; and such other and further relief that the Court deems just and equitable.

## COUNT D:
### April 11, 2023, Swatting: Unlawful Search and Seizure/Failure to Intervene

**(*Monell* Claim against City of Milwaukee)**
**(Individual Claim against Sean Carleton, Dexter Lee, Christian Garrido, Kevin Becker, Devon Williams, and Joseph Scheuring)**

271.     Plaintiffs reallege the above paragraphs.

272.     On April 11, 2023, Defendants Carleton, Lee, Garrido, Becker, Williams, and Scheuring conducted a warrantless seizure of their persons without exigency.

273.     Any reasonable officer would have known there was not probable cause to believe a crime was committed or someone was in danger.

274.     Any reasonable officer would have known there was not an exigency.

275.     Any reasonable officer would have known they were being used as an implement of harassment by Niki and Patrick's stalkers.

276.     Despite being aware that Niki and Patrick were the victims of a vicious and dangerous swatting campaign, the City of Milwaukee failed to implement any policy, practice, or procedure to stop officers from conducting the illegal search of Plaintiffs' home and seizure of their persons.

277.     The City of Milwaukee failed to adequately train or supervise its officers on swatting and on the swatting campaign against Niki and Patrick.

278.     The City of Milwaukee's failure to adequately train or supervise its officers and its failure to implement any policy or procedure to protect Plaintiffs from being swatted by the police was a direct cause or moving force behind the violation of Plaintiffs' Fourth Amendment rights.

279.     Defendants Lee, Garrido, Carleton, Becker, Williams, and Scheuring were personally aware that Patrick and Niki were the victims of a swatting campaign, so they

had no reason to believe he had probable cause or exigent circumstances justifying a seizure or search of the home.

280.     Defendants Lee, Garrido, Carleton, Becker, Williams, and Scheuring had a duty to intervene to stop an illegal search or seizure.

281.     Defendants Lee, Garrido, Carleton, Becker, Williams, and Scheuring did not intervene but instead participated in the illegal search and seizure.

282.     The aforementioned actions of Defendants were the direct and proximate cause of the constitutional violations set forth above and of Plaintiffs' injuries and damages set forth above.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiffs demand actual or compensatory damages against Defendants; and because they acted maliciously, wantonly, or oppressively, punitive damages; the costs of this action, attorneys' fees; and such other and further relief that the Court deems just and equitable.

**COUNT E:**
**April 12, 2023, Swatting: Unlawful Search and Seizure/Failure to Intervene**
**(*Monell* Claim against City of Milwaukee)**
**(Individual Claim against Nathaniel Petersen and Lyndon Evans)**

283.     Plaintiffs reallege the above paragraphs.

284.     On April 12, 2023, members of the Milwaukee Police Department, including Defendants Petersen and Evans, conducted a warrantless search of Niki and Patrick's home and warrantless seizure of their persons without exigency.

285.     Any reasonable officer would have known there was not probable cause to believe a crime was committed or someone was in danger.

286.     Any reasonable officer would have known there was not an exigency.

32

287. Any reasonable officer would have known they were being used as an implement of harassment by Niki and Patrick's stalkers.

288. Despite being aware that Niki and Patrick were the victims of a vicious and dangerous swatting campaign, the City of Milwaukee failed to implement any policy, practice, or procedure to stop officers from conducting the illegal search of Plaintiffs' curtilage.

289. The City of Milwaukee failed to adequately train or supervise its officers on swatting and on the swatting campaign against Niki and Patrick.

290. The City of Milwaukee's failure to adequately train or supervise its officers and its failure to implement any policy or procedure to protect Plaintiffs from being swatted by the police was a direct cause or moving force behind the violation of Plaintiffs' Fourth Amendment rights.

291. Defendants Evans and Petersen were personally aware that Patrick and Niki were the victims of a swatting campaign, so they had no reason to believe they had probable cause or exigent circumstances justifying a search of their home or seizure of their persons.

292. Defendants Evans and Petersen did so anyway.

293. The aforementioned actions of Defendants were the direct and proximate cause of the constitutional violations set forth above and of Plaintiffs' injuries and damages set forth above.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiffs demand actual or compensatory damages against Defendants; and because they acted maliciously,

wantonly, or oppressively, punitive damages; the costs of this action, attorneys' fees; and such other and further relief that the Court deems just and equitable.

**COUNT F:**
**April 17, 2023, Swatting: Unlawful Search and Seizure/Failure to Intervene**
**(*Monell* Claim against City of Milwaukee)**
**(Individual Claim against Lyndon Evans)**

294.    Plaintiffs reallege the above paragraphs.

295.    On April 12, 2023 Defendants Evans, conducted a warrantless search of Niki and Patrick's home and warrantless seizure of their persons without exigency.

296.    Any reasonable officer would have known there was not probable cause to believe a crime was committed or someone was in danger.

297.    Any reasonable officer would have known there was not an exigency.

298.    Any reasonable officer would have known they were being used as an implement of harassment by Niki and Patrick's stalkers.

299.    Despite being aware that Niki and Patrick were the victims of a vicious and dangerous swatting campaign, the City of Milwaukee failed to implement any policy, practice, or procedure to stop officers from conducting the illegal search of Plaintiffs' home and seizure of their persons.

300.    The City of Milwaukee failed to adequately train or supervise its officers on swatting and on the swatting campaign against Niki and Patrick.

301.    The City of Milwaukee's failure to adequately train or supervise its officers and its failure to implement any policy or procedure to protect Plaintiffs from being swatted by the police was a direct cause or moving force behind the violation of Plaintiffs' Fourth Amendment rights.

302.    Defendant Evans was personally aware that Patrick and Niki were the victims of a swatting campaign, so he had no reason to believe they had probable cause or exigent circumstances justifying a seizure or search of the home.

303.    The aforementioned actions of Defendants were the direct and proximate cause of the constitutional violations set forth above and of Plaintiffs' injuries and damages set forth above.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiffs demand actual or compensatory damages against Defendants; and because they acted maliciously, wantonly, or oppressively, punitive damages; the costs of this action, attorneys' fees; and such other and further relief that the Court deems just and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury, pursuant to FED. R. CIV. PRO. 38(b), on all issues so triable.

Respectfully submitted,

Dated: 28 January 2025,

/s/ James Odell
John H. Bradley
    Wisconsin Bar No. 1053124
James Odell
    Wisconsin Bar No. 1131587
R. Rick Resch
    Wisconsin Bar No. 1117722
William E. Grau
    Wisconsin Bar No. 1117724
STRANG BRADLEY, LLC
613 Williamson St., Suite 204
Madison, Wisconsin 53703
(608) 535-1550
John@StrangBradley.com

James@StrangBradley.com
Rick@StrangBradley.com
William@StrangBradley.com

Attorneys for Plaintiffs