UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NIKI ROBINSON AND
PATRICK TOMLINSON,

      *Plaintiffs,*

      *v.*

CITY OF MILWAUKEE, *et al.*,

      *Defendants.*

Case No. 2:24-cv-264

# PARTIES' JOINT STATEMENT OF FACTS FOR SUMMARY JUDGMENT

The parties submit this statement of agreed-upon facts for their motions for summary judgment.

## I. Parties

Plaintiffs Niki Robinson and Patrick Tomlinson are a married couple living in Milwaukee. Ex. A (Tomlinson Dep. Tr.) at 05:01–02, 12:02–05. In 2018, Tomlinson tweeted about a professional comedian, and a group of people, organized online, began harassing him and Robinson. *Id.* at 13:14–25, 20:01–10. Robinson and Tomlinson's Milwaukee home is in the Milwaukee Police Department's District 1. ECF 45, ¶¶87–88.[1] Their home is a duplex with an upper unit and a downstairs unit; they own the entire house. Tomlinson Dep. Tr. 05:05–10.

---

[1] ECF 45, 60, and 62 are Defendants' answers to Plaintiffs' second amended complaint, ECF 42. The admissions cited are in all three answers, but for ease of reading, the parties cite to only ECF 45.

Defendants are the City of Milwaukee and several members of its police department. *Id.*, ¶¶24–85.

Defendants Lyndon Evans and Joseph Scheuring are sergeants in District 1. *Id.*, ¶¶26, 29.

Defendants Patrick Tivnan, Dexter Lee, Andrew Dudley, Kelton McCowan, Kevin Becker, Devon Williams, Shawn Switzer, Christian Garrido, Bradley Orlando, Fidah Mustafa, Sean Carleton, Nathaniel Petersen, Nicole Plevak, and Lorenzo Hernandez are officers in District 1. *Id.*

Defendants Matthew Helwer, Paul Terriquez, Gregory Rupnick, and Jason Warwick are members of Milwaukee's Tactical Enforcement Unit, which is what Milwaukee calls its SWAT team. *Id.*, ¶133; Ex. B (Helwer Dep. Tr.) at 06:09–13, 21:06–08, 20:09–13, 20:21–21:22. At all times the Defendants were interacting with the Plaintiffs, the Defendants were acting under the color of state and local law. No Defendant ever obtained a warrant to seize the Plaintiffs or search their home.[2]

## II. Lead up to Count A

Between 2019 and early 2022, the online group escalated from constant harassment of Robinson and Tomlinson to threats and showing up at their home. Ex. C (Robinson Dep. Tr.) 37:04–19. In 2020, Tomlinson bought a new camera for his porch that allowed them to see, hear, and speak to people on their porch. Tomlinson Dep. Tr. 107:25–109:08.

In summer 2022, the online group escalated to swatting. "Swatting involves placing a hoax emergency call reporting serious threats to provoke an armed law

---
[2] The parties stipulate to this fact.

enforcement response to an individual's residence, usually as an act of harassment or revenge." *Finch v. Rapp*, 38 F.4th 1234, 1237 (10th Cir. 2022).

In the very early hours of July 25, 2022, Tomlinson and Robinson were swatted. ECF 45, ¶¶92–97. Someone had reported a murder and an ongoing hostage situation. *Id.*, ¶93. Milwaukee Police Officers responded, seized Tomlinson on his porch, and searched the home. *Id.*, ¶96.

Later that day, Tomlinson met with Milwaukee Police Department Sgt. Carrie Pocernich. Ex. F (Pocernich Dep. Tr.) at 25:02–06; Ex. G (Pocernich Memo). After talking with Tomlinson, Pocernich wrote a memo to Captain James Campbell explaining that Tomlinson was the target of cyberstalking and was upset about the police response to his home. Ex. G.

