UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NIKI ROBINSON AND
PATRICK TOMLINSON,

        *Plaintiffs,*

        *v.*

CITY OF MILWAUKEE, *ET AL.*,

        *Defendants.*

Case No. 2:24-cv-264

**PLAINTIFFS' BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
AND IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Niki Robinson and Patrick Tomlinson submit this brief in support of their motion for partial summary judgment, ECF 63, and in opposition to Defendants' motion for summary judgment. ECF 70; *see* (January 28, 2025, text-only order allowing parties to cross-move for summary judgment).

The Court should grant partial summary judgment against Nicole Plevak, Shawn Switzer, and Andrew Dudley on Count A; Lyndon Evans, Christian Garrido, and Bradley Orlando on Count C; Evans and Nathaniel Petersen on Count E; and Evans on Count F. Additionally, because the Defendants failed to identify disputed facts, the Court should, with notice, grant summary judgment against Defendants Matthew Helwer, Paul Terriquez, Jason Warwick, Gregory Rupnik, and Fidah Mustafa on Count B, and Defendants Sean Carleton and Kevin Becker on Count D. FED. R. CIV. P. 56(f)(1).

These claims should proceed to a trial on damages. The *Monell* claims and the bystander claims against Garrido, Devon Williams, and Joseph Scheuring on Count D should proceed to trial on liability and damages. In other words, the entirety of Defendants' motion for summary judgment should be denied.

## I. INTRODUCTION

The City of Milwaukee and the Defendant officers in this case knew a lot. They knew enough to spare Robinson and Tomlinson from unnecessary, useless, dangerous, and frightening searches and seizures. Because of the initiative of Officer Adam Robakowski and Sgt. Carrie Pocernich's corresponding memo, they knew Robinson and Tomlinson had been swatted, they knew why, and they knew it was likely to happen again. Parties' Statement of Facts (PSOF) at 2–3. The District One officers knew all that before August 11, 2022, the date of the Count A allegations. The Defendants' own words show how much they knew:

- Switzer: "This guy keeps getting swatted . . . it's an ongoing thing." PSOF at 4.

- Dudley: "Luckily, we already kind of know this is an ongoing thing . . ." PSOF at 5.

- Helwer: "We know. We know." PSOF at 8.

- Carleton: "We were called here for a shooting, per usual . . ." PSOF at 12.

The City of Milwaukee higher-ups knew, too. Definitively by the date of the Count B allegations, October 1, 2022, the Fire and Police Commission knew of Robinson and Tomlinson's plight, and the captain of the division that oversees dispatchers knew. *Id.* at 4, 6. And yet no one apparently bothered to tell Milwaukee's SWAT team about the risk

of swatting at the home. *Id.* at 7. The captain heading dispatch expressly declined to flag the residence because she was worried it might lead to "complacency," a policy that carried through until around March 2023. *Id.* at 4; *see id.* at 9.

Several of the Defendant officers were at the Robinson-Tomlinson home multiple times. Garrido violated the Plaintiffs' rights twice. *Id.* at 9, 11. Evans violated the Plaintiffs' rights thrice. *Id.* at 9, 14, 17. Petersen arrived once and simply left a note, but then violated the Plaintiffs' rights the second time he was at the home. *Id.* at 11, 14.

The Defendants never secured a warrant. And because the swatting calls were obviously fake, the officers lacked probable cause to search and seize. At bottom, given what they knew and given how central the home is to the Fourth Amendment, the officers were unreasonable when they entered the Robinson-Tomlinson home, when they seized Robinson, and when they refused to leave Robinson and Tomlinson's curtilage.

The Defendants have raised qualified immunity. The Court should reject that defense. Qualified immunity is a two-prong analysis. Police officers are not protected by qualified immunity when (1) they violated a person's constitutional right and (2) that right is clearly established. *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018). Thus, the qualified immunity analysis subsumes the question of liability. Accordingly, Plaintiffs will respond below to the Defendants within the qualified immunity framework.

A Plaintiff can meet the second prong by pointing to analogous case law, showing that the contours of the right are sufficiently clear, or by showing that the constitutional violation was obvious or outrageous. *Id.* at 547. Previous case law does not need to be directly on point; "officials can still be on notice that their conduct violates established

law in novel factual circumstances." *Id.* (cleaned up), quoting *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009). Not only does there not need to be a case directly on point, but "a right can be clearly established if the legal landscape surrounding the right clearly establishes the contours of the right." *Smith v. Finkley*, 10 F.4th 725, 743 (7th Cir. 2021). "The crucial question is whether the official acted reasonably in the particular circumstances that he or she faced." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (cleaned up), quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). Known repeated false swatting calls were the "particular circumstances" the Defendants faced. The Defendants' actions here run the gamut from violating clear case law to being outrageous.

Most of the times officers responded to the swattings, they were reasonable. Sometimes, officers would simply leave a note. *Id.* at 6, 11. Sometimes, officers would make contact with Tomlinson or Robinson and tell them they had been swatted again. *Id.* at 16.

