# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

NIKI ROBINSON and PATRICK TOMLINSON,

Plaintiffs,

v.

CITY OF MILWAUKEE, LYNDON EVANS, CHRISTIAN GARRIDO, BRADLEY ORLANDO, NICOLE PLEVAK, FIDAH MUSTAFA, NATHANIEL PETERSEN, SEAN CARLETON, JOSEPH SCHEURING, LORENZO HERNANDEZ, DEXTER LEE, ANDREW DUDLEY, KELTON MCCOWAN, MATTHEW HELWER, GREGORY RUPNIK, PAUL TERRIQUEZ, KEVIN BECKER, DEVON WILLIAMS, SHAWN SWITZER, PATRICK TIVNAN, and JASON WARWICK,

Defendants.

Case No. 24-CV-264-JPS

**ORDER**

## 1. INTRODUCTION

In January 2025, Niki Robinson ("Robinson") and Patrick Tomlinson ("Tomlinson") (together, "Plaintiffs") filed a second amended complaint against the City of Milwaukee ("the City") and individual Milwaukee Police Sergeants Lyndon Evans ("Evans") and Joseph Scheuring ("Scheuring") and Officers Christian Garrido ("Garrido"), Bradley Orlando ("Orlando"), Nicole Plevak ("Plevak"), Fidah Mustafa ("Mustafa"), Nathaniel Petersen ("Petersen"), Sean Carleton ("Carleton"), Lorenzo Hernandez ("Hernandez"), Dexter Lee ("Lee"), Andrew Dudley

("Dudley"), Kelton McCowan ("McCowan"), Matthew Helwer ("Helwer"), Gregory Rupnik ("Rupnik"), Paul Terriquez ("Terriquez"), Kevin Becker ("Becker"), Devon Williams ("Williams"), Shawn Switzer ("Switzer"), Patrick Tivnan ("Tivnan"), and Jason Warwick ("Warwick") (together, the "Officer Defendants") (all defendants together, "Defendants"). ECF No. 42. Plaintiffs assert claims of unlawful search and seizure and failure to intervene via 42 U.S.C. § 1983 against Defendants as individuals and against the City under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) (hereinafter *"Monell"*). *Id.* at 25–34 (Counts A–F).

In June 2025, Plaintiffs moved for partial summary judgment, as to liability only, with respect to Counts A (against Plevak, Switzer, and Dudley), C (against Evans, Garrido, and Orlando), E (against Evans and Petersen), and F (against Evans). ECF No. 63. Plaintiffs simultaneously submitted a brief in support of their motion and a joint statement of facts representing the facts undisputed by either party. ECF Nos. 64 and 65. That motion is fully briefed. ECF Nos. 64, 71 (combined brief in support of Defendants' motion for summary judgment and in opposition to Plaintiffs' motion), 72. In July 2025, Defendants filed a motion for complete summary judgment. ECF No. 70. The motion is also fully briefed. ECF Nos. 71, 72, 73. Also before the Court is a joint motion by the parties to restrict certain documents. ECF No. 66.

For the reasons discussed herein, the Court will deny Plaintiffs' motion, ECF No. 63; grant Defendants' motion in part and deny it in part, ECF No. 70; and grant the joint motion to restrict, ECF No. 66.

## 2.    FACTUAL BACKGROUND[1]

### 2.1    Parties

Plaintiffs Robinson and Tomlinson are a married couple living in Milwaukee, Wisconsin. ECF No. 65 at 1. In 2018, Tomlinson tweeted about a professional comedian. *Id*. Subsequently, a group of people—organized online—began harassing him and Robinson. *Id*. The couple's home, located within the Milwaukee Police Department's ("MPD") District 1, is a duplex with an upper unit and a downstairs unit. *Id*. The couple owns the entire house. *Id*.

Defendants are the City of Milwaukee and several members of MPD. *Id*. at 2. Evans and Scheuring are sergeants in District 1. *Id*. Tivnan, Lee, Dudley, McCowan, Becker, Williams, Switzer, Garrido, Orlando, Mustafa, Carleton, Peterson, Plevak and Hernandez are officers in District 1. *Id*. Helwer, Terriquez, Rupnik, and Warwick are members of the Tactical Enforcement Unit, the name for MPD's SWAT team. *Id*. It is undisputed that at all times Defendants were interacting with Plaintiffs, Defendants were acting under the color of state and local law. *Id*. The parties further stipulate that no Defendant ever obtained a warrant to seize Plaintiffs or search their home. *Id*. at 2 & n.2.

### 2.2    Count A: August 11, 2022

In summer 2022, the online group that had been harassing Robinson and Tomlinson for nearly four years escalated to "swatting." *Id*. at 2.

---

[1]The following recitation of facts is drawn from the parties' agreed-upon statement of facts, ECF No. 65, with irrelevant facts omitted and other minor, non-substantive edits. Citations to the agreed upon statement of facts are generally omitted from the later analysis portion of this Order, except where additional factual detail is provided. Citations within the statement of facts to the underlying record—that is, the exhibits in ECF No. 67—are omitted for brevity.

Swatting is defined as "placing a hoax emergency call reporting serious threats to provoke an armed law enforcement response to an individual's residence, usually as an act of harassment or revenge." *Id*. at 2–3 (quoting *Finch v. Rapp*, 38 F.4th 1234, 1237 (10th Cir. 2022)).

On July 25, 2022, Tomlinson and Robinson were swatted, with the callers reporting a murder and ongoing hostage situation. *Id*. at 3. MPD officers responded, seizing Tomlinson on his porch and searching the home. *Id*. Later that day, Tomlinson met with MPD Sergeant Carrie Pocernich, who subsequently wrote a memo to Captain James Campbell explaining that Tomlinson was the target of cyberstalking and was upset about the police response to his home. *Id*. The next day—July 26, 2022— MPD Officer Adam Robakowski investigated the call. *Id*. He ultimately wrote a report concluding that the call was false and discussed his investigation with Evans. *Id*.

On July 27, 2022, Robert Thiel (then acting Captain of District 1) posted Pocernich's memo to the roll call board. *Id*. The roll call board contains important information to be reviewed by officers. *Id*. Officers are expected to meet and discuss this board at "roll call" at the start of their shift or review the information independently if they can't make roll call. *Id*. Items posted to the roll call board remain there for 72 hours. *Id*.

On August 1, 2022, Tomlinson submitted a complaint to the Fire and Police Commission ("FPC"). *Id*. at 4. He explained that he was being harassed and swatted. *Id*. By then, Tomlinson and Robinson had been swatted five times. *Id*.

On August 3, 2022, Captain Thiel then received a memo from Officer Molly Plumley, which requested that Robinson and Tomlinson's home be marked as a "Swatter House" in the MPD's computer-aided dispatch

("CAD") system. *Id*. Thiel forwarded the memo to Captain Haywood—captain of the MPD Telecommunication Division, who oversaw dispatchers—who ultimately declined to flag the home as a swatting address, "because it could cause a complacency issue for responding officers." *Id*.

On August 11, 2022, Tomlinson and Robinson were swatted again. *Id*. An anonymous caller had reported gunshots and screaming at the home. *Id*. District 1 officers Plevak, Hernandez, Switzer, McCowan, Tivnan, and Dudley responded to the call. Upon arrival, Switzer noted to Hernandez that the couple kept getting swatted as a result of Tomlinson's online posts; he further noted that it was an ongoing issue. *Id*. Nonetheless, Switzer explained that they were going to handle the call as usual, with two officers located at the front of the house and two located at the back of the house. *Id*. at 5.

Hernandez and Dudley walked around to the back of the house, discussing swatting calls and how dangerous they could be. *Id*. Dudley said, "Luckily, we already kind of know this is an ongoing thing because if we didn't, this could end up with this guy dead." *Id*. A few minutes later—without discussing or mentioning his intention to do so—Dudley walked along the back of the house and opened and looked in a cellar door; Hernandez laughed in response, though he was walking away from and not looking at the cellar door when Dudley began to open it. *Id*. Neither Hernandez nor Dudley entered the home. *Id*.

Meanwhile, at the front of the home, McCowan, Plevak, and Switzer made contact with Robinson, who was home alone. *Id*. Robinson explained the swatting history, and Switzer responded that the officers were aware. *Id*. The officers ordered Robinson out of her home. *Id*. Robinson told the

officers about the last swatting, and Plevak responded, "Officers weren't aware at that time because I know it happened on late shift." *Id*. Plevak had previously heard about the house but did not realize Tomlinson and Robinson's home was the home in question until she arrived. *Id*.

After discussing the calls, another officer on the scene, Sergeant Pautzke, stated, "If you don't mind, we still just have to walk through; this is the way it's going to be." *Id*. Robinson replied, "Yeah, fine," twice, then opened the door. *Id*. at 5–6. Switzer and Plevak entered and searched the home. *Id*. at 6. McCowan and Tivnan were standing on the sidewalk and approached the porch but did not enter the home. *Id*. After searching the home, all of the officers left.

### 2.3    Count B: October 1, 2022

On August 12, 2022, there was another swatting at the home. *Id*. Robinson and Tomlinson weren't home. *Id*. The responding officers noted it was the swatting house and left. *Id*.

On September 22, 2022, the FPC issued its response to Tomlinson's August 1, 2022 complaint, finding that Tomlinson had been swatted multiple times. *Id*. Still, it concluded that it would not practically be possible for an MPD call taker to determine, without more, whether a call is legitimate or false. *Id*. Similarly, a police officer responding to a call cannot "simply assume that the call is a swatting incident, rather than a true emergency." *Id*. The FPC concluded that because no policies were violated, the officers had committed no wrongdoing. *Id*. That said, the writer of the response stated that it would explore ways to mitigate the effects of future swatting calls made against Tomlinson and Robinson. *Id*. The FPC has the power to change policies and procedures. *Id*.

Later the same day, Tomlinson and Robinson were swatted again. *Id*. at 7. Officers contacted Tomlinson, who explained it was another swatting, and they left. *Id*.

On October 1, 2022, Tomlinson and Robinson were swatted again. *Id*. This time, the 911 caller reported that they had shot their wife with a shotgun. *Id*. Dispatch did not flag the home as a swatting address, though someone entered into the CAD system that the call was an unfounded call for service. *Id*.

Tactical Enforcement Unit officers Helwer, Terriquez, Warwick, and Rupnik responded to the call, along with District 1 officer Mustafa. *Id*. As the officers were responding, someone over the radio noted that the house was a known swatting location. The Tactical Enforcement Unit officers had not heard about the home before that day. *Id*. Still, before Helwer exited his squad car, he commented that he thought the call might be fake. *Id*.

Upon arrival, Helwer, Terriquez, and Rupnik approached the home and told Robinson, who was home alone, to come out of the house. *Id*. Robinson did so with her hands up. *Id*. The Tactical Enforcement Unit officers were armed with rifles and shields. *Id*. Mustafa took cover on the side of the house. *Id*. While the Tactical Enforcement Unity officers spoke to Robinson and entered the house, Mustafa did not. *Id*. at 7–8.

Robinson, after noting that this had happened before, told Helwer and Rupnik that the address should be flagged. *Id*. at 8. Helwer responded, "We know. We know." *Id*. Robinson informed that officers that there was no issue, but they told her they had to check the home. *Id*. Rupnik and Helwer then entered the home and searched it, while Terriquez spoke with Robinson further. *Id*. Warwick also entered the home to join the search. *Id*. After the search, all the officers left. *Id*.

Two days later, a District 1 sergeant emailed a Tactical Enforcement Unit officer and explained that Robinson and Tomlinson are the victims of swatting, and calls to their house are likely to be fake. *Id*. No Tactical Enforcement Unit officer entered their home ever again. *Id*.

### 2.4 Count C: March 20, 2023

On October 11, 2022, Robinson emailed the FPC, explaining that they had been swatted again and asking the FPC to create a swatting policy. *Id*. She noted that Waukesha and Glendale had such swatting policies. *Id*. The email was forwarded to the head of the patrol division, who sits one step above the District 1 captain in the command chain. *Id*. at 8–9.

From October 2022 to March 2023, there were ten more swattings on Robinson and Tomlinson's home, though none resulted in any searches or seizures. *Id*. at 9. In February 2023, Captain Thiel forwarded an email to District 1 sergeants, including Evans, in which he noted that the address was swatted often and that responders should not breach the building unless certain there is some legitimacy to the call. *Id*. At some point, he further convinced dispatch to start flagging the address as a swatting location. *Id*.

On March 20, 2023, Robinson and Tomlinson were swatted again. *Id*. Someone called a suicide hotline claiming they were Tomlinson and reported that they had shot their mother, demanded $50,000, and claimed that they would shoot anyone who approached the home. *Id*. By now, the home was flagged to dispatch, and dispatch added to the CAD that a sergeant should be dispatched with all calls to this location, given the known swatting risk. *Id*.

Evans, Garrido, and Orlando—all aware of the home's swatting history—responded to the call. *Id*. at 9–10. Evans approached the home with

his gun unholstered and made contact with Robinson. *Id*. at 10. Eventually, Evans called Sergeant Pocernich, who was an acting Lieutenant at the time. *Id*. Evans told Pocernich that Tomlinson wasn't home and Robinson would not let him into the house. *Id*. Pocernich told Evans it was a swatting address and advised him not to go into the house. *Id*. Nonetheless, Evans told Robinson that they had to come in and could not wait. *Id*. Evans then entered and searched the home. *Id*. He exited a few minutes later, argued with Tomlinson over the phone, and argued with Robinson on the porch. *Id*. The officers then left. *Id*.

### 2.5 Count D: April 11, 2023

From March 20, 2023 to April 11, 2023, there were seven more swatting attempts on the home. *Id*. On March 22, 2023, a District 1 sergeant emailed the supervisors and District 1, including Evans and Scheuring, to tell them that Tomlinson had come into the district to complain about Evans entering his home and that the house was flagged as a swatting address in the CAD system. *Id*. at 10–11. Evans received the email. *Id*. at 11.