The next day, July 26, Milwaukee Police Officer Adam Robakowski investigated the call. Ex. D (Robakowski Dep. Tr.) at 08:09–12. Robakowski reviewed the CAD report, interviewed Tomlinson, and wrote a report in which he concluded the call was a false call. *Id.* at 07:07–10, 07:24–08:16; Ex. E (Robakowski Report). Robakowski discussed his investigation with Defendant Evans. Robakowski Dep. Tr. at 13:06–14:03.

On July 27, Captain Thiel posted Sgt. Pocernich's memo to the roll call board. Ex. H (Thiel Dep. Tr.) at 34:09–36:25. The roll call board contains important information to be reviewed by officers. *Id.* at 24:02–14. Officers are expected to meet and discuss the roll call board at "roll call" at the start of their shift or review the information independently if they can't make roll call. *Id.* at 24:02–26:03. Something posted to the roll call board stays there for 72 hours. *Id.* at 36:20–22.

On August 1, 2022, Tomlinson submitted a complaint to the Fire and Police Commission. Ex K. Tomlinson explained that he was being harassed and swatted. *Id.* at 1. By then, Tomlinson and Robinson had been swatted five times. *Id.* at 1–2.

On August 3, Lt. Thiel (then acting Captain of District 1) received a memo from Officer Molly Plumley. Thiel Dep. Tr. at 52:23–53:11. The memo requested that Robinson and Tomlinson's home be marked as a "Swatter House" in the Milwaukee Police Department's CAD system. Ex. I. Thiel forwarded the email to Captain Haywood, who was the captain of the Milwaukee Police Department Telecommunication Division, which oversaw the dispatchers. Thiel Dep. Tr. 39:04–40:03; 53:21–25, Ex. J. Haywood told Thiel that she would not flag the home as a swatting address "because it could cause a complacency issue for responding officers." Thiel Dep. Tr. 39:09–14; Ex. J. Haywood had the authority to flag the address. Thiel Dep. Tr. at 50:03–11.

### III. Count A

On August 11, 2022, Tomlinson and Robinson were swatted again. Ex L. An anonymous caller had reported that they were supposedly jogging and heard gunshots and screaming at the home. *Id.* Then, someone from the crisis line relayed to dispatch that they'd received a call claiming that Tomlinson had beaten up his girlfriend and was going to shoot himself in the head. *Id.* at 1–2.

District One Defendants Plevak, Hernandez, Switzer, McCowan, Tivnan, and Dudley responded to the call. ECF 45, ¶111. Upon arrival, Switzer said to Hernandez, "This guy keeps getting swatted. Talks shit online, so people call the cops and say he's shooting people and . . . it's an ongoing thing. Ex. M (Hernandez BWC) at 00:40–00:48.

Hernandez responded, "Oh, that's bogus." *Id.* at 00:48–00:50. Switzer explained that they were "going to do what they do for a normal call: two in front, two in back." *Id.* at 00:48–00:55.

Hernandez and Dudley then walked around the back of the house. Dudley and Hernandez then talked about the swatting calls and how dangerous they could be. ECF 45, ¶127; Ex. M at 06:30–07:35. Dudley also said, "Luckily, we already kind of know this is an ongoing thing because if we didn't, this could end up with this guy dead." Ex. M at 07:20–07:27. A few minutes later, Dudley walked along the back of the house and opened and looked in a cellar door, which made Hernandez laugh. *Id.* at 12:45–13:05. Dudley did not discuss or mention opening the cellar door prior to opening it. *Id.* Hernandez was walking away from and not looking at the cellar door when Dudley began to open it. *Id* at 12:45-12:55. Hernandez and Dudley did not enter the home. *See id.*

Meanwhile, at the front of the home, McCowan, Plevak, and Switzer made contact with Robinson, who was home alone. Ex. N (Plevak BWC) at 01:15–0:6:30. Robinson explained the swatting history, and Switzer responded, "We're aware," but he wasn't sure whether Robinson was aware. ECF 45, ¶¶112–113. The officers ordered Robinson out of her home. *Id.*, ¶114. Robinson told the officers about the last swatting, and Plevak responded, "Officers weren't aware at that time because I know it happened on late shift." *Id.*, ¶119. Plevak had previously heard about the house but didn't realize it was this one until she arrived. Plevak Dep. Tr. at 14:03-09.