But the Defendant officers, in Counts A–F, did not act reasonably. The Defendants rely heavily on *Bruce v. Guernsey*, 777 F.3d 872 (7th Cir. 2015). *See* ECF 71 at 5, 6, 8, 13. But *Bruce* shows exactly why the officers here should've known they were violating Robinson and Tomlinson's rights.

There's a great dichotomy in *Bruce*. One officer, Justin Harris, the Seventh Circuit deemed reasonable. 777 F.3d at 876–77. A second officer, Derek Guernsey, the Seventh Circuit deemed unreasonable. *Id.* at 877–78. Harris and Guernsey responded to a high school girl's home after her ex-boyfriend told her school that she had tried to kill herself. *Id.* at 873. Harris arrived, and the girl seemed perfectly fine. *Id.* at 874. He detained her

for 37 minutes until Guernsey arrived. *Id.* Guernsey arrived and took the girl, over her and her father's objections, to a hospital. *Id.* at 877. The key difference between the two: "By that time, much more information was available than the initial imprecise and potentially unreliable tip from the ex-boyfriend." *Id.* Because the girl remained calm and rational, and her friends and family maintained she was fine, "Guernsey's actions went well beyond a temporary seizure by an officer facing an unknown situation." *Id.*

In this case, none of the Defendant officers were facing an unknown situation. They were all well aware of the history of the house—through meetings, emails, other officers, dispatchers, and CAD notes. They are Guernseys. The officers who responded, explained that there was another swatting, and left are Harrises.

*Bruce* teaches another important lesson, too. As Plaintiffs argued in their opening brief, this case really comes down to probable cause. ECF 64 at 7–8. The Defendants' actions took place in the Plaintiffs' home and its curtilage. And no warrant was ever secured. Thus, for their actions to be reasonable, they required probable cause of exigency or emergency. *Reardon v. Wroan*, 811 F.2d 1025, 1028 (7th Cir. 1987); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014). And *Bruce* shows that the arguable probable cause qualified immunity standard does not apply just to arrests. *Bruce*, 777 F.3d at 877–78, citing *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) (applying arguable probable cause in a qualified immunity analysis in a wrongful arrest claim). In *Bruce*, no crime was suspected, but the Seventh Circuit denied qualified immunity to Guernsey because there was not arguable probable cause for a mental health seizure. *Id.* at 879.

Here, the basic constitutional principles are beyond debate. For over 50 years, it has been a "'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477–78 (1971). The Supreme Court has made clear that the curtilage surrounding the home is entitled to the same protection as the home itself. *Florida v. Jardines*, 569 U.S. 1, 6–7 (2013); *Collins v. Virginia*, 584 U.S. 586, 592–93 (2018). And two of the classic examples of curtilage are the front porch and the backyard. *Jardines*, 569 U.S. at 7; *Bleavins v. Bartels*, 422 F.3d 445, 452 (7th Cir. 2005). All of Plaintiffs' allegations involve their home and its curtilage.

With no warrants ever secured, then, the only question (outside of the *Monell* theories) is whether an exception to the warrant requirement existed. Meaning, specifically, the only question is whether the individual Defendants had probable cause to believe a crime was being committed and probable cause of exigency. So, under *Bruce*, the qualified immunity analysis is simple. Did the individual Defendants have arguable probable cause to believe a crime was being committed and that there was an exigency? *Bruce*, 777 F.3d at 879; *Reardon*, 811 F.2d at 1028; *Sutterfield*, 751 F.3d at 557.

Think of it this way. Suppose the officers were able to get an instant response to a warrant application. If any of them had requested a warrant from a judge to seize Robinson or search the Robinson-Tomlinson home, would it have been granted?

The answer is "no."

## II.  RESPONSE AND REPLY

### A.  Count A—August 11, 2022

The Court should grant Plaintiffs' motion for partial summary judgment against Defendants Dudley, Plevak, and Switzer. And the Court should not dismiss the bystander claims against Hernandez, McCowan, and Tivnan.

First, Dudley violated Plaintiffs' Fourth Amendment rights. Dudley knew there wasn't an emergency—he explicitly told Hernandez so. PSOF at 5. With no reasonable belief of an emergency, he could do no more than any person off the street could. *Jardines*, 569 U.S. at 8. Defendants concede this. Their argument as to Dudley is limited to qualified immunity. ECF 71 at 7–8.

And Dudley is not entitled to qualified immunity. The case law is clearly established, his actions were outrageous, and there was not even arguable probable cause to believe there was an emergency. *Reed*, 906 F.3d at 546. The law is clearly established by *Jardines*, which makes clear that a police officer may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. Dudley was already illegally in Plaintiffs' curtilage when he opened the cellar door as a joke. PSOF at 5.