On March 25, 2023, a lieutenant in District 1 forwarded that email to a smaller subset of sergeants, including Scheuring. *Id*. He added that the sergeants should "discuss this location and proper response at roll call[]" so officers would be aware if they get dispatched. *Id*. Scheuring has a practice of reading his emails. *Id.*

On April 11, 2023, there were four swatting incidents. *Id*. at 10. Petersen and another officer responded to the first swatting call at 7 a.m. *Id*. at 11. There was a sign on the door with a phone number for responders to call. *Id*. Tomlinson made contact with the two responding officers (Petersen and a sergeant, Roecker) through the porch camera. *Id*. Roecker noted that

he was aware of the situation and left his card in the mailbox. *Id*. He and Petersen left. *Id*.

On the fourth swatting call of April 11, 2023, the responding officers included Scheuring and District 1 officers Carleton, Lee, Garrido, Becker, and Williams. *Id*. Dispatch reported that someone from the suicide hotline had called and said that a teenager had texted the line and said they had killed their parents and were going to kill themselves. *Id*. at 11–12. The suicide hotline employee was concerned that the call was a swatting incident. *Id*. at 12. Dispatch flagged the house as a swatting risk. *Id*.

At about 9:20 p.m., the officers arrived at Tomlinson and Robinson's home. *Id*. They stood in front of and on the sides of the house, but not on the porch. *Id*. Carleton and Becker spoke with Tomlinson through the porch camera. *Id*. Tomlinson explained that he was not home, but Robinson was. *Id*. Carleton told Tomlinson that because they were "called for a shooting, per usual, so whoever's in the house need[ed] to come down and talk to [them]." *Id*. Robinson then began speaking over the camera, explaining to Carleton that she was upstairs. *Id*. Carleton requested that she come downstairs to show that she was fine. *Id*. Robinson pushed back, and Carleton replied that they needed to see her before they could leave. *Id*.

Robinson came downstairs. *Id*. Becker observed that she did so with her hands up. *Id*. Tomlinson began speaking to the officers through the camera. *Id*. at 13. As Robinson tried to calm Tomlinson down, Scheuring approached the porch and asked to talk to Robinson. *Id*. Garrido stood near the front of the house, and Lee, Becker, and Williams stood on the front lawn. *Id*.

Robinson, now angry, asked why she had to talk given that it was the fourth swatting of the day. *Id*. Scheuring explained that he was trying

to stop this from happening, but since he was not there earlier, they needed to start over as if this were a new incident. *Id*. Scheuring said they were sent there for a shooting, and he asked if anyone was shot or injured. *Id*. Robinson said no. *Id*. Scheuring asked if an officer could go into the house, and Robinson said no because they knew it was a fake call and had no probable cause. *Id*. at 14.

Tomlinson then arrived home, yelled at the officers, and was briefly detained. *Id*. The officers then left, with none of them having entered the home. *Id*.

### 2.6 Count E: April 12, 2023

The next day, April 12, 2023, Robinson and Tomlinson were swatted again. *Id*. Petersen and Evans responded to the call. *Id*. Though Petersen had previously been briefed during roll call about the home, he sped through downtown with his emergency lights on towards the home. *Id*.

This call had come in from Tampa Bay, Florida. *Id*. The caller, claiming to be Tomlinson, said he had shot his wife and another man. *Id*. Dispatch noted in the CAD that this was a swatting related call and, as a result of that risk, a sergeant should be dispatched with officers for all calls at this house. *Id*.

Upon the officers' arrival, a passerby told Petersen that he hadn't heard any gunshots. *Id*. Petersen walked onto the porch and began filling out a card, as he had done the day before. *Id*. He then tried to call the number on the door, like he had seen done the day before. *Id*.

Tomlinson then began speaking through the porch camera. *Id*. at 15. Petersen asked if everyone was okay, and Tomlinson responded that, like always, everyone was okay. *Id*. Petersen responded that he knew the situation and explained that they had received another call that Robinson

was shot. *Id*. Petersen would later testify that he knew there wasn't an emergency. *Id*.

Evans then arrived. Petersen asked Tomlinson if Robinson was able to come downstairs, and Evans clarified that she needed to come downstairs. *Id*. Tomlinson refused, and Robinson added over the camera that she was fine. *Id.* Evans responded that Robinson needed to come down, threatening to kick in the door if she did not do so. *Id*. Tomlinson then told Evans and Petersen that the conversation was over, and Evans and Petersen both said they would kick the door in. *Id.* Tomlinson stressed that this was the twenty-eighth swatting on their home and told the officers to go away. *Id*. The parties argued, and Tomlinson said they weren't coming down. *Id*. Ultimately, Evans gestured for Petersen to kick in the door. *Id*. Petersen then attempted to do so but did not succeed. *Id*.

Evans then spoke with Tomlinson through the door and said he needed to see Robinson. *Id*. at 16. Tomlinson rejected this, and Robinson responded through the door that she was okay. *Id.* The parties continued arguing. *Id*. Robinson ultimately showed herself, said she was okay, and told the officers that they did not have probable cause. *Id*. Ultimately, Evans and Petersen left. *Id*.

### 2.7 Count F: April 17, 2023

The next day, April 13, 2023, Robinson and Tomlinson were swatted again. *Id*. Two officers responded, checked with Tomlinson on the porch if everything was okay, and then left. *Id*.

Around this time, Evans had a conversation with Captain Thiel, who told him not to go into the home again. *Id*.

On April 17, 2023, Robinson and Tomlinson were swatted again. *Id*. at 17. Evans and Officer Vento responded. The call came in through

Glendale Police Department. *Id*. Glendale relayed that the caller said he had killed his wife and urged police to hurry before he killed his child. *Id*. Dispatch noted three times that the call was a swatting risk. *Id*.

Upon arrival, Vento said that he had never been to the house but had heard about it "like 50 times." *Id*. He made a few other comments reflecting his awareness of the situation, at which point Evans walked up to the door and told Vento to call the number on the door. *Id*. Sergeant Pocernich briefly called Vento and explained that it was the same type of call as usual. *Id*. Vento then called Robinson and left her a voicemail. *Id*.

Evans then began knocking on the door. *Id*. Tomlinson came to the door, and Evans asked to see Robinson, explaining that as long as they saw her, they would leave. *Id*. Tomlinson refused, explaining that Evans had been to his home and knew the situation. *Id*. Evans repeated that he needed to see Robinson, while Tomlinson repeated that Evans needed to leave. *Id*. at 17–18. Ultimately, while the two continued to argue and Evans threatened to kick down the door, Robinson showed herself. *Id*. at 18. The two officers left. *Id*.

Tomlinson and Robinson have been swatted since April 17, 2023, but they do not allege that any officers have violated their rights since that day. *Id*.

## 3. LEGAL STANDARD

### 3.1 Motion for Summary Judgment

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing FED. R. CIV. P. 56(a) and *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014)).

A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255).

Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) (collecting cases). Instead, "[s]ummary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Com. Underwriters Ins. Co. v. Aires Env't Servs., Ltd.*, 259 F.3d 792, 795 (7th Cir. 2001) (citing *Wolf v. N.W. Ind. Symphony Soc.*, 250 F.3d 1136, 1141 (7th Cir. 2001)).

### 3.2 Fourth Amendment

The Fourth Amendment protects against unreasonable searches and seizures of persons and property. U.S. CONST. amend. IV. As relevant to this case, which raises claims related to searches and seizures in and around Plaintiffs' home, the Fourth Amendment generally prohibits searches and

seizures without a warrant founded on probable cause or exigent circumstances. *See Steagald v. United States*, 451 U.S. 204, 211–12 (1981); *Payton v. New York*, 445 U.S. 573, 586–87 (1980).

As Plaintiffs rightly note, ECF No. 64 at 6, the Fourth Amendment begins from the essential premise that "the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013); *see also Payton*, 445 U.S. at 590 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house."). The "home," in turn, encompasses not only the literal physical structure, but also the curtilage—that is, the area "'immediately surrounding and associated with the home.'" *Jardines*, 569 U.S. at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). The curtilage, as relevant for the instant motions, includes the front porch, *id.* at 7, and the backyard, *Bleavins v. Bartels*, 422 F.3d 445, 452 (7th Cir. 2005) (citations omitted).

As an initial matter, not *every* interaction with police in or around the home requires a warrant and probable cause or an exigent circumstance. In the absence of these factors, police may nonetheless "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. In other words, police may seek voluntary or consensual encounters with individuals in their own homes. *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990), *cert. denied*, 498 U.S. 105 (1991) ("The third category [of police-citizen encounters] involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning."). Such an encounter is "not a seizure within the meaning of the Fourth Amendment." *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 553 – 55 (1980) and *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

This implied license, however, is not without limits. One such limit is that police may not force dwellers to leave their home in order to engage in an encounter with them—that turns a consensual interaction into an investigative stop for purposes of the Fourth Amendment. *United States v. Jerez*, 108 F.3d 684, 692 (7th Cir. 1997). If police officers "refuse[] to take 'no' for an answer," *id.*, and instead "convey a message that compliance with their requests is required," *Florida v. Bostick*, 501 U.S. 429, 435 (1991), then that would constitute a seizure. And the Fourth Amendment would "impose[] some minimal level of objective justification to validate the detention or seizure." *INS v. Delgado*, 466 U.S. 210, 216–17 (1984) (citing *Mendenhall*, 446 U.S. at 554, and *Terry*, 392 U.S. at 21).

Beyond setting parameters for proper interactions with the inhabitants of a home, the Fourth Amendment also dictates when and how a home may be entered. In general, non-consensual entry into a home requires a warrant supported by probable cause. *Kentucky v. King*, 563 U.S. 452, 459 (2011). An officer's warrantless entry into a home is presumptively unreasonable. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)); *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001) (citing *Payton*, 445 U.S. at 585–86, and *United States v. Saadeh*, 61 F.3d 510, 516 (7th Cir. 1995)).

In certain instances, however, the exigencies of a situation may— consistent with the Fourth Amendment's reasonableness requirement— justify entry into a home in the absence of a warrant. *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978) (collecting cases). "Exigent circumstances exist, for example, when officers are in hot pursuit of a fleeing suspect, there is a need to render emergency assistance to an injured occupant or to protect an occupant from imminent injury, or there is a need to prevent the imminent

destruction of evidence." *United States v. Ross*, 565 F. App'x 505, 509 (7th Cir. 2013) (citing *King*, 563 U.S. at 460); *see also United States v. Santana*, 427 U.S. 38, 42–43 (1976) (exception to warrant requirement when police are in hot pursuit of a fleeing felon who escapes to a private home); *Michigan v. Fisher*, 558 U.S. 45, 48 (2009) (exception to warrant requirement where officer reasonably believes that an emergency resulting in serious injury is occurring); *Schmerber v. California*, 384 U.S. 757, 770–71 (1966) (exception to warrant requirement where officer reasonably believes that destruction of evidence is imminent and unavoidable). In order for the exigent circumstances exception to apply and permit warrantless entry into a home, the responding officer(s) must have both probable cause to believe a crime has occurred or will occur *and* an objectively reasonable belief that exigent circumstances exist. *See United States v. Venters*, 539 F.3d 801, 806–07 (7th Cir. 2008) (citations omitted).[2]

---

[2]Whether both probable cause *and* exigent circumstances are required or whether exigent circumstances are enough on their own was not clear at the time the events of this case took place. The parties have not briefed this issue; the Court nonetheless addresses it for the sake of thoroughness.

The Supreme Court seems to have answered this question in the emergency aid context quite recently in *Case v. Montana*, No. 24-624, 2026 WL 96690, *6 (U.S. Jan. 14, 2026) ("We repeat today what we have held before: An officer may enter a home without a warrant if he has 'an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.'" (citing *Brigham City*, 547 U.S., at 400)). However, for one, it is not clear how this finding translates to the broader exigent circumstances context. Moreover, this case was not decided at the time of the alleged instances here.

Instead, the Court looks to the majority of case law from the Supreme Court and Seventh Circuit that existed at the time of this incident. Some cases do operate disjunctively, seemingly requiring probable cause *or* exigent circumstances. For instance, in *Sutterfield v. City of Milwaukee*, the Seventh Circuit indicated explicitly that exigent circumstances based on an emergency, without probable cause, would be enough. 751 F.3d 542, 564 (7th Cir. 2014).

Probable cause for a search exists where, based on a totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Scott*, 516 F.3d 587, 589 (7th Cir. 2008) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "It requires a probability, not absolute certainty, that contraband or evidence of a crime will be found." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (collecting cases). The level of assuredness that an officer needs to have has been described many different ways. In some cases, it is described as a "fair probability," *id.* at 522, or a "substantial chance," *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006), that evidence of a crime will be found. In other cases, probable cause has been described merely as "a good reason to act." *Hanson v. Dane County*, 608 F.3d 335, 338 (7th Cir. 2010) (citing *Gates*, 462 U.S. at 235). Probable cause does not, by contrast, require that it be "more likely than not" that a crime has been committed. *Id.*; *see also United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003). "In determining whether there is probable cause to search, law enforcement officers may draw reasonable

---

But the overwhelming majority of cases speak conjunctively, requiring both probable cause *and* exigent circumstances. *See, e.g.*, *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002); *United States v. Marshall*, 157 F.3d 477, 481–82 (7th Cir. 1998); *United States v. Rivera*, 248 F.3d 677, 680–81 (7th Cir. 2001); *Reardon v. Wroan*, 811 F.2d 1025, 1028 (7th Cir. 1987) (citing *Payton*, 445 U.S. at 587–88 (1980) and *United States v. Paul*, 808 F.2d 645, 647 (7th Cir. 1986); *United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006) (quoting *Rivera*, 248 F.3d at 680–81); *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Mason v. Godinez*, 47 F.3d 852, 855 (7th Cir. 1995) (citing *Payton*, 445 U.S. at 586). Indeed, this is true even of several cases that took place after *Sutterfield*, even cases that hinged on the existence of an emergency. *See, e.g.*, *United States v. Leo*, 792 F.3d 742, 749 n.2 (7th Cir. 2015); *United States v. Karmo*, 109 F.4th 991, 995 (7th Cir. 2024); *Marvin v. Holcomb*, 72 F.4th 828, 832 (7th Cir. 2023).