After discussing the calls, Sgt. Pautzke said, "If you don't mind, we still just have to walk through; this is the way it's going to be," and Robinson said, "Yeah, fine" twice,

once while Pautzke was talking. Ex. N at 06:30–06:51. Robinson then opens the door, enters the home, and holds the door open for officers to follow. *Id.* Switzer and Plevak then entered and searched the home. ECF 45, ¶125. McCowan and Tivnan were standing on the sidewalk and approached the porch while Robinson and Sgt. Pautzke were talking. McCowan and Tivnan did not enter the home. Ex. PP; Ex. QQ. After searching the house, all of the officers left. Ex. N at 12:12–12:22.

### IV. Lead up to Count B

On August 12, 2022, there was another swatting at the home. Ex. O. (Popp BWC). Robinson and Tomlinson weren't home, the officers noted it was the swatting house, and left. *Id.* at 02:30–03:00.

On September 22, 2022, the Fire and Police Commission issued its response to Tomlinson's complaint. Ex. K. The FPC found that Tomlinson had been swatted multiple times. *Id.* at 1–4. But it concluded,

> It would be nearly impossible for an MPD call taker to determine at the outset whether a call for service is legitimate or false. Similarly, if a squad is dispatched to a call for service, they cannot simply assume that the call is a swatting incident, rather than a true emergency.

*Id.* at 4. The FPC concluded that because no policies were violated, the officers were exonerated of any wrongdoing. *Id.* The writer of the investigation, however, said he would "explore ways to potentially mitigate the effect of any future swatting calls made against you." *Id.* The FPC has the power to change policies and procedures. Thiel Dep. Tr. at 11:17–20.

At about 11:30 p.m. on September 22, Tomlinson and Robinson were swatted again. Ex. P (Yang BWC). Officers made contact with Tomlinson, who explained it was another swatting, and left. Ex. P at 05:25–07:13.

## V.     Count B

On October 1, 2022, Tomlinson and Robinson were swatted again. Ex. Q. Someone called 911 and reported that they had shot their wife with a shotgun. *Id.* at 1. Dispatch did not flag the home as a swatting address. *See id.* Someone entered in the CAD system, however, that it was a "similar C9 call." *Id.* A C9 call means an unfounded call for service. Helwer Dep. Tr. 36:09–15.

TEU Defendants Helwer, Terriquez, Warwick, and Rupnick responded to the call, along with District One Defendant Mustafa. ECF 45, ¶247. As the officers were responding, someone over the radio noted, "Be aware there are multiple calls, a history of calls for shootings at this residence: A known swatting location." Ex. R (Mustafa BWC) 09:25–09:45. The TEU officers had not heard about the Robinson-Tomlinson home before October 1. Helwer Dep. Tr. 16:02–05. Before Helwer exited his squad car, he commented that he thought the call might be "bogus." *Id.* at 23:09–16.

Upon arrival, Helwer, Terriquez, and Rupnick approached the home and told Robinson, who was home alone, to come out of the house. Ex. S at 04:05–04:50. Robinson came out of the home with her hands up. *Id.* The TEU officers were armed with rifles and shields. *Id.*; Helwer Dep. Tr. 09:15–21. Mustafa took cover on the side of the house. Ex. R at 16:18. While TEU officers were speaking to Robinson and entering the house, Mustafa

was taking cover in the neighbor's yard behind a tree, and Mustafa did not enter the house. *See* ex. R at 16:18–16:30.