Defendants make several unpersuasive arguments for qualified immunity. First, they argue the Seventh Circuit has taken a "limited view" of *Jardines*. ECF 71 at 7. They rely on a case that discusses the difference between the two approaches for Fourth Amendment standing, the privacy-based *Katz* approach and the property-based *Jones* approach. *Id.* at 7–8, quoting *United States v. Lewis*, 38 F.4th 527, 533 (7th Cir. 2022); *see*

*Katz v. United States*, 389 U.S. 347 (1967) *and United States v. Jones*, 565 U.S. 400 (2012). The *Lewis* court was simply describing the two approaches. *Lewis*, 38 F.4th at 533 ("Two lines of precedent govern whether officer conduct amounts to a search."). True, as the *Lewis* court observes, *Jardines* was decided under the property approach. *Id.* at 533–43. But that's just an observation, not some type of limited reading of *Jardines*. As the *Jardines* court reiterated, the *Jones* approach "has been *added* to, not *substituted* for" the *Katz* approach. *Jardines*, 569 U.S. at 11 (emphasis in original), quoting *Jones*, 565 U.S. at 409. In any event, Dudley's decision to enter the Plaintiffs' curtilage and open their cellar door was a search under both approaches—it was a trespass into Plaintiffs' curtilage and a search of an area with a legitimate expectation of privacy. *See Jardines*, 569 U.S. at 12 (Kagan, J., concurring) (concluding that Jardines would have succeeded under the *Katz* approach as well). It's as simple as this: is it reasonable for your neighbor to come into your backyard at night and root around in your cellar? Of course not.

Second, citing to a case decided before *Jardines*, the Defendants argue that Dudley's search was reasonable because he had a "legitimate law enforcement objective." ECF 77 at 8. This is the opposite of what *Jardines* stands for. *Jardines* holds that an officer without a warrant can "do no more than any private citizen might do." *Jardines*, 569 U.S. at 9, quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011). As this Court has concluded,

> In light of these well-settled principles and the Supreme Court's instruction in *Jardines* on the boundaries of the "knock and talk" investigative tactic, a reasonable police officer in 2015 would know that the broad catch-call of "legitimate law enforcement objective" is not an exception to the Fourth Amendment's curtilage rule, . . .

*Reardon v. Schossow*, 416 F. Supp. 3d 793, 804 (E.D. Wis. 2019) (denying qualified immunity).

Finally, Defendants briefly argue that Dudley may have distrusted the call and so was allowed to perform a protective sweep. ECF 71 at 8. An officer can perform a protective sweep "if he has a reasonable belief, based on specific and articulable facts, that the area swept harbored an individual posing a danger to the officer or others." *United States v. Thompson*, 842 F.3d 1002, 1008–09 (7th Cir. 2016). But Dudley did not simply have reason to distrust the call; he had just been talking about how it was fake. PSOF at 5. And there was no articulable basis to believe anyone or anything was in the cellar.

Thus, Dudley violated the clearly established rule to be free from unreasonable curtilage searches. *Jardines*, 569 U.S. at 11; *see Collins*, 584 U.S. at 592 ("Like the automobile exception, the Fourth Amendment's protection of curtilage has long been black letter law."). In addition, his decision to enter the Plaintiffs' backyard and search their cellar as a joke is outrageous and it should have been obvious to him that it was unreasonable. Dudley went from discussing the risks of swatting, and how it was lucky that he knew the call was fake, to opening the cellar door and joking around with Hernandez. PSOF at 5.

Nor are Defendants Plevak and Switzer entitled to qualified immunity. Plevak told Robinson that she was aware of the previous swatting. PSOF at 5. Switzer said the same. *Id.* The call reported that Tomlinson had beaten up his girlfriend. *Id.* at 4. Robinson answered the door and was fine. *See id.* at 4–5.

And yet they ordered Robinson out of her home anyway. *Id.* at 5. Ordering someone out of their home— "convey[ing] a message that compliance with their requests

was required"—is a seizure. *United States v. Jerez*, 108 F.3d 684, 692 (7th Cir. 1997) (alterations modified, quoted source omitted). Defendants concede this. Their argument is that the seizure was reasonable. ECF 71 at 4–6.

Because Robinson was in her home or its curtilage, Plevak and Switzer needed an exception to the warrant requirement to seize her. Defendants argue that a person can be seized on less than probable cause on her porch because it's not entitled to the same protections as the inner part of the house. They rely on *Gut* and *Richmond*. ECF 71, citing *Gut v. City of Wausau*, 592 F. Supp. 3d 777 (W.D. Wis. 2022) and *United States v. Richmond*, 924 F.3d 404 (7th Cir. 2019). That cannot be correct, as the Supreme Court has concluded that curtilage is "part of the home itself for Fourth Amendment purposes." *Jardines*, 569 U.S. at 6, quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984). Indeed, *Gut*, like the Defendants' argument, rests on a misreading of *Richmond*. *Gut*, 592 F. Supp. 3d at 786.