As a result, to avoid any possible foot faults, the Court will operate under the premise that both probable cause and exigent circumstances are required for the exigent circumstances exception to apply.

inferences from the facts based on their training and experience." *Zahursky*, 580 F.3d at 521 (citing *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006)).

Warrantless seizures operate similarly, generally requiring probable cause. *Dunaway v. New York*, 442 U.S. 200, 210 (1979). However, when the seizure is "substantially less intrusive" than an arrest, the normal probable cause rule may be displaced by the lower standard of reasonable suspicion. *Id.*[3] Reasonable suspicion requires more than a hunch but less than probable cause and "considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Neither party expressly raises the prospect that reasonable suspicion applies here to govern the seizure(s) of Plaintiffs. However, Defendants—at least at some points—contend that the seizures may be justified on something lower than probable cause, using the language of an "investigative stop." *See, e.g.*, ECF No. 71 at 4. Defendants do not specify what the replacement standard is, although they cite to one case allowing a seizure of person on a porch based on reasonable suspicion. *Id.* (citing *United States v. Richmond*, 924 F.3d 404, 412 (7th Cir. 2019)).

The Supreme Court has yet to directly address the constitutionality of a *Terry* stop within a home's curtilage, but the Seventh Circuit has to a

---

[3]The paradigmatic case of a seizure legitimately operating on less than probable cause is a *Terry* stop, *see* 392 U.S. 1 (1968), which may instead proceed under the lower standard of reasonable suspicion. *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015).

As a general matter, *Terry* stops operate as such: where officers have "a reasonable suspicion, grounded in specific and articulable facts" that a crime has occurred, *United States v. Hensley*, 469 U.S. 221, 222 (1985), they may undertake a "limited course of investigation" to "quickly confirm or dispel the authorities' suspicion." *United States v. Place*, 462 U.S. 696, 702 (1983). That investigation may involve a "limited intrusion into an individual's privacy," *Richmond*, 924 F.3d at 411 (citations omitted), like stopping them to "ask a few, brief questions." *Brown v. Polk County*, 141 S. Ct. 1304, 1304 (2021) (citing *Terry*, 392 U.S. at 21–22).

certain extent. In one case, the Seventh Circuit allowed a *Terry* stop in a structure attendant to a house—namely, a condominium garage. *United States v. Pace*, 898 F.2d 1218, 1228–29 (7th Cir. 1990).[4] In a later case, the Seventh Circuit cautioned that reasonable suspicion cannot justify entry into the curtilage—another exception, like consent or knock-and-talk, would need to apply. *United States v. Banks*, 60 F.4th 386, 390 (7th Cir. 2023) (citing and distinguishing *Richmond*, 924 F.3d 404). But the Seventh Circuit there did not proscribe *Terry* stops if one is otherwise legitimately within the curtilage, *see id.*, and at least one other case reaffirmed that view. *See Richmond*, 924 F.3d at 413 (permitting a *Terry* stop on a porch). The relative dearth of cases leaves the Court unable to resolve if reasonable suspicion might apply here, so for thoroughness's sake, the Court will address each seizure in both reasonable suspicion and probable cause terms.

Finally, the Court takes a moment to define exigent circumstances as a concept distinct from probable cause. Exigent circumstances, as relevant here, exist where "there is a reasonable belief by police that their safety, or the safety of the public, may be threatened." *United States v. Webb*, 83 F.3d 913, 916 (7th Cir. 1996) (citations omitted).

> When determining whether exigent circumstances exist, the court must analyze the situation from the perspective of the officers at the scene. Accordingly, we ask not what the police could have done but rather whether they had, at the time, a reasonable belief that there was a compelling need to act and no time to procure a search warrant.

*Marshall*, 157 F.3d at 482 (internal citations omitted). The burden is on the government to prove that exigent circumstances exist. *Id.* (citing *United States v. Robles*, 37 F.3d 1260, 1263 (7th Cir. 1994)).

---

[4]The Seventh Circuit assumed without deciding that the garage was part of the curtilage. *Pace*, 898 F.2d at 1228.

### 3.3 Qualified Immunity

Finally, before turning to the instant case, the Court will briefly address the doctrine of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Humphries v. Milwaukee County*, 702 F.3d 1003, 1006 (7th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 800, 818 (2009)). To be clearly established at the time of the challenged conduct, the right's contours must be "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right,'" and "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). This standard "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Creighton*, 483 U.S. at 639).

In assessing qualified immunity, the Court undertakes a two-part inquiry. *Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995) (citing *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994)). First, the plaintiff must establish that the defendant violated a constitutional right. *Id*. If the plaintiff fails to do so, the Court's inquiry ends. If a constitutional right was violated, the Court asks if the constitutional right was clearly established at the time in question. *Id.*[5] "To be clearly established, a constitutional right must be

---

[5]Qualified immunity is not a strictly sequential analysis. A court may answer these questions in either order. *Jones v. Clark*, 630 F.3d 677, 682 (7th Cir.

confirmed by Supreme Court or [Seventh] Circuit precedent or the overwhelming weight of authority from other courts." *Finch v. Rapp*, 38 F.4th 1234, 1240 (10th Cir. 2022) (citing *Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir. 2007)); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) ("[W]e look first to controlling Supreme Court precedent and our own circuit decisions on the issue."). The cases purporting to clearly establish the right must be closely analogous to the case at issue. *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (citing *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013)).

### 4. ANALYSIS: PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs move for partial summary judgment on Counts A, C, E, and F in their operative complaint, arguing that Defendants violated Plaintiffs' Fourth Amendment rights in three ways. First, they argue, Defendants violated the "implied license to approach a door, knock, and seek a consensual encounter." ECF No. 64 at 5 (citing *Jardines*, 569 U.S. 1). Second, they contend that Defendants violated Plaintiffs' rights by requiring them to answer their door. *Id.* (citing *Jerez*, 108 F.3d at 691–92). Third, they argue Defendants violated Plaintiffs' rights by entering and searching Plaintiffs' home. *Id.* (citing *Payton*, 445 U.S. at 537–38 and *Caniglia v. Strom*, 593 U.S. 194, 198 (2021)). The Court examines each Count subject to Plaintiffs' motion in turn.

---

2011) (citing *Pearson*, 555 U.S. at 236–43). "If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (citation and internal quotation marks omitted). Here, the Court opts to address the questions sequentially.

### 4.1 Count A: August 11, 2022

With respect to Count A, Plaintiffs argue that

> Defendant Dudley exceeded his implicit license by drifting into [Plaintiffs'] home's curtilage (their backyard) and searching a cellar door. Also in Count A, Defendants Plevak and Switzer forced Robinson to exit her home and then entered and searched it.

ECF No. 64 at 5. The Court takes up these arguments as to each relevant Defendant.[6]

#### 4.1.1 Dudley

Specifically, with respect to Dudley, Plaintiffs contend that leaving the home's front path, entering into the backyard, and opening the cellar door constituted a search of the home's curtilage without a warrant. *Id.* at 10. Insofar as "Dudley had reason to know (and did know) the call was bogus," Plaintiffs argue that there was no exigent circumstance justifying the lack of a warrant for the entry and search. *Id.* at 11.

Defendants, for their part, argue that Dudley is entitled to qualified immunity. ECF No. 71 at 8. They argue that it is not clearly established that an officer cannot quickly check a cellar for a suspect lying in wait "when responding to a report of possible gunshots, even if . . . an officer had a basis to distrust the report." *Id*. The Court will therefore undertake a qualified immunity analysis as to Dudley in this section, analyzing, first, whether a constitutional violation occurred here and, second, whether the

---

[6]Plaintiffs move for summary judgment on Count A with respect to liability for only three of the five individual Defendants named in the operative complaint. ECF No. 63. Defendants oppose the motion and seek summary judgment as to *all five* defendants, on liability and/or qualified immunity grounds (depending on which Defendant is at issue). ECF No. 70. Defendants' arguments as to the remaining individual officers on which Plaintiffs do not seek summary judgment are discussed *infra* Section 5.

constitutional right violated was clearly established. *See Eversole*, 59 F.3d at 717.

The Court begins with the question of whether a constitutional violation occurred, stating at the outset that this as a close call. As an initial matter, the level of intrusion here was objectively quite minor. Opening a cellar door and presumably glancing inside for mere seconds hardly seems like the kind of intrusion into the home proscribed in such harsh terms by Fourth Amendment case law. And that matters because, "[i]n assessing the reasonableness of any search, the court balances the degree of intrusion against the government's justification for the search." *United States v. Schlatter*, 411 F. App'x 896, 899 (7th Cir. 2011) (citing *United States v. Knights*, 534 U.S. 112, 118–19 (2001)).

But the true relevant dilemma is this: on the one hand, an officer confronted with a reliable report of a shooting at a house would likely be within his rights to conduct a brief search to determine whether a shooter was, in fact, present on scene and lying in wait. *See, e.g.*, *Maryland v. Buie*, 494 U.S. 325 (1990); *United States v. Henderson*, 748 F.3d 788, 792 (7th Cir. 2014). On the other hand, this was not just a case of a report of dubious validity, but one that was *more likely than not false*. A Fourth Amendment analysis hinges on "an objective assessment of an officer's actions in light of the facts and circumstances then known to him." *Scott v. United States*, 436 U.S. 128, 137 (1978). A reasonable officer, having knowledge of the *multiple* false reports of criminal activity at Plaintiffs' home, would deem it highly unlikely that a crime actually had occurred or was ongoing there. Dudley's comments and conduct while on-scene reflect that he was not particularly convinced that the call was real, chatting with his co-officer about the dangerousness of false reports and giving no warning before

opening the cellar door. Defendants' explanation that Dudley was looking for a suspect lying in wait, ECF No. 71 at 8, seems like little more than an *ex post* justification, especially given the lack of citation to anything in the record suggesting that is what Dudley was thinking when he opened the cellar door.

All things considered, the Court concludes that Dudley committed a Fourth Amendment violation by entering Plaintiffs' home's backyard and opening the cellar door. There was limited evidence of any crime happening here. The 911 report itself constituted all the evidence that responding officers had of a crime being committed at Plaintiffs' home, and not only did they have little reason to believe it was real, but after five prior false calls over the span of just a couple weeks, they also had affirmative reasons to believe it was false. There was no corroborating evidence on the scene to suggest that the call had any validity to it—no screaming (as the call had suggested), no gunshots or evidence of gun violence, and no visible evidence of crime or injury at all. So, if the Court looks at probable cause as the net weight of all the information available to Dudley—the totality of the circumstances, *United States v. Oliva*, 385 F.3d 1111, 1114 (7th Cir. 2004) (citing *Gates*, 462 U.S. 213)—the net weight here was clearly in the direction of no crime having occurred, giving Dudley no reason to enter the home's backyard and open the cellar door. Even though the intrusion was minor, there was simply no objective reason for an intrusion of this sort at all, because there was no probable cause to believe that a crime had occurred. *See United States v. Delgado*, 701 F.3d 1161 (7th Cir. 2012) (holding it unreasonable for officers to believe a shooter may be in an apartment where no indication was ever given that the shooter was in the apartment). Likewise, Dudley lacked any objectively reasonable belief that exigent

circumstances existed given that there was no suggestion of anyone being in the cellar. While it is true that "the business of [officers] is to act, not to speculate or meditate on whether the report is correct," *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963), they also may not "close [their] eyes to facts that would help clarify the circumstances." *Reardon*, 811 F.2d at 1028 (citing *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986)). In short, Dudley's warrantless entry into Plaintiffs' curtilage and opening their cellar door on August 11, 2022 was justified neither by probable cause that a crime had occurred nor by a reasonable belief that exigent circumstances existed and accordingly violated Plaintiffs' Fourth Amendment rights.

This, of course, does not end the inquiry. The Court must also consider whether a reasonable officer could have reasonably believed that probable cause and exigent circumstances existed in light of clearly established law. *See Eversole*, 59 F.3d at 717; *Anderson*, 483 U.S. at 640. The answer here seems to be "yes." There is a real dearth of cases addressing how officers are meant to handle repeated swatting instances to avoid affronts to Fourth Amendment rights. This alone could be enough to find that qualified immunity should apply, because there is no beyond-debate answer to whether probable cause or exigent circumstances can be found in repeated swatting cases. *al-Kidd*, 563 U.S. at 741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." (citing *Anderson*, 483 U.S. at 640, and *Malley v. Briggs*, 475 U.S. 335, 341 (1986))).

But the Court can consider whether there is a pattern of case law so sufficiently analogous that Dudley would have been on notice of the unconstitutionality of his actions. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). And here, analogous cases do not "confirm" a right against an intrusion of

this sort. *Finch*, 38 F.4th at 1240 (citing *Cortez*, 478 F.3d at 1114–15). Indeed, the cases provide a somewhat confusing morass of contradictory statements about whether and to what extent 911 calls can be relied upon to generate probable cause, reasonable suspicion, or exigent circumstances, and how doubt-inducing information should be weighed against the presence of a 911 call. A brief survey of the relevant case law at the time Count A occurred would be helpful here.