As Robinson walked out of her home, she told the officers that this had happened before, and Helwer and Rupnick directed her off the porch to Terriquez. Ex. S at 04:44 at 05:03. Robinson told Helwer and Rupnick that their address should be flagged, and Helwer responded, "We know. We know." *Id.* at 05:02–05:10. Robinson told the officers that nothing was going on, and Rupnick told her, "We have to check it." Ex. T (Terriquez BWC) at 07:10–07:20. Rupnick and Helwer then entered the home and searched it, while Terriquez spoke with Robinson further. *Id.* at 07:20–07:50. As they were entering, Warwick approached, introduced himself to Robinson, and then also entered the home. *Id.* at 07:44–08:00. Mustafa joined Terriquez and Robinson while Warwick, Rupnick, and Helwer were searching. Ex. R at 16:40–17:30. After the search, all of the officers left. Ex. S at 08:15–08:50.

Two days later, a District 1 sergeant emailed a TEU officer and explained that Robinson and Tomlinson are the victims of swatting, and calls to their house are likely to be fake. ECF 45, ¶142. No TEU officer ever again entered their home.

### VI. Lead up to Count C

On October 11, 2022, Robinson emailed Inspector Banks for the Fire and Police Commission. Ex. K. She explained that they had been swatted again and asked the FPC to create a swatting policy, noting that Waukesha and Glendale have swatting policies. *Id.* The email was forwarded to Inspector Feldmeier, who is the head of the patrol division

and one step above District One Captain in the command chain. *Id.*; Thiel Dep. Tr. at 60:06–61:12.

From October 2022 to March 2023, there were ten more swattings on Robinson and Tomlinson.[3] Tomlinson and Robinson were not seized, and their home wasn't searched during any of those swatting attempts.

On February 21, Thiel forwarded an email to District One Sergeants, including Defendant Evans, noting that Tomlinson and Robinson were going on vacation. Ex. U. Thiel added,

> Here is an update on the swatting location. Please be aware of this. To the new Sergeants, be aware that this address is swatted often. Please do not breach the building unless we know for sure there is some legitimacy to the call.

*Id.* At some point, Thiel also convinced dispatch to start flagging the address as a swatting location. Thiel Dep. Tr. at 47:01–21.

## VII. Count C

On March 20, 2023, Robinson and Tomlinson were swatted again. Ex. V. Someone saying they were Patrick Tomlinson had called a suicide hotline through a VPN and reported that he had shot his mother, was demanding $50,000, and would shoot anyone who approached the home. *Id.* By now, the home was flagged by dispatch. Dispatch added to the CAD, "Swatting risk at this location—a Sgt[.] is to be dispatched with squads to all calls at this location." *Id.*

Defendants Sgt. Evans and Officers Garrido and Orlando responded to the call. Ex. W (Evans Dep. Tr.) at 27:07–10. Evans, Garrido, and Orlando were aware of the

---

[3] The parties stipulate to this fact for purposes of summary judgment.

home's swatting history. Ex. X (Evans Report) at 1; Ex. NN (Garrido Dep. Tr.) at 07:01–24, 08:07–09; Ex. OO (Orlando Dep. Tr.) at 08:24–09:06, 09:13–17, 11:08–20. Evans approached the home with his gun unholstered. *Id.* Evans made contact with Robinson. Ex. Y (Garrido BWC) at 00:30–00:35. Robinson called Tomlinson, who was not home, and Evans (his gun now holstered) called Sgt. Pocernich, who was an acting Lieutenant at the time. *Id.*; Evans Dep. Tr. 40:11–24.

Evans told Pocernich that Tomlinson wasn't home but Robinson was, but she wouldn't let him inside. Ex. Y at 00:35–00:42. Pocernich told Evans it was a swatting address and advised him not to go into the house. Pocernich Dep. Tr. 18:03–15; Evans Dep. Tr. 41:25–42:09. Evans ended the call and told Robinson, "Alright, yeah we gotta come in. We gotta come in. We can't really wait." Ex. Y at 00:58–01:12. Robinson handed the phone (with Tomlinson still on the line) to Evans, who handed it to Garrido. *Id.* at 01:11–01:25. Evans then entered and searched the home. *Id.* 01:20–01:30. Evans exited the house a few minutes later, argued with Tomlinson over the phone for a few minutes, argued with Robinson on the porch for a few minutes, and then the officers left. *Id.* at 04:26–12:36.