*Richmond* did not create a reasonable suspicion exception to the Fourth Amendment protections to curtilage. The officers there engaged in a protective search on a porch and found a gun. *Richmond*, 924 F.3d at 409, 418. But the officers were already on the porch lawfully; they had consent to be there. *Id.* at 413. Thus, the Seventh Circuit has explained that *Richmond* does not allow people to be searched and seized in their home's curtilage with only reasonable suspicion:

> Consent is a well-accepted exception to the warrant requirement, but reasonable suspicion is not. In *Richmond* both parties agreed that the officers had consent to enter the curtilage. [] Our language about whether reasonable suspicion independently justified the officers' entry was not essential to our holding given Antoine Richmond's consent to the police being on his porch.

*United States v. Banks*, 60 F.4th 386, 390 (7th Cir. 2023) (citation omitted). The *Banks* court granted suppression on a warrantless curtilage arrest and declined to apply the good

faith exception to the exclusionary rule, reiterating that "the home's curtilage, the Supreme Court has emphasized, receives 'protection as part of the home itself.'" *Id.* at 390–91, quoting *Jardines*, 569 U.S. at 6.

Moreover, Plevak and Switzer did not suspect Robinson of a crime. The bogus call had reported a male perpetrator and a female victim. PSOF at 4. The officers removed Robinson from her home so they could search it. The Defendants are correct that, to protect the safety of officers, in some instances, officers can detain a person incident to a search of something or someone else. *Bailey v. United States*, 568 U.S. 186, 193 (2013) (detention incident to search warrant); *Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020) (detention incident to frisk); *United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013) (detention of one passenger to arrest another passenger). These are merely *de minimis* intrusions incident to an already lawful intrusion. As the Court explained in *Johnson*, which allows police officers, during an otherwise legal traffic stop, to ask people out of their cars:

> Against this important interest we are asked to weigh the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. We think this *additional intrusion* can only be described as *de minimis*.

*Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (emphasis added). None of these cases authorized bootstrapped seizures incident to unlawful searches or unlawful seizures.

But that just gets us back to where we started. Plevak and Switzer needed probable cause of a crime and probable cause of exigency to search Robinson's home. *Reardon*, 811 F.2d at 1027–28. Just because someone reports a crime doesn't mean there's probable

cause. Upon receipt of a "report of questionable reliability, the police need[] to investigate." *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994).

And there wasn't probable cause here, not even arguably so. *Bruce*, 777 F.3d at 879. Here, the Defendants rely on *Bruce*. ECF 71 at 5. But the Defendants here knew more than Officer Guernsey in *Bruce*, who the Seventh Circuit found unreasonable and denied qualified immunity to. *Bruce*, 777 F.3d at 879. Plevak and Switzer knew of the history of bogus calls. PSOF at 3–5. Switzer called it an "ongoing thing." *Id.* at 3. They both should have seen Pocernich's memo on the roll call board. *Id.* at 3. And the call was not corroborated. Robinson, the supposed victim, answered the door and further explained that it was another swatting attempt *Id.* at 5.

*Bruce* clearly established that a seizure and home entry was unreasonable. As did *Richardson*. In *Richardson*, the Seventh Circuit concluded that a home entry in response to a bogus call was reasonable where there had been one previous bogus call that the responding officers were unaware of, but it also concluded it was a "very close case." *United States v. Richardson*, 208 F.3d 626, 627–29 (7th Cir. 2000); *see also Hebron*, 18 F.3d at 422–23 (officers who receive a complaint from a begrudged party must investigate).

As did *Reardon*. In *Reardon*, police officers responded to a call reporting a burglary in progress at a fraternity. *Reardon*, 811 F.2d at 1026. The officers entered the fraternity, claiming exigent circumstances. *Id.* at 1027–28. The Seventh Circuit concluded that a jury could find there was no probable cause that a crime was committed,[1] where there was

---

[1] The Court concluded that there was probable cause of exigency, implicitly concluding that if there was probable cause to believe a crime was committed, there necessarily would've also been exigency. *See id.* at 1029.

evidence that the call was fake—that lights were on, a car was parked adjacent, and the door was closed. *Id.*, parenthetically quoting *BeVier v. Hucal*, 806 F.2d 123, 127 (7th Cir. 1987) ("[a] police officer may not close his eyes to facts that would help clarify the circumstances of an arrest."). The Court also denied qualified immunity to the officers. *Id.* at 1030.

This case is *Reardon* plus. Not only were the details of the call not corroborated, Plevak and Switzer also knew before they arrived that there was a history of fake calls to the home. And beyond the clear case law, there also was not arguable probable cause to believe a crime was committed or there was an emergency.

Because the seizure of Robinson was unreasonable, any consent she gave was tainted, making the subsequent search of her home unreasonable. *United States v. Conrad*, 673 F.3d 728, 734 (7th Cir. 2012), quoting *Jerez*, 108 F.3d at 695, 695 n.13 (collecting cases). Defendants have not addressed this theory. *See* ECF 71 at 4–6. So if the Court agrees that Robinson was unreasonably seized, it can conclude the search was also unreasonable. Defendants' consent argument is thus irrelevant. If they had probable cause and exigency, they didn't need Robinson's consent. If they unreasonably seized Robinson because they lacked probable cause and exigency, her consent can't have been valid. Regardless, Robinson did not consent to the search of her home. Although she said, "Yeah fine," Sgt. Pautzke told her they had to search her home, like it or not. PSOF at 5 ("this is the way it's going to be"). There is no consent where police "convey a message that compliance with their requests is required." *Bostick*, 510 U.S. at 435.