In *Bruce v. Guernsey*, the Seventh Circuit confronted a case in which an ex-boyfriend's tip that his ex-girlfriend, Falyn Bruce, was suicidal led two officers—Harris and Guernsey—to her door, where officers encountered a lucid and "perfectly fine" Bruce. 777 F.3d 872, 873–74 (7th Cir. 2015). Officer Harris ordered Bruce out of the house and held her on the driveway for around 37 minutes. *Id.* at 876–77. Officer Guernsey then arrived, drove Bruce to a hospital against her will and had her involuntarily committed. *Id.* at 877. The Seventh Circuit condoned Harris' actions but condemned Guernsey's. *Id.* at 876–77. It said that an "initial imprecise and potentially unreliable tip" is not enough to generate probable cause for actions like Guernsey's, especially where the information is contradicted when officers arrive on the scene. *Id.* at 877. Intrusions into the sphere protected by the Fourth Amendment are not justified "solely" by a report to police. *Id*. However, the *Bruce* court permitted Harris' seizure of Bruce based solely on that same call, thereby implicitly countenancing probable cause based on 911 calls alone.

In *United States v. Richardson*, police received a 911 call reporting a rape and murder at a particular address. 208 F.3d 626, 627–28 (7th Cir. 2000). The caller described where in the residence the victim could be found, identified himself by name, and gave the basis for his knowledge. *Id*. Police

had received a false 911 call reporting a murder at the same address one week prior. *Id*. Still, they searched the house on this occasion without a warrant. *Id*. Identifying this as a "close case," the Seventh Circuit nonetheless permitted the warrantless entry based on exigent circumstances, despite the prior "bogus call." *Id.* at 629–30. The court specifically said, "911 calls reporting an emergency can be enough to support warrantless searches under the exigent circumstances exception, particularly where, as here, the caller identified himself." *Id.* at 630 (citations omitted). However, the court also said that it could imagine "a case in which it would be objectively unreasonable for a police officer to rely on a 911 call[] because of additional information available to the officer." *Id*. at 631.

In *United States v. Drake*, the Seventh Circuit said that it "presume[d] the reliability of an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion, particularly when the caller identifies herself. . . . Requiring further indicia of reliability would only jeopardize the usefulness of the 911 system and the ability of officers to prevent further danger to the public." 456 F.3d 771, 775 (7th Cir. 2006). But that case did not go so far as to say that a 911 call reporting an emergency could generate *probable cause*. *See generally id*.

In *Fitzgerald v. Santoro*, a woman had called a police station sounding intoxicated and, as far as officers knew, threatening suicide. 707 F.3d 725, 732 (7th Cir. 2013). She then abruptly hung up the phone when officers approached her apartment. *Id*. The Seventh Circuit found that exigent circumstances justified officers entering the apartment. *Id*. This seems to have been a case of officers relying on a call to police to generate exigent circumstances, but it is unclear from this case whether the call *itself* was

enough to generate exigent circumstances or if the fact that she hung up or was clearly identifiable may have played a role as well. Moreover, there was no history of false calls to indicate this one might be fake.

In the 1987 case *Reardon v. Wroan*, police officers entered a residence in response to a 911 call reporting a burglary in progress. 811 F.2d at 1026. When officers arrived, they found that the house lights were on, the nearby car was parked normally in a lot adjacent to the home, and the door to the house was closed. *Id.* at 1028. The court concluded that a jury could find that no probable cause existed for entry. *Id.* at 1029. In essence, though it did find exigent circumstances, *id.* at 1029–30, the Seventh Circuit was not convinced that a call alone was necessarily enough to establish probable cause for entry in the presence of mitigating information.

In the 2010 case *Hanson v. Dane County*, a wife dialed 911. 608 F.3d at 337. By the time the 911 dispatcher picked up, the call had disconnected, and no one answered when the dispatcher called back. *Id*. Officers were sent to the house and entered without a warrant, eventually learning after entry that the husband had "bumped" the wife during an argument. *Id*. The Seventh Circuit found both probable cause and exigent circumstances justifying entry, stating that "a 911 call provides probable cause for entry[] if a call back goes unanswered." *Id*.

In *Florida v. J.L.*, the Supreme Court, addressed the case of an anonymous 911 call that led police to stop and frisk an individual at a bus stop. 529 U.S. 266, 268 (2000). The Supreme Court noted that, in general, anonymous 911 calls cannot generate reasonable suspicion unless they bear some additional "indicia of reliability." *Id.* at 273. However, the Supreme Court explicitly countenanced certain situations of danger—such as a report of someone carrying a bomb—that might justify a search even

without a showing of reliability. *Id.* at 273–74. It is unclear how this statement translates to circumstances of probable cause or exigent circumstances rather than reasonable suspicion.

In *Navarette v. California*, the Supreme Court elaborated, holding that where anonymous 911 calls bear sufficient indicia of reliability—like accurately predicting future behavior, being from an eyewitness, or giving a tip contemporaneous in time to the crime being reported—they can generate reasonable suspicion. 572 U.S. 393, 398–400 (2014). The Court went on to say:

> None of this is to suggest that tips in 911 calls are *per se* reliable. Given the foregoing technological and regulatory developments, however, a reasonable officer could conclude that a false tipster would think twice before using such a system. The caller's use of the 911 system is therefore one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call.

*Id.* at 401.

In *United States v. Hicks*, the Seventh Circuit gave its take on the inherent reliability (or lack thereof) of 911 calls. 531 F.3d 555 (7th Cir. 2008). The court made two relevant statements. First, the court stated that "anonymous tips about emergencies cannot always be trusted—although frequency data does not exist, fraudulent 911 calls are agreed to be a dangerous problem." *Id.* at 560 (citation omitted). Second, and in contrast, the Court stated that "any body of law requiring 911 operators to carefully make credibility determinations would unacceptably delay the necessary responses to *all* emergency calls, including genuine ones." *Id.* at 561. This case dealt in reasonable suspicion rather than probable cause, so even if the Court could discern the precise takeaway, it is not obvious how it would apply to the case at hand.

Other cases come to similar conclusions regarding the ability of 911 calls or anonymous tips to generate probable cause, exigent circumstances, or reasonable suspicion. *United States v. Jenkins*, 329 F.3d 579 (7th Cir. 2003); *United States v. Collins*, 110 F. App'x 701 (7th Cir. 2004); *U.S. v. Wooden*, 551 F.3d 647 (7th Cir. 2008); *Alabama v. White*, 496 U.S. 325 (1990). However, none adds more to the analysis than the overview provided just above. The takeaway is this: the Seventh Circuit and Supreme Court seem clear that, where exigent circumstances are alleged, 911 calls alone *can* be enough to support warrantless entries. However, it is unclear how these cases grapple with reasons to believe the 911 call is reliable and, even less frequently, affirmative reasons to believe the 911 call is unreliable. The only case that addresses the matter, *Richardson*—in which a prior false call a week earlier gave the Seventh Circuit pause as to whether probable cause existed—resulted in a "close case." 208 F.3d at 629. With this background, the Court is unprepared to find that precedent clearly established the right Plaintiffs seek to have vindicated today. While the Court agrees that their rights were, in fact, violated, this would not have been clearly established to Dudley at the time of the alleged intrusion.

The Court pauses to make two brief remarks. First, there is one case—*United States v. Delgado*—that neither party cites but which gives the Court pause. In that case, one individual, who had been shot, ran into the apartment of another individual to seek refuge from his shooter. 701 F.3d at 1163. A witness reported the shooting to the police. *Id*. After police arrived, the two individuals came out of the apartment, one bearing a graze wound on his wrist. *Id*. Neither indicated—"in words, demeanor, or otherwise—that the shooter was in the same apartment from which they exited. There was no indication that anyone else was in the apartment or

that [either individual] had been subjected to violence inside the apartment." *Id*. Nonetheless, officers searched the apartment, later arguing that the search was justified by exigent circumstances, as a shooter in wait could pose an immediate threat to officers. *Id*. at 1164. The Seventh Circuit rejected that argument, finding the officers' explanation, frankly, unreasonable. *Id*. ("It is unreasonable to believe that, faced with such life-threatening danger, both the shooting victim and Delgado would leave the apartment with nary a word or any expression whatsoever indicating that the shooter was just over their shoulder or that they were within seconds of being killed."). The Court explained that for the government's theory to be reasonable, one would need to believe several implausible things. *Id*.

The Seventh Circuit went on to state in no uncertain terms: in exigent circumstances cases, "it is actually incumbent upon the government to point to some *affirmative* sign of exigency. Silence in this context cannot be that sign, as it could have easily meant any number of things having nothing to do with exigent circumstances." *Id*. at 1165 (citation omitted).

The parallels to the instant issue seem clear enough. Dudley, operating on nothing but an implausible report, entered Plaintiffs' backyard and briefly searched the cellar, later arguing that he did so in case a shooter was lying in wait.

Still, the Court finds these cases are sufficiently distinguishable. In *Delgado*, there was absolutely *no* indication that the shooter was in the apartment. Not only did the men stepping out of the apartment not report it, but the initial witness on the street did not do so either. *See generally* 701 F.3d 1161. Here, by contrast, the reports were of a shooting at the home and a beating involving the residents of the home. In other words, there was reason to believe that if there was a shooter, he or she could plausibly be in

the home. The "affirmative sign" of exigency was the simple fact that the 911 report indicated an attacker inside the home.

As a second point, the Court notes the highly fact-specific nature of its finding of a constitutional violation here. The Court finds no probable cause or exigent circumstances justifying a search of a residence where there exist *multiple* prior swatting instances at the residence, lack of identification or traceability of the caller, and lack of corroboration upon arrival at the scene. It is likely not the case that a single swatting incident would be enough to eliminate probable cause or exigent circumstances in the face of an otherwise reliable call. *See generally Richardson,* 208 F.3d 626. Perhaps two false calls would also not be enough. But in the very particular case of responding to a 911 call to a residence associated with multiple previous swatting instances—coupled with the lack of identification of the caller, call traceability, or corroborating evidence—Dudley's intruding into Plaintiffs' backyard and cellar is prohibited by the Fourth Amendment. This is especially so where the act of glancing into a cellar bears little relation to the risks raised by the 911 call except when framed in terms of a *post hoc* rationalization for the conduct.

### 4.1.2 Plevak and Switzer

The Court next turns to Plevak and Switzer. As a reminder, Plevak and Switzer were both aware of the house's repeated swatting history at the time they took the complained-of actions. Plaintiffs contend that Plevak and Switzer "order[ed]" Robinson out of her home and then entered searched it. ECF No. 64 at 11. Plaintiffs argue this was a violation of their Fourth Amendment rights, insofar as forcing Robinson out of the home constituted a seizure, and her apparent "consent" to their searching the home was both involuntary and part and parcel of the unlawful seizure. *Id.*

Defendants apparently concede that they seized Robinson, but they argue that the limited seizure was reasonable in light of the reports of danger and violence that they had received. ECF No. 71 at 4–5. Moreover, they argue that Plevak and Switzer had Robinson's consent to enter her home and walk through it with her, insofar as she assented twice, opened the door, entered the home, and held the door open for Plevak and Switzer to follow. *Id.* at 6. Moreover, Defendants argue that even if a constitutional violation occurred, qualified immunity should result in dismissal of the claims against these Defendants. *Id*. at 8–9.

Again, insofar as Defendants raise qualified immunity, the Court will undertake a similar analysis to above, assessing whether a constitutional violation occurred and, if so, whether it was clearly established. *Eversole*, 59 F.3d at 717. The Court begins by addressing Plevak and Switzer ordering Robinson out of the home.

Here, for the same reasons discussed above, neither probable cause, exigent circumstances, nor any reasonable suspicion existed to seize Robinson, and a constitutional violation occurred. There was an anonymous 911 call reporting gunshots and screaming at the house. A crisis line operator reported to dispatch that they had received a call claiming that Tomlinson had beaten up his girlfriend and was going to shoot himself in the head. But the 911 call was unaccompanied by a name, and the crisis line call was not entirely inconsistent with the 911 call—they reported very different situations. Neither was traceable. And when Plevak and Switzer arrived—both aware of the swatting history—they spoke to a decidedly coherent Robinson who was able to explain the home's swatting history. In truth, aside from the 911 call, all contextual knowledge and on-scene observations belied any notion of crime or exigency.

Defendants would have the Court say that it was reasonable for an officer to believe that Tomlinson, for whom there was no history of violence on the record, had suddenly—after multiple false 911 calls reporting violence—decided to *actually* become violent. He then decided to either beat or shoot his wife and incorrectly identify her as his girlfriend on the call to the crisis line. Despite being beaten and/or shot, Robinson then coherently explained the home's swatting history through the door, giving no indication "in words, demeanor, or otherwise" of issues in the home. *Delgado*, 701 F.3d at 1163. Of course, in situations of domestic violence, the fact that a victim says nothing is wrong does not immediately mean police should take that as true. But as the Seventh Circuit in *Delgado* explained:

> The government notes that in other cases, police officers have validly entered homes without a warrant upon suspicion of domestic violence even when the victim remains silent upon answering the door, but in those cases, silence or an indication that everything was fine was not *in and of itself* an affirmative indication of exigent circumstances. The victim's silence simply failed to vitiate *other* affirmative indications that something dangerous was happening inside the home.

*Id.* at 1165 (citations omitted). There were no such affirmative indications here. So the Court cannot adopt Defendants' view of the facts. Additionally, reasonable suspicion did not exist. Reasonable suspicion is ultimately based on "commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. Defendants' view is not logical or commonsensical. Plevak and Switzer were thus not justified in ordering Robinson out of the house based on the facts they knew at the time of the incident.

However, for the same reasons as above, the Court cannot conclude that the law to this effect was clearly established at the time of the violation.