VIII. **Lead up to Count D**

From March 20 to April 11, 2023, there were seven more swatting attempts, including four incidents on April 11 alone. ECF 45, ¶166. On March 22, a District One sergeant emailed the supervisors and District One, including Defendants Evans and Scheuring, to tell them that Tomlinson had come into the district to complain about Evans

entering his home. Ex. Z. The sergeant noted that the house is flagged as a swatting address in the CAD system. *Id.* Evans received the email. *Id.*

On March 25, a lieutenant in District One forwarded that email to a smaller subset of sergeants, including Defendant Scheuring. *Id.* The Lieutenant added,

> I just wanted to request from all of you to please discuss this location and proper response at roll calls with our shift officers so they are either initially informed or memory refreshed so they are aware if they get dispatched.

Ex. Z. Sgt. Scheuring has a practice of reading his emails.[4]

Defendant Petersen, with Officer Roecker, responded to the first swatting call on April 11 at about 7:00 a.m. Ex. AA (Petersen BWC I). There was a sign on the door with a phone number for police, fire, and EMTs to call. *Id.* at 02:20–02:30. The sergeant surmised that Tomlinson likely "gets called a lot." *Id.* at 02:50–02:57. Tomlinson made contact with the two through to porch camera. *Id.* at 3:05–03:10. Roecker told Tomlinson, "We're aware of the situation. Yeah, we're aware of the situation. I just gotta give you a card with my name on it, if you're home." *Id.* at 03:10–03:19. Tomlinson said he and Robinson were both home, and Roecker could place the card in the mailbox." *Id.* at 03:20–03:25. Roecker put his card in the mailbox, and he and Petersen left. *Id.* at 03:25–03:43.

## IX. Count D

On the fourth swatting call of April 11, among the officers who responded was Defendant Sgt. Scheuring and Defendant Officers Carleton, Lee, Garrido, Becker, and Williams. ECF 45, ¶182. Dispatch reported that someone from the suicide hotline had called and said that a teenager had texted the line and said that they had killed their

---

[4] The parties stipulate to this fact for purposes of summary judgment.

parents and were going to kill themselves. Ex. BB at 1. The person who took the call at the suicide hotline was concerned that the call "may be a swatting incident." *Id.* The text to the suicide hotline came in from a VPN. *Id.* Dispatch flagged the house as a swatting risk. *Id.*

Officers arrived and Tomlinson and Robinson's home at about 09:20 p.m. Ex. CC at 02:00–03:13. Officers stood in front of the house and on the sides of the house, but not on the porch. *Id.* Carleton and Becker stood just off the porch and spoke with Tomlinson through the porch camera. *Id.* at 03:25–03:50. Tomlinson explained that he wasn't home, but Robinson was. *Id.* at 03:40–03:50. Tomlinson said, "Put your guns down, you idiots." *Id.* at 03:48–03:51. Carleton said they didn't have guns, and that he saw the camera, so Tomlinson could "refrain from the idiot talk." *Id.* at 03:51–04:07.

Then Carleton told Tomlinson, "We were called here for a shooting, per usual, so whoever's in the house needs to come down the stairs and talk to us." *Id.* at 04:05–04:15. Robinson then began speaking over the camera; she told Carleton she was upstairs. *Id.* at 04:45–04:55. Carleton said, "Can you come downstairs so we can see you're okay and that's it?" *Id.* at 04:53–04:58. Robinson replied, "Fine. Everything is fine, okay?" *Id.* at 04:59–05:06. Carleton responded, "We need to see you before we can leave." *Id.* at 05:04–05:08.