Finally, the fact that the call came in through 911 is not dispositive. There is no categorical rule allowing police to search a home and seize within curtilage just because police are responding to a 911 call. The Supreme Court has explicitly said that its opinions should not be read to "suggest that tips in 911 calls are per se reliable"; instead, the fact that a "caller's use of the 911 systems" is just "one of the relevant circumstances" officers are entitled to consider when assessing a given situation. *Navarette v. California*, 572 U.S. 393, 400 (2014). Indeed, in *Richardson*, the Seventh Circuit made the same point, it expressly declined to "exclude the possibility of a case in which it would be objectively unreasonable for a police officer to rely on a 911 call, because of additional information available to the officer, . . ." *Richardson*, 208 F.2d at 631.

The Court should not grant summary judgment as to Defendant Hernandez on the bystander claim of Count A. Officers must intervene and stop a constitutional violation when they know one is occurring and they have a reasonable opportunity to intervene. *Yang v. Hardin*, 37 F.3d 282, 285–86 (7th Cir. 1994). A jury could find that Hernandez had ample opportunity to prevent Dudley from violating Plaintiffs' rights. Hernandez and Dudley were both in Plaintiffs' curtilage for no reason. PSOF 5. Hernandez had the sense to walk back to the side of the house; he should have told Dudley to do the same. *See* PSOF at 5.

Finally, the bystander claims against McCowan and Tivnan should not be dismissed. A jury could find they knew a constitutional violation was occurring and had opportunity to intervene. *See Yang*, 37 F.3d at 285–86. The Defendants fail to cite to the

record and only suppose that McCowan and Tivnan would not have been able to hear, from the sidewalk, what was going on. ECF 71 at 7; *see* ECF 65 at 6.

### B. Count B—October 1, 2022

The Court should not grant Defendants summary judgment on Count B. Plaintiffs have not moved for partial summary judgment on this count. Defendants Helwer, Terriquez, Warwick, and Rupnick are members of Milwaukee's SWAT team, which Milwaukee calls the Tactical Enforcement Unit. PSOF at 2. They responded to a call (along with District One Officer Mustafa), reporting that a man had shot his wife. PSOF at 7. The CAD system warned that there had previously been a bogus call to the home. *Id.* Someone on the radio noted, "Be aware there are multiple calls, a history of calls for shootings at this residence: A known swatting location." *Id.* Defendant Helwer commented, on the way to the home, that the call might be "bogus." *Id.* When Robinson answered her door and tried to explain that it was another false call, Helwer told her, "We know. We know." *Id.* at 8.

Plaintiffs' understanding was that Defendants disputed whether Helwer, Terriquez, Warwick, Rupnick, and Mustafa saw the CAD note or heard the comment over the radio. *See* ECF 64 at 3. But Defendants did not file any disputed facts with their motion or brief. *See* ECF 70. By the Court's pretrial order, that was the time to inform the Court of disputed facts.[2] If it's undisputed that these Defendants saw the CAD note and heard

---

[2] "To the extent there are factual disputes, the parties must also jointly submit a single, itemized statement of disputed facts, written in list form, *which is to be filed by the movant at the time the motion is due.* Each itemized, disputed fact should be supported by each party's separate pinpoint citation(s) to the record." ECF 9 at 9 (emphasis changed).

the radio comment, the Court can, with notice, grant summary judgment for Plaintiffs. FED. R. CIV. P. 56(f)(1).

Indeed, on those facts Helwer, Terriquez, Warwick, Rupnick, and Mustafa violated Plaintiffs' rights by entering and searching their home. PSOF at 8. Again, as in Count A, the details of the call were not corroborated—a woman answered the door and explained the call was fake. *Id.* And the law is clearly established. The officers knew more than Officer Guernsey in *Bruce. Bruce*, 777 F.3d at 879–80. Unlike the officers in *Richardson*, the "very close case," the officers were warned of the history of fake calls to the home. *Richardson*, 208 F.3d at 629, 631. And as in *Reardon*, when the officers arrived the details of the call were not corroborated. *Reardon*, 811 F.2d at 1028. Indeed, the officers knew more than the officers in *Reardon*; they had been warned ahead of time. This case, without the warnings from the CAD and the radio, would be *Reardon*.