Indeed, Plevak and Switzer's actions look quite analogous to those taken by Officer Harris in *Bruce*. The officers ordered Robinson out of the home, but they did not keep her for a long time and did not remove her from the vicinity in which they found her. *See Bruce*, 777 F.3d at 877. The Seventh Circuit in *Bruce* did point out that Officer Harris "had no other information regarding Bruce's mental state aside from the call," while Officer Guernsey had "much more information available" to him "than the initial imprecise and potentially unreliable tip from the ex-boyfriend." *Id.* at 876–77 (citation omitted). But the court did not address what it would have said about Officer Harris' actions had he had the information Officer Guernsey did. That is, the court did not analyze an intrusion similar to the one Plaintiffs experienced in the context of greater information. Therefore, the court did not "confirm" a right of the sort Plaintiffs seek to have vindicated. *Finch*, 38 F.4th at 1240 (citing *Cortez*, 478 F.3d at 1114–15). And the additional cases the Court cited *supra* Section 4.1.1 do not shed further light on how this doubt-inducing information should be weighed against a 911 call.

Turning to the search of the house,[7] the Court begins by noting at the outset that no probable cause or exigent circumstances existed here. Once the officers ordered Robinson out of the house, spoke with her, and saw that the report of her injuries were blatantly contradicted by her uninjured physical appearance, it is hard to imagine how probable cause or exigent circumstances could attach. This is not a case like *Bruce*, wherein suicidality

---

[7]Defendants do not advance any meaningful qualified immunity defense on this point. That said, the Seventh Circuit has made clear that where the "defendants' assertion in their opening brief of a qualified immunity defense was unambiguous," the failure to raise it with respect to an individual claim is not "a relinquishment" or the defense. *Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011). Thus, the Court will analyze the alleged violation using the qualified immunity framework.

is harder to visually identify and as a result, the plaintiff's calm demeanor was insufficient to eliminate the probable cause generated by the reliable but ultimately false report of her suicidality. Instead, where an alleged assault took place following five false police reports, and the alleged victim is visibly uninjured, police do not have probable cause nor do exigent circumstances exist to justify subsequently entering an individual's home against her will and searching it. To the contrary, police had too much information beyond the calls alone at this point to justify a search.

Thus, the only way the search could have been justified was by Robinson's consent, which Plaintiffs argue was lacking. The Court begins with the basic framework: "Consent obtained after an illegal seizure is invalid unless it can be shown that the consent was in fact 'sufficiently an act of free will to purge the primary taint' of the unlawful seizure." *McGann v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 8 F.3d 1174, 1184 (7th Cir. 1993) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). In order to determine whether purported consent was "free of the unlawful taint," the Court must assess whether there was "a break in the causal connection between the illegality and the consent given." *Id.* (citing *United States v. Recalde*, 761 F.2d 1448, 1458 (10th Cir. 1985)). "When statements and conduct evidencing consent to a search are given contemporaneously with the illegal seizure, with no break in the causal chain, the actions of the person seized are not free from the taint of unlawful detention and are thus insufficient to show consent." *Id.* (citing *Bostick*, 501 U.S. 429; *Florida v. Royer*, 460 U.S. 491, 507–08 (1983); and *United States v. McCraw*, 920 F.2d 224, 230 (4th Cir.1990)). The government faces a "heavy burden" of proving that the consent has been "purged of the taint of an antecedent illegal seizure." *Jerez*, 108 F.3d 684, 695 (7th Cir. 1997) (citation omitted). In assessing whether that burden has been

met, the Court considers: "(1) the lapse of time between the illegality and the defendant's consent; (2) any intervening factors between the two events; and (3) the 'purpose and flagrancy of the official misconduct.'" *United States v. Palomino-Chavez*, 761 F. App'x 637, 644 (7th Cir. 2019) (quoting *United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004)).

Here, the purported consent occurred *during* the illegal seizure. That is, it occurred while Robinson was on the porch to which she had been ordered by Plevak and Switzer. As such, the Court is unprepared to find that Robinson's actions were free from the taint of the unlawful detention. It is not clear that there was an "independent act of free will." *United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001) (quoting *United States v. Thompson*, 106 F.3d 794, 798 (7th Cir. 1997)). Thus, the Court finds that a constitutional violation occurred, as the warrantless search lacked meaningful consent divorcing it from the illegal seizure.

The next question is, was the illegality of the search clearly established? In some sense, the answer is "yes." It is clearly established that where there has been an illegal seizure, consent to a search that is not freed from its taint is not voluntary and is subsumed by the illegality of the seizure. *McGann*, 8 F.3d at 1184 (quoting *Wong Sun*, 371 U.S. at 486). That law is beyond dispute. In another sense, however, if the illegality of the initial seizure was not clearly established, it strikes the Court as odd to deem the right against the ensuing search clearly established. *See, e.g., Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (failure to intervene claims failed where plaintiff's right to be free from certain interrogation tactics was not clearly established at the time). In other words, if officers would not have been on notice about the illegality of the initial search—as qualified immunity implicitly requires, *Hope*, 536 U.S. at 739—and consent

for the subsequent search is bound up with the legality of the initial seizure, *McGann*, 8 F.3d at 1184, the Court would not expect them to know or even have reason to know that the ensuing search was illegal.

The purposes of qualified immunity affirm this result. The purpose of qualified immunity is to "protect public officials from guessing about constitutional developments at their peril." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (citing *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008). It is meant to shield public officials from liability unless they violate clearly established rights "of which a reasonable person would have known." *Catlin v. City of Wheaton*, 574 F.3d 361, 365 (7th Cir. 2009) (citations omitted). With that goal in mind, it strikes the Court as unreasonable to penalize the officers here for a search incident to a seizure that was ultimately illegal but was not clearly established to be illegal at the time of the search. Logically, since there was no "reasonable notice" that a seizure of this sort was illegal, officers could not have known that the search incident to it was illegal. *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009) (citing *Hope*, 536 U.S. at 739). As a result, the Court will extend the qualified immunity from the initial seizure to cover the otherwise illegal search incident to it.

### 4.2 Count C: March 20, 2023

With respect to Count C, Plaintiffs argue that constitutional violations occurred when "Evans entered and searched the Robinson-Tomlinson home, and Garrido and Orlando failed to intervene." ECF No. 64 at 5. Specifically, Plaintiffs point to the fact that all three officers knew about the swatting history of the home, the fact that the call came not through 911 and was made through a Virtual Protected Network, which "disguise[es] the user's identity," and the fact that the details of the call

were not corroborated upon the officers' arrival. *Id.* at 12–13 (citation omitted). Plaintiffs contend that Evans, therefore, violated Plaintiffs' constitutional rights by searching the home, and Garrido and Orlando violated their constitutional rights by failing to intervene. *Id.* at 13.

Defendants respond by arguing that Evans, Garrido, and Orlando are entitled to qualified immunity. ECF No. 71 at 11. Once more, the Court will begin the qualified immunity analysis by assessing whether each of these Defendants committed a constitutional violation and, if so, whether the constitutional right at issue was clearly established.

### 4.2.1 Evans

First, the analysis here is quite similar to the analysis performed above, the crux of it being whether—in the absence of a warrant—probable cause and exigent circumstances existed such that Evans was justified in his search of the house and Garrido and Orlando were justified in not stopping him.

At the time of the contested search, Evans knew that a call had come in through a suicide hotline claiming to be Tomlinson and reporting that "he had shot his mother, was demanding $50,000, and would shoot anyone who approached the home." ECF No. 65 at 9. The home was flagged by dispatch as a swatting risk, and all of the responding officers were aware of the home's swatting history. By the time of the incident challenged in Count C, the home had been swatted no less than nineteen times. Evans had spoken to Tomlinson, the purported perpetrator of the shooting, and therefore had information about his demeanor available to him. Pocernich, acting Lieutenant at the time, told Evans it was a swatting address and advised him not to go inside.

That knowledge, in the Court's view, does not give rise to probable cause to search or exigent circumstances. Given the minimum nineteen prior false calls, it was highly unlikely that any crime had occurred here at all, much less the crime described on the call, nor that any exigent circumstances existed. The source was questionable to begin with, and when police arrived, they spoke by phone to a decidedly not murderous Tomlinson, who was also no longer demanding $50,000. All of these factors undermined any belief Evans might have had of probable cause and exigent circumstances. The Court thus finds his entry unconstitutional.

With respect to whether the right in question was clearly established, the Court directs the parties to the overview of cases provided *supra* Section 4.1.1. The Supreme Court and Seventh Circuit simply have not provided confirmation of precisely how 911 calls are meant to be weighed against other factors tending to disprove the reliability of that call.

*Richardson*, the most analogous case to what Plaintiffs have faced here, drives home the unsettled state of the law. In that case, there had been one false call a week prior to the call at issue in the case. 208 F.3d at 628. Ultimately, the Seventh Circuit said it was a "close case," but nonetheless held that exigent circumstances could have been found to justify police's warrantless entry. *Id.* at 629–30. That case has important factual distinctions to the one at issue here. In *Richardson*, there had been just one false prior call, and in the call at issue, the caller identified himself, gave some basis for his knowledge, and gave predictive information, describing precisely where in the house the victim could be found. *Id.* at 628. The Seventh Circuit did not thoroughly discuss how those factors weighed into its decision to allow warrantless entry based on a 911 call alone. But ultimately, the Seventh Circuit made two relevant statements. First, it said that "911 calls

reporting an emergency can be enough to support warrantless searches under the exigent circumstances exception, particularly where, as here, the caller identified himself." *Id.* at 630. Second, it "d[id] not exclude the possibility of a case in which it would be objectively unreasonable for a police officer to rely on a 911 call, because of additional information available to the officer." *Id*. at 631. This combination of statements strongly supports a finding of illegality in the instant case. But it does not make an affirmative statement *confirming* the illegality of the current situation. *See Finch*, 38 F.4th at 1240 (citing *Cortez*, 478 F.3d at 1114–15). With no other case providing such a confirmatory statement, qualified immunity must apply.

However, the Court notes that Evans represents an even closer call than Plevak and Switzer in Count A. Acting Lieutenant Pocernich explicitly told Evans that this was a swatting address and that he should not enter the house. "A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place." *BeVier*, 806 F.2d at 128. Here, Evans closed his eyes to the views expressed by his superior officer. It is hard to imagine that Pocernich's statement does not obviate probable cause and exigent circumstances, but again, because the Supreme Court and Seventh Circuit have not expressly instructed officers on how statements like Pocernich's should be weighed against 911 calls—which have been afforded substantial deference in the law, *Drake*, 456 F.3d at 775—the Court cannot say it was clearly established that Evans' conduct was a constitutional violation.

### 4.2.2    Garrido and Orlando

The Court turns to the failure to intervene claim raised against Garrido and Orlando. "An officer who is present and fails to prevent other law enforcement officers from infringing constitutional rights of citizens" can be liable under § 1983 for failing to intervene "if that officer had reason to know . . . that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (citations omitted). In order for liability to exist in a failure to intervene case, "an officer must know that a citizen's rights are being infringed." *Doxtator v. O'Brien*, 39 F.4th 852, 864–65 (7th Cir. 2022).

Garrido and Orlando were on the porch with Evans during this incident. After Evans announced "Alright, yeah we gotta come in. We gotta come in. We can't really wait," Garrido and Orlando had the time it took for Robinson to hand the phone to Evans and for Evans to hand the phone to Garrido to intervene.

But baked into the failure to intervene standard is a "reason to know" requirement. *Yang*, 37 F.3d at 285. And insofar as the Court just found that Evans' constitutional violation was not clearly established, Garrido and Orlando cannot be held to account for not knowing a constitutional violation was occurring. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("If the law at that time was not clearly established, an official could not . . . fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.").

### 4.3    Count E: April 12, 2023

Plaintiffs allege that, on April 12, 2023, while Petersen and Evans were allowed to approach their house for purposes of pursuing a

consensual encounter, the officers impermissibly exceeded their implicit license to seek a consensual interaction when they refused to leave. ECF No. 64 at 13. Second, Plaintiffs allege that Petersen and Evans unreasonably seized them by forcing them to come outside. *Id*. With respect to both of these violations, Plaintiffs allege that no exigent circumstances existed. *Id*.

Defendants make two primary arguments in response. First, they argue that the limited seizure was a reasonable step to dispel the allegations in the 911 call. ECF No. 71 at 13–14. Second, they argue that qualified immunity applies. *Id.* at 14. They assert that a search cannot be found here, as Evans and Petersen did not approach the house for purposes of "gathering evidence against the property owner," but instead approached for the limited purpose of dispelling the allegations contained in the 911 call. *Id*. "Taking the limited step of ordering the occupant of the home to show themselves, even after being told to leave by one of the other occupants," they argue, "does not violate clearly established case law." *Id*.

The two allegations can be addressed together, because if probable cause (or, perhaps, reasonable suspicion) and exigent circumstances existed, the officers would not have had to leave the porch and likely would have been justified in a brief seizure of Plaintiffs.

Here, as above, the officers here did not have probable cause to believe a crime had occurred, nor did exigent circumstances exist. By April 12, 2023, Plaintiffs had been swatted over *two dozen times*. Petersen and Evans were notified of the swatting risk at this location by the CAD; indeed, the call was specifically demarcated as a "swatting related call." Beyond this, both knew about the swatting history, and Petersen had been there just the day before. The call reported that a man had shot his wife, but a passerby reported hearing no gunshots, and Petersen and Evans talked to

Robinson—the wife in question—through the porch camera. Petersen later admitted that, at the time, "he knew there wasn't an emergency."[8] ECF No. 65 at 15. In short, there was no real reason to believe that any crime had occurred nor that any exigent circumstance existed. And Tomlinson had clearly told the officers to leave. In light of these facts, Evans and Petersen exceeded their implicit license and illegally seized Robinson by requiring her compliance, going so far as to attempt to kick down Plaintiffs' door. And once more, to the extent Defendants try to make an argument rooted in reasonable suspicion, none can be found here: it is not commonsensical whatsoever to believe that after over two dozen false calls, Tomlinson suddenly developed violent tendencies and shot Robinson, who was thereafter able to talk clearly and coherently to officers. *See Wardlow*, 528 U.S. at 125 (noting that reasonable suspicion requires "commonsense judgments and inferences about human behavior").