Robinson came downstairs, and as she was walking down, Becker observed, "She's coming downstairs with her hands up." *Id.* at 05:10–05:16. Carleton said in response, "Are you kidding me?" *Id.* at 05:16–05:18. Robinson opened the door, and Carleton said, "We don't have any guns in our hands." *Id.* at 05:18–05:25. Robinson,

agitated, said, "No. Why are you here?" *Id.* at 05:25–05:28. Carleton responded, "We were called here for a shooting." *Id.* at 05:28–05:30. Robinson replied, "Okay, dude, this is the fourth time *today*." *Id.* at 05:30–05:33. Carleton said, "I understand, we still have to come here and do our job." *Id.* at 05:33–05:38. Robinson told him that she couldn't see him on the camera, she saw flashlights, and didn't know whether they had guns. *Id.* at 05:38–05:43.

Tomlinson then began speaking through the camera. *Id.* at 05:40–05:51. Tomlinson told the officers they were talking to him now, but Carleton said he wasn't talking to Tomlinson because he wasn't there. *Id.* at 05:51–06:00.

Robinson tried to calm Tomlinson down as Sgt. Scheuring approached the porch and asked to talk to Robinson. *Id.* at 06:00–06:12. Scheuring had been standing back from the porch listening and watching. Garrido stood near the front of the house but on the side listening.[5] Lee, Becker, and Williams were standing on the front lawn while Carleton and Tomlinson were talking. Ex. KK (Lee body-worn camera) at 04:30–09:50; ex. LL (Becker body-worn camera) at 09:30–14:15; Ex. MM (Williams body-worn camera) at 07:45–08:45.

Robinson, now angry, asked why they had to talk given that it was the fourth swatting of the day. *Id.* at 06:12–06:23. Scheuring said he was trying to stop this from happening, but he wasn't there earlier, so she needed to start over as though it were a "fresh new thing." *Id.* at 06:23–06:46. Scheuring said they were sent for a shooting, and asked if anyone was shot or injured. *Id.* at 06:46–06:52. Robinson said no. *Id.* Scheuring

---

[5] The parties stipulate to this fact for purposes of summary judgment.

told her they have to follow protocol and asked some follow up questions. *Id.* at 06:52–07:21. Scheuring asked if an officer could go in the house, and Robinson said no because they knew it was a fake call and had no probable cause. *Id.* at 07:21–07:33.

Scheuring then got a call from his lieutenant and told Carleton to get some information. *Id.* at 07:33–07:47. Tomlinson then arrived home, yelled at the officers, and was briefly detained. *Id.* at 07:47–10:08. The officers then left. *Id.* at 10:08–11:30. No officer went into the home. *Id.*

### X.     Count E

The next day, April 12, 2023, Robinson and Tomlinson were swatted again. Ex. DD at 1. Defendants Petersen and Evans responded to the call. Evans Dep. Tr. 75:02–05. Petersen had previously been briefed during roll call about the home. ECF 45, ¶195. Petersen sped through downtown with his emergency lights on, at one point overtaking a school bus, for over five minutes to get to the home. *Id.*

The call came in through Tampa Bay. Ex. DD at 1. The caller, saying he was Tomlinson, said he had shot his wife and another man. *Id.* Dispatch noted in the CAD, ****Be advised swatting related call**** and "swatting risk at this location—a sgt[.] is to be dispatched with squads to all calls at this location." *Id.* Upon arrival, a passerby told Petersen that he hadn't heard any gunshots. *Id.* Petersen walked onto the porch and began filling out a card, like he had the day before. ECF 45, ¶196; Ex. EE (Petersen BWC II) at 00:00–00:20. He then tried to call the number on the door, like he had seen done the day before. *Id.* at 00:20–01:00.