The Defendants analogize to medical emergency cases. ECF 71 at 10, citing *Brigham City v. Stuart*, 547 U.S. 398 (2006), *Fitzgerald v. Santoro*, 707 F.3d 725 (7th Cir. 2013), and *Hanson v. Dane County*, 608 F.3d 335 (7th Cir. 2010). But the false call cases, *Bruce* and *Reardon*, are more on point. The Defendants here were ostensibly looking to arrest the 911 caller, not see if he was okay. And unlike the officers in *Fitzgerald* and *Hanson*, the officers did not simply confront a potentially injured person who claimed not to need help; the officers had third-party information, from their own department, that the call was likely fake. *See Fitzgerald*, 707 F.3d at 732 *and Hanson*, 608 F.3d at 338. That makes this case more similar to *Bruce*, where family members were saying the high school girl was okay, and *Reardon*, where physical evidence suggested the burglary call was fake. *Bruce*, 777 F.3d at

879–80; *Reardon*, 811 F.2d at 1028. If anything, the range of cases from *Fitzgerald, Santoro,* and *Hanson* to *Bruce* and *Reardon* shows just how much guidance officers in the Seventh Circuit have for these types of calls. In other words, the contours of the right are sufficiently clear. *Reed*, 906 F.3d at 547.

Qualified immunity can also be rejected for lack of arguable probable cause. *See Bruce*, 777 F.3d at 879. The details of the 911 call were not corroborated. The *warnings that the call was fake* were corroborated.

### C. Count C—March 20, 2023

The Court should grant Plaintiffs' motion for partial summary judgment against Defendants Evans, Garrido, and Orlando. And it should reject their plea for qualified immunity. The Defendants do not argue that there was no seizure or search, or that either was consensual. *See* ECF 71 at 11–12. This violation was worse than Counts A and B. Evans had repeatedly, for months, been made aware of the false calls at the Robinson-Tomlinson home. PSOF at 3, 9. Garrido and Orlando also knew about the history of the home before they got there. The bogus call came in through a VPN instead of 911. *Id.* at 9. When Evans arrived, he called Sgt. Pocernich, who told him not to go into the house. *Id.* at 10. Again, faced with a potential female victim, a woman answered the door and further explained that the call was fake. *Id.* at 10.

Orlando and Garrido had the sense to not go into the home, but they failed to stop Evans. *Id.* Defendants do not argue that they lacked the opportunity to intervene. ECF 71 at 11.

The Court should deny qualified immunity because Evans's conduct was outrageous and obviously unconstitutional, which also means he lacked even arguable probable cause to believe there was criminal activity or exigency. *Reed*, 906 F.3d at 546; *Bruce*, 777 F.3d at 878–79. And, again, even more so than the officers found unreasonable in *Bruce* and *Reardon*, Evans, Garrido, and Orlando should have known (and probably did know) that the call was fake. *Bruce*, 777 F.3d at 879–80; *Reardon*, 811 F.2d at 1028. Thus, the case law is clearly established.

### D. Count D—April 11, 2023

The Court should deny the Defendants' motion for summary judgment on Count D. Defendant Carleton ordered Robinson out of her home without a warrant or an exception to the warrant requirement. *See* PSOF at 13. Defendants do not dispute this was a seizure. *See* ECF 71 at 12.

Again, Plaintiffs believed that Defendants were disputing facts on this count, which is why they did not move for summary judgment. Specifically, Plaintiffs believed Defendants disputed that the responding officers hadn't been aware of the swatting history at the house before they arrived. ECF 64 at 3.

This was a dubious claim to begin with, even setting aside the fact that all these Defendants were out of District One, meaning they should've heard about the house during roll call. PSOF at 3. But there's also direct evidence. Carleton told Tomlinson, through a camera, that they were there for a shooting call, "per usual." PSOF at 12. And before he spoke to Robinson, he was annoyed that she came down the stairs with her hands up, meaning *he* was annoyed that Robinson thought it was an emergency. *Id.* at 12.

Becker stood next to him during all of this. *Id.* The Court should consider, with notice, granting summary judgment against Carleton and Becker. FED. R. CIV. P. 56(f)(1).

Carleton's conduct was more obviously unconstitutional than the conduct in Counts A and B. The reported crime did not come through 911; it came in through a text to the suicide hotline. PSOF at 11–12. By now, dispatch was flagging calls to the Robinson-Tomlinson house as potential swatting calls. *Id.* at 12. And again, the details of the reported crime were not corroborated upon arrival; the warning that the call was fake was corroborated. The report alleged that teenagers had killed an adult, but Carleton spoke to two adults who explained that the call was fake. *Id.* at 11–12.

The Defendants criticize Robinson for failing to "diffuse" the situation. ECF 71 at 12. But they cite no authority for the proposition that a citizen is obligated to diffuse a situation. And they, without citation, misattribute Tomlinson's words to Robinson. *Compare id. to* ECF 65 at 12. Finally, Tomlinson's anger was justified. The officers wanted, without reason, to enter and search his home while his wife was home alone. ECF 65 at 14. They only stopped trying to persuade Robinson to let them in when Tomlinson ran home and yelled at them. *Id.*

Regardless, Tomlinson and Robinson's actions aside, any reasonable officer would've known there wasn't probable cause to believe a crime had been committed or that there was an exigency. Again, Carleton and Becker knew much more than Officer Guernsey in *Bruce* and the officers in *Reardon*. *Bruce*, 777 F.3d at 879–80; *Reardon*, 811 F.2d at 1028. And because they had prior knowledge of the history of fake calls to the house, unlike *Richardson*, this is not a "close case." *Richardson*, 208 F.2d at 629. Stated simply,

19

they lacked even arguable probable cause. Thus because the law is clearly established, the Court should deny their request for qualified immunity.