Although the constitutional violation here is clear, the law was not clear at the time of the violation. The case law surveyed *supra* Section 4.1.1 includes no statement from either the Supreme Court or the Seventh Circuit on how this type of case was meant to be handled. Insofar as the officers could not have been expected to know that they lacked probable cause, exigent circumstances, or even reasonable suspicion, they cannot be expected to know that they should have left the curtilage when consent was revoked, nor can they be expected to know that their brief seizure was unlawful.

Plaintiffs raise but do not meaningfully develop a failure to intervene claim aside from putting it in the title portion of Count E. ECF No. 42 at 32;

---

[8]The Court understands the term "knew" here to be in the colloquial sense of strongly believing, rather than in the absolute sense of actual knowledge.

*see also* ECF No. 64 at 13–14 (Plaintiffs' brief not discussing failure to intervene claim under Count E). The Court will consider that claim abandoned and will therefore dismiss it. *See Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003) ("[B]ecause [the plaintiff] failed to delineate his negligence claim [in summary judgment briefing], his negligence claim is deemed abandoned." (collecting cases)).

### 4.4    Count F: April 17, 2023

Plaintiffs allege that, on April 17, 2023, Evans "violated the Fourth Amendment by refusing to leave [Plaintiffs'] constitutionally protected curtilage and by forcing Robinson to show herself through the door." ECF No. 64 at 14. First, they contend that Evans "violated his implicit license to seek a consensual interaction by refusing to leave the porch when he was told to do so." *Id*. Second, they allege that Evans seized Plaintiffs by forcing them to answer the door, in particular when Evans threatened to kick the door down and told Plaintiffs he wasn't leaving because he needed to see Robinson. *Id*. With respect to both of these claims, they argue that exigent circumstances did not exist. *Id*.

Defendants first contend that no seizure occurred at all. ECF No. 71 at 15. They argue that Tomlinson started and engaged in an argument with Evans of his own free will, with no attempt by Evans to restrict Tomlinson's movements. *Id*. Robinson, they contend, merely "assumed" she had to make an appearance and therefore did so. *Id*. Defendants argue that neither was forced to exit their home. *Id*. Second, Defendants argue that even if a limited seizure occurred, it was reasonable because it was minimally intrusive. *Id.* at 15–16. Finally, Defendants argue Evans is entitled to qualified immunity because he did not arrive with the purpose of

conducting a search. *Id*. at 16. Instead, his behavior was merely oriented around verifying that Robinson was unharmed. *Id*.

Turning to the first prong of the qualified immunity analysis, the Court begins by assessing whether Evans "violated the Fourth Amendment by refusing to leave Robinson and Tomlinson's constitutionally protected curtilage." ECF No. 64 at 14. As note *supra*, police, like any other visitor, may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. This "implicit license" to seek a consensual encounter is based upon the "habits of the country." *Id.* (quoting *McKee v. Gratz*, 260 U.S. 127, 136 (1922)). And of course, just as any other person, without justification for their intrusion, police must honor a person's revocation of consent. *United States v. Dyer*, 784 F.2d 812, 816 (7th Cir. 1986) ("Clearly a person may limit or withdraw his consent to a search, and the police must honor such limitations.").

Here, the Court agrees that Evans violated his implicit license to seek a consensual encounter when he stayed on the porch after being told by Tomlinson to leave. At the point when Officer Vento called Robinson and Evans knocked on the door, the interaction had all the trappings of a consensual encounter and raised no concern. But when Tomlinson said, unequivocally, "Go the fuck away," ECF No. 65 at 17, Evans' implicit license to remain on the curtilage ended. Defendants argue that "*Jardines* is limited in scope and does not establish that, when responding to a dispatched report of a violent crime, even with information that dispatch may be false, an officer is required to leave the porch as soon as the occupant of the home requests." ECF No. 73 at 8. True enough, *Jardines* did not confront that issue. But the right of people to revoke consent in the

Fourth Amendment context is otherwise well-established. "Clearly a person may limit or withdraw his consent to a search, and the police must honor such limitations." *Dyer*, 784 F.2d at 816; *see also United States v. Jachimko*, 19 F.3d 296, 299 (7th Cir. 1994). Of course, "police officers do not act unreasonably by failing to halt their search every time a consenting suspect equivocates." *United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 820 (7th Cir. 2013). But here, "Go the fuck away," was unequivocal. Any "reasonable officer" would have understood that Tomlinson was withdrawing his consent. *Id.* at 820–21.

So if, in the general sense, individuals have the right to revoke their consent and officers must leave when such revocation happens, the only way Evans could have stayed was if, under the facts as they presented themselves to him, probable cause and exigent circumstances existed. Again, the Court does not find that either existed. This was at least the thirtieth swatting at the home. Evans had been instructed by his captain not to go into the home again. The 911 caller had reported that a man had killed his wife and was going to kill his child, but it does not appear from the record that any children lived in Plaintiffs' home—a home Evans had visited multiple times before and knew well. Dispatch noted three times that the call was a swatting risk. All of these factors call for only one conclusion: it was unreasonable for Evans to believe that overstaying his welcome was justified by the risk of imminent harm. A constitutional violation therefore occurred by Evans remaining within the curtilage after Tomlinson revoked his consent.

The question, therefore, is whether this was clearly established as a violation. That is, with a 911 call on the one hand and the multiple factors indicating the absence of imminent danger on the other, was it clearly

established that Evans remaining on the property was a constitutional violation? Again, the Court cannot say "yes"—not with the weight of cases like *Richardson*, *Bruce*, *Hicks*, *Reardon*, and *Hanson* looming overhead. Given the confusing morass of law regarding the capacity for 911 calls to generate probable cause, exigent circumstances, or reasonable suspicion on their own, it simply was not clear that a 911 call could not be enough. Indeed, in *Richmond*, the Seventh Circuit analyzed a search of a home's curtilage and found it permissible in part because an "imminent safety threat existed." *Richmond*, 924 F.3d at 415. Though ultimately the Court is not convinced that any imminent safety threat could reasonably have been found here, this law was simply not confirmed.

From here, the Court must address Plaintiff's second argument—that an illegal seizure of Robinson occurred. Seizures of a person require either the application of "physical force" or "*submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis in original). The latter is at issue here and "involves either voluntary submission to a show of authority or the termination of freedom of movement." *Torres v. Madrid*, 592 U.S. 306, 322 (2021).

Under the circumstances presented, the Court concludes that there was no seizure in what Plaintiffs describe as Evans "forcing Robinson to show herself through the door." ECF No. 64 at 14. The parties' statement of undisputed facts is clear:

> When asked why she came to the top of the stairs, Robinson stated, "In this one, I think I heard [Tomlinson] yelling at him or something, and I just figured that I had to make an appearance." When Robinson came to the stairwell, she assumed [Tomlinson] was arguing with someone from the [MPD], but wasn't sure it was the police at the door.

ECF No. 65 at 18 (internal citations omitted).

The fact that Evans told Tomlinson that he would not leave until Robinson showed herself is irrelevant because Robinson was not aware of the exchange. Her decision to show herself was not a submission to a show of authority. It may well have been based upon her past interactions with police—which is understandable—but the Court is aware of no authority stating that showing oneself on the expectation that one may likely be asked to do so by police is tantamount to actually being made to do so by police. Indeed, the Supreme Court has been clear that in order for a seizure to exist, the purported compliance must "occur[] in response to authority." *Brendlin v. California*, 551 U.S. 249, 255 (2007). And in *Sibron v. New York*, the Supreme Court—in response to a case in which an officer told an individual to come outside and the individual did—could not determine whether a seizure had occurred because the record was "barren of any indication whether [the individual] accompanied [the officer] outside in submission to a show of force or authority which left him no choice, or whether he went voluntarily in a spirit of apparent cooperation with the officer's investigation." 392 U.S. 40, 63 (1968). Here, Robinson's actions look far more like cooperation rather than a response to an *actual* show of authority. Because there was no seizure, the Court need not turn to the second prong of the qualified immunity analysis.

Plaintiffs raise but do not meaningfully develop a failure to intervene claim aside from putting it in the title portion of Count F. ECF No. 42 at 34; *see also* ECF No. 64 at 14 (Plaintiffs' brief not discussing failure to intervene claim under Count E). The Court will consider that claim abandoned and will therefore dismiss it. *Palmer*, 327 F.3d at 597–98.

## 5. ANALYSIS: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on all counts as to all Defendants. ECF No. 70. They argue that, in all cases, Defendants did not violate Plaintiffs' constitutional rights or, alternatively, that Defendants are entitled to qualified immunity. *Id.* at 1. Because the Court addressed the claims against certain individual Defendants above, the Court will, in this section, only address those remaining claims against the remaining individual Defendants and the City.

### 5.1 Count A: August 11, 2022

Defendants address the following remaining Defendants in their motion for summary judgment: Hernandez, McCowan, and Tivnan. With respect to Hernandez, they argue, first, that he did not enter Plaintiff's home and, second, that he had no meaningful chance to intervene in Dudley's constitutional violation. ECF No. 71 at 6. With respect to McCowan and Tivnan, Defendants argue that these Defendants should be dismissed because they did not enter Plaintiffs' home and did not have a meaningful chance to intervene in Plevak and Switzer's constitutional violation. *Id.* at 7. In any event, Defendants allege that all of these Defendants are entitled to qualified immunity. *Id.* at 8–9.

Plaintiffs respond that the Court should not grant summary judgment as to Hernandez, because "[a] jury could find that Hernandez had ample opportunity to prevent Dudley from violating Plaintiffs' rights" and that Hernandez, when he left the backyard, should have told Dudley to do the same. ECF No. 72 at 14. With respect to McCowan and Tivnan, Plaintiffs argue that "[a] jury could find they knew a constitutional violation was occurring and had opportunity to intervene." *Id*. Specifically, they note that

nothing in the record affirmatively shows that McCowan and Tivnan could not have heard what was going on from the sidewalk.[9] *Id.* at 14–15.

### 5.1.1 Hernandez

The Court begins with Hernandez, undertaking a qualified immunity analysis and concluding that no constitutional violation occurred. Dudley did not give any signal that he was planning to open the cellar door. A failure to intervene claim requires a "reasonable opportunity to intervene to prevent the harm from occurring." *Yang*, 37 F.3d at 285 (internal citations omitted). But, here, Hernandez had "no reason to think" Dudley would open the cellar door. *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014). Dudley gave no signal and conveyed no message that he planned to do so. Plaintiffs do not meaningfully explain how Hernandez was supposed to know what Dudley was going to do, nor how Hernandez was supposed to stop it once it began, given how brief the cellar intrusion was. On these facts, no jury could find that Hernandez was supposed to stop something he did not know and could not have known was going to happen and had very little time to stop. Hernandez committed no constitutional violation, so the Court need not reach the second prong of qualified immunity.

To the extent Plaintiffs seek to hold Hernandez accountable for not telling Dudley to leave the backyard when he did so himself, ECF No. 72 at

---

[9]Plaintiffs bring their failure to intervene claim against Plevak, Hernandez, Switzer, McCowan, Tivnan, and Dudley. ECF No. 42 at 26. Though Defendants only address Hernandez, McCowan, and Tivnan—for reasons the Court finds understandable and logical, given the fact that Plevak, Switzer, and Dudley directly committed the constitutional violations—the Court's logic in addressing the failure to intervene claim will apply equally to all of these Defendants. As such, the failure to intervene claim with respect to all individual Count A Defendants will be dismissed.

14, the Court directs the parties' attention to the analysis provided in Section 4.1.1. The violation would not have been established in the first instance, so the Court will not impose on Hernandez the expectation to have told Dudley to leave the curtilage.

### 5.1.2  McCowan and Tivnan

As to McCowan and Tivnan, the Court finds that any factual dispute as to what they heard or did not hear is ultimately irrelevant. As the Court explained *supra* Section 4.1.2, although Plevak and Switzer ultimately did commit a constitutional violation, this violation would not have been clearly established at the time of the offense. The purpose of qualified immunity is to "ensur[e] that officials can reasonably . . . anticipate when their conduct may give rise to liability for damages." *Reichle*, 566 U.S. at 664 (2012) (internal quotation marks and citation omitted). An officer cannot anticipate liability when the violation was not clear—that is, when it may have been debatable. So even if McCowan and Tivnan had heard of Plevak and Switzer's plan to search the home, they would not have been expected to stop it. *See, e.g., Gill*, 850 F.3d at 342 (failure to intervene claims failed where plaintiff's right to be free from certain interrogation tactics was not clearly established at the time).

### 5.2  Count B: October 1, 2022

As a brief reminder, on this swatting occasion, Tactical Enforcement Unit officers Helwer, Terriquez, Warwick, and Rupnik, as well as District 1 officer Mustafa, responded to the call. The caller had reported that they had shot their wife with a shotgun. A CAD note described the address as being associated with an unfounded call. Someone reported over the radio that there was a history of swatting at the address. Upon arrival, Helwer, Terriquez, and Rupnik approached the home and told Robinson, who was

home alone, to come out with her hands up. Thereafter, Rupnik, Helwer, and Warwick searched the home, while Terriquez and Mustafa remained on the porch with Robinson.

Defendants allege that all of these Defendants are entitled to qualified immunity. ECF No. 71 at 9. Moreover, they allege that the limited search and seizure of Robinson were reasonable under the emergency aid doctrine. *Id.*

Plaintiffs respond. First, they assert that Defendants have raised no dispute that these Defendants saw the CAD note or heard the radio report and therefore knew the general contours of the address's history. ECF No. 72 at 15. Assuming these facts are true, Plaintiffs argue that they are entitled to summary judgment because the 911 call was so heavily belied by Defendants' observations upon arrival that they had no reason to seize Robinson or search the home. *Id.* at 15–16. Moreover, Plaintiffs expressly dispute any analogy to medical emergency cases, arguing that the contours of the right at issue are clear. *Id.* at 16–17. Finally, and relatedly, Plaintiffs argue that qualified immunity does not apply, because probable cause did not exist once the details of the call were not corroborated. *Id.* at 17.