Tomlinson then began speaking through the porch camera. *Id.* at 01:00–01:02. Petersen said, "Hi, how's it going? I'm Officer Petersen. I'm so sorry to bother you. Is everybody okay?" *Id.* at 01:02–01:07. Tomlinson replied, "Yes, everybody's okay. Everybody's always okay", and Petersen said, "I know," and explained that they had another call that Robinson was shot. *Id.* at 01:07–01:21. Petersen would later testify that he knew there wasn't an emergency. Ex. FF (Petersen Dep. Tr.) at 44:05–45:05.

Then Sgt. Evans arrived. Ex. EE at 01:20–01:23. Petersen asked Tomlinson if Robinson was "able to" come down, but Evans said, "not able—she needs to come down." *Id.* at 01:23–01:26. Tomlinson said she didn't need to come down, and Robinson said over the camera that she was fine. *Id.* at 01:25–01:29. Evans responded, "Sorry. This is not acceptable. She needs to come down." *Id.* at 01:28–01:31. Evans then threatened to kick in the door if Robinson did not come down. *Id.* at 01:31–01:37. Petersen then began knocking strongly on the door. *Id.* at 02:02–02:06.

Tomlinson told Evans and Petersen that the conversation was over, and Evans and Petersen both said they would kick the door in. *Id.* at 02:06–02:20. Tomlinson said that they didn't need to search the house, that they didn't need to see Robinson, that this was the 28th swatting on their home, and told them, "Go away." *Id.* at 02:15–02:22. Evans said, "No," as he pulled the screen door further open. *Id.* at 02:22–02:25. The parties argued, and Tomlinson said they weren't coming down. *Id.* at 02:25–02:47. Sgt. Evans said, "We just need to make sure she's okay. *Id.* at 02:32–02:34. Evans said, "All right, and gestured for Petersen to kick in the door." *Id.* at 02:45–02:47. Petersen then attempted to kick in the door. *Id.* at 02:47–02:55.

Evans then spoke with Tomlinson through the door and said he needed to see Robinson. *Id.* at 03:15–03:27. Tomlinson responded that the officers didn't need to see Robinson. *Id.* at 03:27–03:30. Robinson then told the officers she was okay through the door. *Id.* at 03:30–03:33. Evans then said, "There's one other person that claims to have been shot." *Id.* at 03:33–03:41. Tomlinson again told Evans to leave. *Id.* at 03:41–04:30. Sgt. Evans repeated that he would kick in the door, and in response, Tomlinson stated, "We'll be suing you into fucking poverty." *Id.* at 03:53–03:56. After some more argument, Evans said, "You don't need to talk to me, but I do need to come in." *Id.* at 04:30–04:37. Robinson then showed herself, said she was okay, and told the officers they didn't have probable cause. *Id.* at 04:37–05:06. Sgt. Evans said, "You don't have to come out; I just need to see you right here. *Id.* 04:58–05:01. Tomlinson again told the officers to leave. *Id.* at 05:07–05:40. Evans and Petersen then left. *Id.* at 05:40–06:10.

### XI. Lead up to Count F

The next day, April 13, 2023, Robinson and Tomlinson were swatted again. Ex. GG. Two officers responded to the house, and Tomlinson came out onto his porch. *Id.* at 00:20–0:30. A sergeant asked Tomlinson, "Is everything good?" *Id.* at 00:30–00:41. And Tomlinson responded, "Yeah, everything's always good." *Id.* at 00:41–00:42. After a brief conversation, the officers left. *Id.* at 0:42–04:13.

Sometime before Evans responded to the house again, he had a conversation with Thiel, who told him not to go in Robinson and Tomlinson's home again. Evans Dep. Tr. 71:01–11, 140:15–23.