Finally, the Court should deny the Defendants' motion for summary judgment as to Defendants Lee, Garrido, Williams, and Scheuring. The Defendants argue only that, because there was no underlying constitutional violation, they cannot be liable. ECF 71 at 13. The Defendants therefore concede, at least for summary judgment purposes, that they knew a constitutional violation was occurring and had opportunity to intervene. *See Yang*, 37 F.3d at 285–86.

### E. Count E—April 11, 2023

The Court should grant Plaintiffs' motion for summary judgment against Defendants Evans and Petersen. Both were not only aware of the swatting history of the house; they had personally responded to calls there. PSOF at 9–10, 11. As discussed above, Evans was very aware of the history of the home. PSOF at 3, 9. Moreover, dispatch warned them of the swatting risk, and the call came from someone in Tampa Bay. PSOF at 14. Petersen admitted in his deposition that he knew there wasn't an emergency. *Id.* Evans, since the last time he was at the Robinson-Tomlinson home, had received emails reminding him about the home (prompted by Tomlinson's complaint *about Evans*). PSOF at 10–11.

Evans and Petersen had no probable cause to be on the porch. As *Jardines* explains, they were allowed to seek a consensual encounter, but "absent invitation to linger longer," they were required to leave. *Jardines*, 569 U.S. at 8. They went beyond lingering. They were explicitly told to leave. PSOF at 15. Their implicit license was revoked. *See*

*Jardines*, 569 U.S. at 8. In *Jardines*, Justice Scalia quipped, "Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." *Id.* Any private citizen, girl scouts and trick-or-treaters included, would know that "go away" means you're not welcome on the porch. PSOF at 15.

The Defendants do not respond to this argument directly. ECF 71 at 13–14. Instead they argue that Evans and Petersen's actions did not violate clearly established law. *Id.* at 14. They also concede that Evans and Petersen seized Robinson but argue it was reasonable. *Id.* at 13.

Evans and Petersen are not entitled to qualified immunity. As to the seizure, as discussed above, there was no probable cause to believe a crime had been committed or that there was an exigency. If they even remotely believed there had been, why did they not actually break down the door and rush in, guns drawn? Thus, Evans and Petersen violated the rules clearly established by *Bruce, Reardon,* and *Richardson*. *Bruce*, 777 F.3d at 879–80; *Reardon*, 811 F.2d at 1028; *Richardson*, 208 F.2d at 629. They knew a lot more than the officers in those cases.

Indeed, again, because Evans and Petersen knew so much, the Court should deny them qualified immunity because their conduct was outrageous and obviously unconstitutional. *Reed*, 906 F.3d at 546. "At the [Fourth] Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Jardines*, 569 U.S. at 6, quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961). Thus, the seizure of Robinson violated clearly established law.

As did Evans and Petersen's refusal to leave the porch. True, *Jardines* was about a K9 sniff. *Id.* at 4. But the holding squarely applies here and clearly establishes the law along with *King*. A "police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id.* at 8, quoting *King*, 563 U.S. at 469. "And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak." *King*, 563 U.S. at 469–70. Thus, "the boundaries of the 'knock and talk' investigative tactic" are clearly established. *Reardon*, 416 F. Supp. 3d at 804 (relying on *Jardines*, 569 U.S. at 8). *Jardines's* holding was ultimately grounded in consent. As the Court explained,

> The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics.

*Id.* at 9. Because there was no probable cause, an implied license (customary consent) is what allowed Evans and Petersen to enter the Robinson-Tomlinson porch. No reasonable person would believe he continued to have consent to remain on a porch after a homeowner tells them to "go away" and threatens to sue them. PSOF at 15–16.

### F. Count F—April 13, 2023

For the same reasons (and more) as Count E, the Court should grant summary judgment against Evans.

By this time, Evans had been warned directly by his supervisor, Captain Thiel, not to go into the Robinson-Tomlinson home. PSOF at 16. Officer Vento, who had never been to the house, immediately figured out the call was fake. *Id.* at 17–18. Dispatch noted three

times that the call was a swatting risk. *Id.* at 17. By now, Evans personally knew Robinson and Tomlinson, such that when Vento asked who was talking to them, Evans explained it was Tomlinson's wife (the supposed victim on this call). *Id.* Tomlinson could not have been more clear that Evans was not allowed in his curtilage. *Id.* at 17 ("You fucking know the situation. Go the fuck away."). The seizure of Robinson was not justified by exigent circumstances, and Evans had no implicit license to remain on the porch. *Bruce*, 777 F.3d at 879–80; *Reardon*, 811 F.2d at 1028; *Richardson*, 208 F.2d at 629; *Jardines*, 569 U.S. at 8. Again, Evans's conduct was outrageous and obviously unconstitutional. *Reed*, 906 F.3d at 546. The Court should not grant him qualified immunity.