As to the initial seizure, at the summary judgment phase, the Court draws all reasonable inferences in favor of the non-moving party. *Poer v. Astrue*, 606 F.3d 433, 439 (7th Cir. 2010) (citing *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)). For this Count, that party is Plaintiffs, and the Court finds it reasonable to infer that the officers saw the CAD note and heard the radio report. As a result, the Court infers that these officers knew about the house's history. Assuming the officers *were* aware of the CAD report and the radio report, they would have approached the house armed with far more knowledge than police normally have—knowledge that

would have indicated that unless there was *something* corroborating the call, this was in all likelihood another swatting incident. It would ultimately be for a jury to decide what knowledge the officers had when responding and accordingly whether a constitutional violation occurred in their seizure of Robinson. But the Court, at this juncture, is not prepared to find no constitutional violation occurred (as Defendants request).[10]

As to the search, the Court is prepared to find a constitutional violation regardless of whether the officers knew of the swatting history when they arrived. The report was of a wife shot by her husband. Robinson, the wife, exited the home clearly not shot. Unlike *Hanson*, where certain domestic disturbances or subtler injuries are difficult to resolve upon a cursory physical review of the individual, whether or not someone has been shot is easily resolvable. And unlike *Sutterfield* and *Bruce*, Robinson's assurances that all was well carry more weight since they were backed up by her unharmed appearance, whereas assertions of mental stability are by nature harder to prove. But even more significant is the fact that Robinson definitively told officers about the swatting history while speaking to them on the porch. By the time of the actual search, Rupnik, Helwer, and Warwick knew of the swatting history, putting them in the same positions as earlier Defendants with respect to whom the Court found constitutional

---

[10]Because there is a factual dispute as to whether these officers saw the CAD note or heard the radio report, the Court will not, as Plaintiffs request, ECF No. 72 at 15–16, grant summary judgment for Plaintiffs. Instead, the Court will merely find that it cannot say that no constitutional violation occurred. And in any event, as the Court describes *infra*, whether a constitutional violation occurred is ultimately irrelevant to its determination of individual liability here, as any violation would not have been clearly established and is therefore dismissed on qualified immunity grounds.

violations. This swatting history made it even more unlikely that there was a shooter or a shot person in the home, undermining probable cause.

The emergency aid doctrine "recognizes that a warrantless entry into the home may be appropriate when police enter for an urgent purpose other than to arrest a suspect or to look for evidence of a crime." *Sutterfield*, 751 F.3d at 557 (collecting cases). The ultimate question is "whether the police, given the facts confronting them, reasonably believed that it was necessary to enter a home in order to 'render assistance or prevent harm to persons or property within.'" *Id.* at 558 (quoting *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1244 (7th Cir. 1994)). For the emergency aid exception to apply under the facts here, the officers would have had to assume that the shooter shot someone other than his wife, but lied and reported that he had shot his wife, or that the shooter allowed Robinson out of the house but somehow still planned to shoot her such that police needed to go in. In truth, the Court is skeptical that officers sincerely believed anything of this sort. Instead, their actions look more like a perfunctory, reflexive application of a 911-call-equals-probable-cause-and-exigent-circumstances principle which, while understandable, is not a principle this Court is prepared to adopt. Thus, in the absence of probable cause or exigent circumstances, the Court finds a constitutional violation in Rupnik, Helwer, and Warwick searching the home.

Still, the Court cannot say that it was clearly established that either the seizure—even if the officers knew of the home's history—or the search was illegal. As already explained multiple times, the Supreme Court and Seventh Circuit had not, at the time of this incident, provided clear guidance on exactly when 911 calls would *not* be enough to establish probable cause or exigent circumstances. Certainly, cases identified factors

tending to make a 911 call alone sufficient—the caller identifying himself, the call being traceable, the call giving predictive information—but none of those cases grappled with when competing information would make an otherwise "identified" 911 call (insofar as the caller claimed to be Tomlinson) insufficient. As such, the Court is constrained to find that qualified immunity applies.

By extension, the Court must dismiss the failure to intervene claims against Helwer, Terriquez, Warwick, Rupnik, and Mustafa. Since the search and seizure were not clearly established as illegal, the Court cannot find a constitutional violation in these Defendants' failure to know that a constitutional violation was happening.

### 5.3 Count D: April 11, 2023

By the fourth swatting call of the day on April 11, 2023, Plaintiffs had been swatted around 26 times. District 1 Sergeant Scheuring and officers Carleton, Lee, Garrido, Becker, and Williams responded. Someone claiming to be a teenager had texted the suicide hotline saying that they had killed their parents and were going to kill themselves. Dispatch flagged the house as a swatting risk. Carleton spoke to Tomlinson and Robinson through the porch camera, insisting that Robinson show herself. Robinson came downstairs, while the remaining officers stood on various parts of the lawn. When asked by Scheuring, Robinson confirmed that no one was shot or injured. Robinson denied them access to the house. Tomlinson then arrived home, yelled at the officers, and was briefly detained. The officers then left. No officer went into the home.

Defendants argue that summary judgment is appropriate here. ECF No. 71 at 12. First, they argue that the limited seizure of Robinson was justified. *Id*. They critique Robinson's lack of cooperation with officers, but

ultimately, their argument seems to hinge on the fact that Robinson was never put in handcuffs or removed from the scene. *Id*. This limited seizure, they contend, was reasonable to confirm that the call was false. *Id*. Second, they say that Lee, Garrido, Becker, Williams, and Scheuring did not fail to intervene because there was no underlying constitutional violation. *Id*. at 13. Finally, they argue that these officers are entitled to qualified immunity for their actions, analogizing the limited seizure to the one permitted in *Bruce* and noting the inherent danger in responding to a call reporting a violent crime. *Id*. They further contend that, based on *Hanson*, officers were not required to leave upon Robinson's over-the-camera assertion that everything was fine. *Id*.

Plaintiffs respond, arguing that it is undisputed that each involved officer was aware of the swatting history when they arrived at the house or, at the very least, that Carleton and Becker were. ECF No. 72 at 18–19. As such, Plaintiffs argue that they are entitled to summary judgment with respect to Carleton and Becker, because the combination of their awareness of the house's history and the dubious nature of the emergency report meant there was no probable cause of a crime or reasonable belief in an exigency. *Id*. at 19. Plaintiffs point to several cases—*Reardon*, *Bruce*, and *Richardson*—that they say place the officers' response beyond the pale of possibly reasonable responses and therefore argue that qualified immunity is inapplicable. *Id.* at 19–20. Finally, as to Lee, Garrido, Williams, and Scheuring, Plaintiffs argue that Defendants' motion for summary judgment should be denied because these officers knew a constitutional violation was occurring and had an opportunity to intervene. *Id.* at 20.

Again, at summary judgment, the Court draws all reasonable inferences in favor of the nonmoving party. *Poer*, 606 F.3d at 439 (citing

*Magin,* 420 F.3d at 686). For this Count, that party is Plaintiffs, and the Court finds it reasonable to infer that the officers were aware of the house's swatting history when they arrived; as Plaintiffs point out, there is certainly circumstantial evidence to support such a reasonable inference, ECF No. 72 at 18–19. And when the Court infers that the officers knew of the swatting history, the Court cannot definitively conclude that no constitutional violation occurred. Between the 26 prior swatting calls, the fact that officers familiar with the home would know whether a teenager even lived there, and the fact that Robinson and Tomlinson spoke clearly and coherently through the porch camera—which would have been difficult to do had they been dead—a jury could find a constitutional violation occurred. [11]

But ultimately, the Court need not resolve whether the officers did or did not know of the swatting history here. The end result is the same because of qualified immunity. As discussed in depth *supra* Section 4.1.1, the law surrounding responding to emergency reports was not clearly established at the time of the incident. So even if Carleton knew about the history of swatting, it would not have been clearly established that his seizure of Robinson was illegal. By extension, Scheuring, Lee, Garrido, Williams, and Becker cannot be held liable for failure to intervene. *See, e.g., Gill*, 850 F.3d at 342 (failure to intervene claims failed where plaintiff's right

---

[11]Again, because there is a factual dispute as to whether these officers knew of the house's history upon arrival, the Court will not, as Plaintiffs request, ECF No. 72 at 18–19, grant summary judgment for Plaintiffs. Instead, the Court will merely find that it cannot say that no constitutional violation occurred. And in any event, as the Court describes just below, whether a constitutional violation occurred is ultimately irrelevant to its determination of individual liability here, as any violation would not have been clearly established and is therefore dismissed on qualified immunity grounds.

to be free from certain interrogation tactics was not clearly established at the time).

### 5.4 *Monell* Claims

Plaintiffs assert, with respect to each count in the operative complaint, that the alleged constitutional violations occurred as a result of the City's failure to adequately train or supervise its officers and/or its failure to implement any policy or procedure to protect Plaintiffs from the alleged violations.[12] ECF No. 42 at 26, 28, 29–30, 31, 33, 34. In explaining *Monell* liability, the Seventh Circuit has said:

> A municipality may not be held liable under § 1983 based on a theory of respondeat superior or vicarious liability. . . . A municipality only may be held liable under § 1983 for constitutional violations caused by the municipality itself through its own policy or custom. . . . Although a municipality may be directly liable for constitutional violations by its officers when the municipality evinces a deliberate indifference to the rights of the plaintiff by failing to train adequately its officers to prevent the violation, there can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights.

*Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (citations omitted). As to a failure to implement an appropriate policy or procedure, the Supreme Court has said, "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990) (citing *Avery v. County of Burke*, 660 F.2d 111, 114 (4th Cir. 1981); *Murray v. City of Chicago*, 634 F.2d 365, 366–67 (7th Cir.

---

[12]The *Monell* claims are not demarcated as a standalone count in the operative complaint but instead are asserted as an additional theory of liability for each count. *See generally* ECF No. 42. In their briefing, however, the parties seem to accept this standalone organization, so the Court adopts it for purposes of the instant summary judgment motions.

1980)). Similarly, in *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293 (7th Cir. 2010), the Supreme Court said that "in situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable." *Id.* at 303. Importantly, municipalities do not enjoy absolute or qualified immunity from § 1983 suits. *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166 (1993).

Defendants' argument in favor of summary judgment with respect to Plaintiffs' *Monell* claims against the City is fairly cursory. Because there were no constitutional violations, they argue, Plaintiffs' *Monell* claims must be dismissed. ECF No. 71 at 16.

Plaintiffs respond, arguing that the motion for summary judgment should be denied, first because there were constitutional violations here. ECF No. 72 at 24. Second, Plaintiffs point out that municipalities are not entitled to qualified immunity, so even if the *Monell* claims against certain Defendants were dismissed, it does not follow that the claims against the City must also be dismissed. *Id*. Finally, Plaintiffs argue that even if a Defendant is dismissed for lack of background knowledge, it does not follow that the City is off the hook. *Id*. They highlight that Plaintiffs "made their plight known to top-level policymakers before the conduct in Count A" and argue that "[i]f summary judgment is granted in favor of any of the Defendants because the City . . . failed to make them aware of the constant swatting at the Robinson-Tomlinson home, then the City's policies or lack of policy, training, supervision, or discipline could have caused a constitutional violation without the person-Defendant being also liable." *Id.* at 25. More generally, Plaintiffs contend that Defendants' argument was so cursory and underdeveloped that it should be dismissed outright as

"forfeited, if not waived." *Id.* (citing *Felton v. Brown*, 129 F.4th 999, 1010 (7th Cir. 2025)).

Defendants later clarified that they only seek summary judgment to the extent that the Court finds that no constitutional violation occurred with respect to a given Count. ECF No. 73 at 9.

So, the Court's only task for summary judgment purposes is to determine whether constitutional violations have occurred or if there is a genuine dispute of material fact as to whether constitutional violations have occurred, as Defendants do not move for summary judgment with respect to Plaintiffs' *Monell* claims on any ground other than that.[13] And the Court has been clear:

---

[13]The Seventh Circuit has not squarely addressed whether a *Monell* claim may proceed where individual claims have been dismissed on the basis of qualified immunity, but where the court has otherwise found that a constitutional violation occurred or could have occurred. However, there is case law generally indicating that the Seventh Circuit does not require that a right be "clearly established" before a municipality may be held liable for a violation of it, such that the Court is comfortable inferring that a *Monell* claim can survive dismissal of individual claims based on qualified immunity.

In *Glisson v. Indiana Department of Corrections*, 849 F.3d 372 (7th Cir. 2017) (en banc), the plaintiff challenged a prison system's failure to establish protocols to care for inmates with chronic diseases. *Id.* at 382. The plaintiff argued that this failure led to violations of his constitutional rights, but he did not allege that any individual medical provider was deliberately indifferent to a serious medical need. *Id.* at 378. The court, in assessing the case, did not consider clearly established rights at all. *Id*. Nonetheless, the Seventh Circuit found that there was enough evidence to submit the plaintiff's *Monell* claim to a jury. *Id.* at 380–82; *id.* at 378 ("[T]his case well illustrates why an organization might be liable even if its individual agents are not.").

In *Thomas*, 604 F.3d 293, the Seventh Circuit discussed *Los Angeles v. Heller*, 475 U.S. 796 (1986). In discussing that case, the court said,

> If, for instance, the officer had pled an affirmative defense such as good faith, then the jury might have found that the plaintiff's constitutional rights were indeed violated, but that the officer could not be held liable. In that case, one can still argue that the City's

- Count A: The Court finds that Dudley committed an unconstitutional search. The Court finds the Plevak and Switzer committed an unconstitutional seizure and an unconstitutional search. None of these violations was clearly established, and thus, both the search and the seizure claims must be dismissed on the basis of qualified immunity. With respect to all Defendants named in

---

policies caused the harm, even if the officer was not individually culpable.