## XII. Count F

A few days later, on April 17, 2023, Robinson and Tomlinson were swatted again. Ex. HH (Vento BWC). Defendant Evans and Officer Vento responded. *Id.* The call came in through the Glendale Police Department. Ex. II at 1. Glendale relayed that a caller said he had killed his wife and to hurry before he killed his child. *Id.* Dispatch noted three times that the call was a swatting risk. *Id.*

Upon arrival, Vento said, "I've never been here. I've heard it like 50 times." Ex. HH at 00:33–00:45. Evans asked Vento if he was recording, and Vento said he was. *Id.* at 00:44–00:47. Vento then continued, "Do we even ask to see them, or through the door is fine?" *Id.* at 00:47–00:58. Vento then wondered aloud, "I thought they had a ring doorbell?" *Id.* at 00:58–01:00.

Evans walked up the door, gun holstered, and told Vento to call the number on the door. *Id.* at 01:00–01:14. Vento asked who Niki Robinson was, and Evans replied, "Wife." *Id.* at 01:10–01:20. As Vento was starting to call the number, Sgt. Pocernich called him. *Id.* at 01:20–01:23. Pocernich told Vento, "It's the same thing, same m.o., same thing they always say." ECF 45, ¶222. Vento then called Robinson and left her a voicemail. *Id.*, ¶223.

Evans then began knocking on the door. Ex. HH at 03:05–03:10. Tomlinson came to the door, and Evans said, "Can we see your wife? That's it. Can we see your wife. . . If we can see your wife, we'll leave." *Id.* at 03:11–03:39. Tomlinson observed that this was the third time that Evans had been to his home and said, "You fucking know the situation. Go the fuck away." *Id.* at 03:38–03:42. Evans repeated that he needed to see Tomlinson's

wife while Tomlinson repeated that Evans needed to leave. *Id*. at 03:42–03:55. Evans said that he was refusing to leave, as Tomlinson told him again to leave. *Id.* at 03:55-04:07. Evans told Tomlinson to have his wife come to the stairwell. *Id.* at 04:07–04:10. As the two continued to argue, Vento called Robinson and left her a voicemail. *Id.* at 04:10–04:50. Then, Evans threatened to kick down the door, Robinson eventually showed herself, Evans told her that she should answer her phone, and then the two officers left. *Id.* at 04:35–04:55; Ex. JJ (Vento Dep. Tr.) at 42:04–14; Evans Dep. Tr. 144:17–25. When asked why she came to the top of the stairs, Robinson stated, "In this one, I think I heard Patrick yelling at him or something, and I just figured that I had to make an appearance." Robinson Dep Tr. 132:1–4. When Robinson came to the stairwell, she assumed Patrick was arguing with someone from the Milwaukee Police Department, but wasn't sure it was the police at the door. *See* Robinson Dep Tr. at 133. Vento would later testify that he did not believe the officers had probable cause to enter the home and that he would not have kicked down the door. Vento Dep. Tr. at 34:14–25, 43:16–25.

Tomlinson and Robinson have been swatted since April 17, 2023, but they do not allege that any officers have violated their rights since that day.[6]

---

[6] The parties stipulate to this fact for purposes of summary judgment.

Dated: 5 June 2025.

    STRANG BRADLEY, LLC,
    Attorneys for Plaintiffs

    /s/ R. Rick Resch
    John H. Bradley
      Wisconsin Bar No. 1053124
    James Odell
      Wisconsin Bar No. 1131587
    R. Rick Resch
      Wisconsin Bar No. 1117722
    William E. Grau
      Wisconsin Bar No. 1117724
    613 Williamson St., Suite 204
    Madison, Wisconsin 53703
    (608) 535-1550
    John@StrangBradley.com
    James@StrangBradley.com
    William@StrangBradley.com

    CITY ATTORNEY'S OFFICE, CITY OF MILWAUKEE
    Attorneys for Defendants

    EVAN C. GOYKE
    City Attorney

    /s/ William Hotchkiss
    WILLIAM HOTCHKISS
    Assistant City Attorney
    State Bar No. 1112878
    800 City Hall
    200 E. Wells St.
    Milwaukee, WI 53202
    Phone: (414) 286-2601
    Fax: (414) 286-8014
    whotch@milwaukee.gov