Defendants also argue that Robinson was not seized. ECF 71 at 15. First, they argue that her freedom of movement wasn't restrained. Evans told Tomlinson and Robinson that he would not leave unless Robinson showed herself. *Id.* at 17–18. He thus "convey[]ed a message that compliance with [his] requests was required." *Jerez*, 108 F.3d at 692. Second, they argue that Robinson can't have been seized because she wasn't sure Tomlinson was arguing with a police officer. *Id.* at 71. They cite no authority for the proposition that a citizen has to be 100% sure they are submitting to a government official for it to be a seizure. Robinson inferred correctly (from dozens of previous swattings, no doubt) that Tomlinson was arguing with a police officer. PSOF at 18. She was seized.

### G. *Monell* claims

Plaintiffs have brought *Monell* claims for each count in the operative complaint. ECF 42 at 26–34. Under *Monell*, a governmental entity can be liable for a constitutional

violation if an official policy or custom caused the constitutional violation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).

Defendants have moved for summary judgment on these claims. ECF 71 at 16. In a single paragraph, they offer only one argument, that the *Monell* claims should be dismissed if the Court finds no underlying constitutional violation. *Id.* They do not cite a case in support of this argument. *Id.* On this record, that argument is not enough to dismiss any *Monell* claim for any reason. At the threshold, the Court should deny summary judgment because there are underlying constitutional violations.

But even if the Court grants summary judgment to Defendants on some of their claims, that does not automatically mean the corresponding *Monell* claim must also be dismissed.

First, municipalities are not entitled to qualified immunity. *Owen v. City of Independence, Mo.*, 445 U.S. 622, 650 (1980). So, in "some cases the assertion of a defense of qualified immunity by the individual officer raises the potential scenario in which a plaintiff who proves a constitutional violation loses his claim against the individual defendant because of the defense of qualified immunity, but could prevail against the City under *Monell* by proving that the violation was the result of a municipal policy or custom." *Elrod v. City of Chicago*, No. 06 C 2505, 2007 WL 3241352, at *4 (N.D. Ill. Nov. 1, 2007), citing *Owen*, 445 U.S. at 6254.

And second, relatedly and significantly, if a Defendant is dismissed for lack of background knowledge, that would not absolve the City of Milwaukee. Tomlinson and Robinson made their plight known to top-level policy makers before the conduct in

Count A. PSOF at 4. Also before Count A, the captain of the Milwaukee Police Department Telecommunications Division, which oversaw dispatch, was aware of the swatting threat and expressly declined to flag the home as a swatting risk. *Id.* at 5. If summary judgment is granted in favor of any of the Defendants because the City of Milwaukee failed to make them aware of the constant swatting at the Robinson-Tomlinson home, then the City's policies or lack of policy, training, supervision, or discipline could have caused a constitutional violation without the person-Defendant being also liable.

The Defendants' perfunctory argument against *Monell* liability misses the intricacies and details of this case. It is thus underdeveloped and should be denied outright. *Felton v. Brown*, 129 F.4th 999, 1010 (7th Cir. 2025) (underdeveloped argument was "forfeited, if not waived").

### III.  CONCLUSION

The Defendants are not entitled to qualified immunity. The specific guidance from similar cases, on both sides of the liability line, from *Fitzgerald, Santoro,* and *Hanson* to *Bruce* and *Reardon* clearly establishes the contours of the rights at issue here. The law is clearly established.

The Court should grant partial summary judgment against Plevak, Switzer, and Dudley on Count A; Evans, Garrido, and Orlando on Count C; Evans and Petersen on Count E; and Evans on Count F. Additionally, because the Defendants failed to identify disputed facts, the Court should, with notice, grant summary judgment against Defendants Helwer, Terriquez, Warwick, Rupnik and Mustafa on Count B, and

Defendants Carleton and Becker on Count D. These claims should proceed to a trial on damages. The *Monell* claims and the bystander claims against Garrido, Williams, and Scheuring on Count D should proceed to trial on liability and damages.

Dated: 6 August 2025,

STRANG BRADLEY, LLC

/s/R. Rick Resch
John H. Bradley
   Wisconsin Bar No. 1053124
R. Rick Resch
   Wisconsin Bar No. 1117722
William E. Grau
   Wisconsin Bar No. 1117724
James Odell
   Wisconsin Bar No. 1131587
STRANG BRADLEY, LLC
613 Williamson St., Suite 204
Madison, WI 53703
(608) 535-1550
John@StrangBradley.com
Rick@StrangBradley.com
William@StrangBradley.com
James@StrangBradley.com

*Attorneys for Plaintiffs*