*Id.* at 304. The *Thomas* court rejected the municipal defendant's argument that "it cannot be held liable under *Monell* because none of its employees were found to have violated [the plaintiff's] constitutional rights." *Id.* And *Thomas*, even more than *Glisson*, implies that the Seventh Circuit would permit a *Monell* claim to proceed where individual claims have been dismissed for qualified immunity. *Id.* at 305 ("[A] municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." (citations omitted)).

In fact, there is at least one case in which the Seventh Circuit has fully analyzed *Monell* liability *after* dismissing individual defendants on qualified immunity grounds. *Calderone v. City of Chicago*, 979 F.3d 1156, 1163–65. (7th Cir. 2020). The Seventh Circuit in *Calderone* "bypass[ed] the constitutional question" and did not decide whether the facts illustrated a constitutional violation. *Id.* at 1163.

For what it is worth, the remainder of the circuits are split on the matter. Legal scholar Joanna C. Schwartz describes the state of the law as follows:

Two circuits—the Ninth and Eleventh—have ruled that a *Monell* failure-to-train claim can proceed even if the individual officers received qualified immunity. Four circuits—the First, Fifth, Sixth, and Eighth—have adopted backdoor municipal immunity. Different panels of the Second and Tenth Circuits have ruled both ways. The issue has not squarely been addressed by the remaining circuits.

Joanna C. Schwartz, *Backdoor Municipal Immunity*, 132 YALE L.J. FORUM 136, 139 (2022) (internal citations omitted).

Count A—Plevak, Hernandez, Switzer, McCowan, Tivnan, and Dudley—the Court finds that the failure to intervene claim must be dismissed for lack of a clearly established constitutional violation.

- Count B: With respect to Helwer, Terriquez, and Rupnik, the Court finds that disputes of fact preclude determining whether a constitutional violation occurred in their seizure of Robinson, because their knowledge is unclear. With respect to Rupnik, Helwer, and Warwick, the Court finds that they committed a constitutional violation in their search of the home. Any such violation or potential violation, however, was not clearly established, and thus, both the search and the seizure claims must be dismissed on the basis of qualified immunity. With respect to all Defendants named in Count B—Helwer, Terriquez, Warwick, Rupnik, and Mustafa—the Court finds that the failure to intervene claim must be dismissed for lack of a clearly established constitutional violation.

- Count C: The Court finds that Evans committed a constitutional violation in searching Plaintiffs' home. This violation was not clearly established, and thus, the claim must be dismissed on the basis of qualified immunity. With respect to all Defendants named in Count C—Evans, Garrido, and Orlando—the Court finds that the failure to intervene claim must be dismissed for lack of a clearly established constitutional violation.

- Count D: With respect to Carleton, the Court finds that disputes of fact preclude determining whether a constitutional violation occurred in his seizure of Robinson, because his knowledge is unclear. Any such violation, however, was not clearly established, so the claim must be dismissed on the basis of qualified immunity. With

respect to all Defendants named in Count D—Carleton, Lee, Garrido, Becker, Williams, and Scheuring—the Court finds that the failure to intervene claim must be dismissed for lack of a clearly established constitutional violation.

- Count E: The Court finds that Evans and Petersen committed a constitutional violation by exceeding their implicit license and seizing Robinson. This violation was not clearly established, so both claims must be dismissed on the basis of qualified immunity. With respect to both Defendants named in Count E—Evans and Petersen—the Court finds the failure to intervene claim abandoned and therefore will dismiss it.

- Count F: The Court finds that Evans committed a constitutional violation by exceeding his implicit license. This violation was not clearly established, so the claim must be dismissed on the basis of qualified immunity. The Court finds that Evans did not seize Robinson, so that claim must also be dismissed. The Court finds the failure to intervene claim abandoned and therefore will dismiss it.

With this framing in mind, Defendants' motion for summary judgment will be granted with respect to all individual claims but denied as to all *Monell* claims, except for the *Monell* claims premised on the individual failure-to-intervene claims and on Evans' alleged seizure of Robinson in Count F, for which the Court finds no constitutional violations and based on which no *Monell* claim can rest. *Thomas*, 604 F.3d at 304 (describing that a *Monell* claim cannot stand where there is definitively no underlying constitutional violation). Those latter *Monell* claims will be dismissed.

A chart will be helpful to clarify where each claim stands.

| Count | Individual Claims | *Monell* Claims |
|---|---|---|
| A | • Dudley—search: Dismissed on qualified immunity grounds<br>• Plevak and Switzer – seizure and search: Dismissed on qualified immunity grounds<br>• Plevak, Hernandez, Switzer, McCowan, Tivnan, and Dudley — failure to intervene: Dismissed for lack of constitutional violation | • Dudley—search: *Monell* claim survives<br>• Plevak and Switzer— seizure and search: *Monell* claim survives<br>• Plevak, Hernandez, Switzer, McCowan, Tivnan, and Dudley — failure to intervene: *Monell* claim dismissed |
| B | • Helwer, Terriquez, and Rupnik—seizure: Dismissed on qualified immunity grounds<br>• Rupnik, Helwer, and Warwick—search: Dismissed on qualified immunity grounds<br>• Helwer, Terriquez, Warwick, Rupnik, and Mustafa—failure to intervene: Dismissed for lack of constitutional violation | • Helwer, Terriquez, and Rupnik—seizure: *Monell* claim survives<br>• Rupnik, Helwer, and Warwick—search: *Monell* claim survives<br>• Helwer, Terriquez, Warwick, Rupnik, and Mustafa—failure to intervene: *Monell* claim dismissed |
| C | • Evans—search: Dismissed on qualified immunity grounds<br>• Evans, Garrido, and Orlando—failure to intervene: Dismissed for lack of constitutional violation | • Evans—search: *Monell* claim survives<br>• Evans, Garrido, and Orlando—failure to intervene: *Monell* claim dismissed |

| | | |
|---|---|---|
| D | • Carleton—seizure: Dismissed on qualified immunity grounds<br>• Carleton, Lee, Garrido, Becker, Williams, and Scheuring—failure to intervene: Dismissed for lack of constitutional violation | • Carleton—seizure: *Monell* claim survives<br>• Carleton, Lee, Garrido, Becker, Williams, and Scheuring—failure to intervene: *Monell* claim dismissed |
| E | • Evans and Petersen— exceeding implicit license: Dismissed on qualified immunity grounds<br>• Evans and Petersen— seizure: Dismissed on qualified immunity grounds<br>• Evans and Petersen— failure to intervene: Abandoned and therefore dismissed | • Evans and Petersen— exceeding implicit license: *Monell* claim survives<br>• Evans and Petersen— seizure: *Monell* claim survives<br>• Evans and Petersen— failure to intervene: *Monell* claim dismissed |
| F | • Evans—exceeding implicit license: Dismissed on qualified immunity grounds<br>• Evans—seizure: Dismissed for lack of constitutional violation<br>• Evans—failure to intervene: Abandoned and therefore dismissed | • Evans—exceeding implicit license: *Monell* claim survives<br>• Evans—seizure: *Monell* claim dismissed<br>• Evans—failure to intervene: *Monell* claim dismissed |

## 6. MOTION TO RESTRICT

Also before the Court is the parties' joint motion to restrict to case participants only certain documents—namely, Exhibit A through Exhibit QQ to the parties' Joint Statement of Facts for Summary Judgment. ECF No. 66. The parties request that the Court grant such restriction because "counsels are aware that [the harassing] group has been monitoring the

docket to search for additional information they can use to contact individuals involved in the case." *Id.* at 1. In addition, the harassing group has "used the docket to collect information and generate fake social media profiles where they pose as individuals involved in the case." *Id.* at 1–2.

Some of the documents sought to be restricted contain personal information about the parties. *Id.* at 2. Others "show the internal structure of the [MPD] and how the department responds to swatting calls, which could be dangerous if obtained by someone who wants to swat someone in Milwaukee." *Id*.

The Court may restrict public access to a document for "good cause." GEN. L.R. 79(d)(3). Here, the Court finds the "good cause" standard amply met. As such, the Court will grant the motion to restrict and direct that the documents subject to the motion—ECF Nos. 67-1 through 67-43—remain under case participant-only restriction until further order of the Court.

**7.    CONCLUSION**

For the reasons stated herein, the Court will deny Plaintiffs' motion for partial summary judgment. ECF No. 63.  It will grant Defendants' motion for summary judgment in part and deny it in part. ECF No. 70. The Court will dismiss all individual claims found in Counts A, B, C, D, E, and F. All such individual claims will be dismissed on qualified immunity grounds, except for: the individual failure-to-intervene claims in Counts A, B, C, and D, which are dismissed on the grounds that no clearly established constitutional violations occurred; the individual failure-to-intervene claims in Counts E and F, which are dismissed as abandoned; and the individual claim in Count F as to Evans' alleged seizure of Robinson, which is dismissed on the grounds that no constitutional violation occurred. The Court will, by extension, dismiss the *Monell* claims to the extent they

operate with respect to failure-to-intervene claims or with respect to the alleged seizure of Robinson in Count F. Finally, the Court will grant the joint motion to restrict. ECF No. 66.

Accordingly,

**IT IS ORDERED** that Plaintiffs Niki Robinson and Patrick Tomlinson's motion for partial summary judgment, ECF No. 63, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants the City Of Milwaukee, Lyndon Evans, Christian Garrido, Bradley Orlando, Nicole Plevak, Fidah Mustafa, Nathaniel Petersen, Sean Carleton, Joseph Scheuring, Lorenzo Hernandez, Dexter Lee, Andrew Dudley, Kelton McCowan, Matthew Helwer, Gregory Rupnik, Paul Terriquez, Kevin Becker, Devon Williams, Shawn Switzer, Patrick Tivnan, and Jason Warwick's motion for summary judgment, ECF No. 70, be and the same is hereby **GRANTED** to the extent that it operates with respect to (i) the individual claims found in Counts A through F, (ii) the *Monell* claims premised on the individual failure-to-intervene claims, and (iii) the *Monell* claim premised on Evans' alleged seizure of Robinson in Count F; Defendants' motion for summary judgment, ECF No. 70, be and the same is hereby **DENIED** to the extent that it operates with respect to the *Monell* claims not identified in (ii) and (iii);

**IT IS FURTHER ORDERED** that the individual Defendant claims found in Count A be and the same are hereby **DISMISSED** on qualified immunity grounds, except for the failure to intervene claim, which is **DISMISSED** on the basis of a lack of constitutional violation;

**IT IS FURTHER ORDERED** that *Monell* claim in Count A be and the same is hereby **DISMISSED** to the extent it operates with respect to the failure to intervene claim;

**IT IS FURTHER ORDERED** that the individual Defendant claims found in Count B be and the same are hereby **DISMISSED** on qualified immunity grounds, except for the failure to intervene claim, which is **DISMISSED** on the basis of a lack of constitutional violation;

**IT IS FURTHER ORDERED** that *Monell* claim in Count B be and the same is hereby **DISMISSED** to the extent it operates with respect to the failure to intervene claim;

**IT IS FURTHER ORDERED** that the individual Defendant claim found in Count C be and the same is hereby **DISMISSED** on qualified immunity grounds, while the failure to intervene claim is **DISMISSED** on the basis of a lack of constitutional violation;

**IT IS FURTHER ORDERED** that *Monell* claim in Count C be and the same is hereby **DISMISSED** to the extent it operates with respect to the failure to intervene claim;

**IT IS FURTHER ORDERED** that the individual Defendant claim found in Count D be and the same is hereby **DISMISSED** on qualified immunity grounds, while the failure to intervene claim is **DISMISSED** on the basis of a lack of constitutional violation;

**IT IS FURTHER ORDERED** that *Monell* claim in Count D be and the same is hereby **DISMISSED** to the extent it operates with respect to the failure to intervene claim;

**IT IS FURTHER ORDERED** that the individual Defendant claims found in Count E be and the same are hereby **DISMISSED** on qualified

immunity grounds, except for the failure to intervene claim, which is **DISMISSED** as abandoned;

**IT IS FURTHER ORDERED** that *Monell* claim in Count E be and the same is hereby **DISMISSED** to the extent it operates with respect to the failure to intervene claim;

**IT IS FURTHER ORDERED** that the individual Defendant claim found in Count F based on Evans exceeding his implicit license be and the same is hereby **DISMISSED** on qualified immunity grounds, the individual Defendant claim based on the alleged seizure is **DISMISSED** for lack of a constitutional violation, and the failure to intervene claim is **DISMISSED** as abandoned;

**IT IS FURTHER ORDERED** that *Monell* claims in Count F be and the same are hereby **DISMISSED** to the extent they operate with respect to the seizure or failure to intervene claims;

**IT IS FURTHER ORDERED** that Defendants Lyndon Evans, Christian Garrido, Bradley Orlando, Nicole Plevak, Fidah Mustafa, Nathaniel Petersen, Sean Carleton, Joseph Scheuring, Lorenzo Hernandez, Dexter Lee, Andrew Dudley, Kelton McCowan, Matthew Helwer, Gregory Rupnik, Paul Terriquez, Kevin Becker, Devon Williams, Shawn Switzer, Patrick Tivnan, and Jason Warwick be and the same are hereby **DISMISSED** from this action; and

**IT IS FURTHER ORDERED** that the parties' joint motion to restrict, ECF No. 66, be and the same is hereby **GRANTED**; ECF Nos. 67-1 through 67-43 shall remain under case participant-only restriction until further order of the Court.

Dated at Milwaukee, Wisconsin, this 26th day of March, 2026.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge